JUDGE FURMAN

James S. O'Brien, Jr. (JR-0858)
Dyan Finguerra-DuCharme (DF-9228)
**PRYOR CASHMAN LLP**
7 Times Square
New York, New York 10036
Telephone: (212) 421-4100
jobrien@pryorcashman.com
dfinguerra-ducharme@pryorcashman.com

# 14 CV 8467

*Attorneys for Plaintiff Chefs Diet Acquisition Corp.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| CHEFS DIET ACQUISITION CORP. d/b/a CHEFS DIET, <br><br> Plaintiff, <br><br> - against - <br><br> LEAN CHEFS, LLC, NICHOLAS ZAZZA and ARTHUR GUNNING, <br><br> Defendants. | Civil Action No. |

## MEMORANDUM OF LAW IN SUPPORT OF THE
## APPLICATION FOR A PRELIMINARY INJUNCTION

1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... iii

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ................................................................................................3

    The CHEFS DIET Trademarks........................................................................................3

    Defendants Form A Competing Business and Adopt A Confusingly Similar Mark ................4

    Defendants Misappropriate The Customer List Through Improper Means............................6

    CDAC Is Suffering Irreparable Harm ............................................................................7

ARGUMENT ...................................................................................................................8

    I.   LEGAL STANDARD ...........................................................................................8

    II.  CDAC IS LIKELY TO SUCCEED ON ITS CLAIM
        FOR MISAPPROPRIATION OF TRADE SECRETS ...........................................8

        A.  The Customer List Is A Trade Secret ...............................................................9

        B.  Defendants Misappropriated The Customer List In Breach
            Of A Duty Owed To CDAC And Through Improper Means ......................................10

    III. CDAC IS LIKELY TO SUCCEED ON ITS CLAIMS FOR
         TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION............................12

        A.  The CHEFS DIET® Mark Is Strong And Inherently Distinctive...............................13

            1.  A Conclusive Presumption Exists That
               CHEFS DIET® Is Inherently Distinctive ............................................................13

            2.  CHEFS DIET® Also Has Acquired Distinction In The Marketplace .................15

        B.  Defendants Use A Substantially Similar Mark .........................................................16

        C.  Defendants Market And Offer For Sale Identical Goods And Services .....................17

        D.  Actual Confusion Is Prevalent ...............................................................................18

        E.  Defendants Adopted The LEAN CHEFS Mark In Bad Faith....................................19

F.   Defendants Offer Low Quality Goods And Services ....................................................20

G.   Consumers Are Not Particularly Sophisticated ........................................................20

IV. ABSENT AN INJUNCTION, CDAC WILL SUFFER IRREPARABLE HARM ..........21

V.  CDAC DOES NOT POSSESS ADEQUATE REMEDIES AT LAW ............................23

VI. THE BALANCE OF HARDSHIPS AND EQUITIES
ENTIRELY FAVORS CDAC AND AN INJUNCTION
IS CONSISTENT WITH THE PUBLIC INTEREST .......................................................23

CONCLUSION ......................................................................................................................25

## TABLE OF AUTHORITIES

**CASES**                                                                                              **PAGE(s)**

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
    537 F.2d 4 (2d Cir. 1976), *modified on other gds.*, 189 U.S.P.Q. (BNA) 769
    (2d Cir. 1976).................................................................................................13, 14

*Ashland Management Inc. v. Janien*,
    82 N.Y.2d 395 (1993) ........................................................................................9

*B.U.S.A. Corp. v. Ecogloves, Inc.*,
    No. 08 Civ. 6372 (HB), 2006 U.S. Dist. LEXIS 85988 (S.D.N.Y. Jan. 31, 2006).... *passim*

*Blue & White Food Products Corp. v. Shamir Food Industrial*,
    350 F. Supp. 2d 514 (S.D.N.Y. 2004).......................................................15, 16

*Byrne v. Barrett*,
    268 N.Y. 199 (1935) ........................................................................................10

*CJ Products LLC v. Snuggly Plushez, LLC*,
    809 F. Supp. 2d 127 (E.D.N.Y. 2011) ............................................................23

*Charles of Ritz Group Ltd. v. Quality King Distributors, Inc.*,
    832 F.2d 1317 (2d Cir. 1987)...................................................................15, 19

*Christian Louboutin S.A. v. Yves Saint Laurent America Holding, Inc.*,
    696 F.3d 206 (2d Cir. 2012).............................................................................8

*Cross Media Mktg. Corp. v. Nixon (In re Cross Media Mktg. Corp.)*,
    No. 06 Civ. 4228 (MBM), 2006 U.S. Dist. LEXIS 56112 (S.D.N.Y. Aug. 11,
    2006) ...........................................................................................................9, 10

*Dial-A-Mattress Operating Corp. v. Mattress Madness*,
    841 F. Supp. 1339 (E.D.N.Y. 1994) ...............................................................14

*Fun-Damental Too, Ltd. v. Gemmy Industrial Corp.*,
    111 F.3d 993 (2d Cir. 1997)............................................................................16

*Gayle Martz, Inc. v. Sherpa Pet Group, LLC*,
    651 F. Supp. 2d 72 (S.D.N.Y. 2009), *amended on other gds.,* 2009 U.S. Dist.
    LEXIS 80929 (S.D.N.Y. Sept. 2, 2009)..........................................................23

**CASES**                                                                                              **PAGE(s)**

*Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc.*,
  No. 02 Civ. 0861 (LMM), 2002 U.S. Dist. LEXIS 12722 (S.D.N.Y. July 12,
  2002), *aff'd*, 50 F. App'x 52 (2d Cir. 2002)........................................................20

*Heisman Trophy Trust v. Smack Apparel Co.*,
  595 F. Supp. 2d 320 (S.D.N.Y. 2009).................................................................14

*Kraft General Foods v. Allied Old English*,
  831 F. Supp. 123 (S.D.N.Y. 1993) ...............................................................13, 17

*Laro Maintenance Corp. v. Culkin*,
  255 A.D.2d 560 (2d Dep't 1998), *aff'd*, 267 A.D.2d 431 (2d Dep't 1999).........................11

*Lexington Management Corp. v. Lexington Capital Partners*,
  10 F. Supp. 2d 271 (S.D.N.Y. 1998)..........................................................12, 13, 14

*Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*,
  799 F.2d 867 (2d Cir. 1986).......................................................................14, 18

*Lon Tai Shing Co. v. Koch & Lowy*,
  No. 90 Civ. 4464 (DNE), 1990 U.S. Dist. LEXIS 19123 (S.D.N.Y. Dec. 14, 1990).........18

*Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*,
  426 F.3d 532 (2d Cir. 2005).............................................................................16

*Merrill Lynch, Pierce, Fenner & Smith v. Rahn*,
  73 F. Supp. 2d 425 (S.D.N.Y. 1999)................................................................22, 23

*Morningside Group, Ltd. v. Morningside Capital Group, L.L.C.*,
  182 F.3d 133 (2d Cir. 1999)........................................................................18, 19

*Muze, Inc. v. Digital On-Demand, Inc.*,
  123 F. Supp. 2d 118 (S.D.N.Y. 2000), *rev'd on other gds.*, 356 F.3d 492 (2d Cir.
  2004) ..............................................................................................22, 23

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*,
  704 F. Supp. 2d 305 (S.D.N.Y. 2010)......................................................... *passim*

*North Atlantic Instruments, Inc. v. Haber*,
  188 F.3d 38 (2d Cir. 1999)...................................................................... *passim*

*Pfizer Inc. v. Sachs*,
  652 F. Supp. 2d 512 (S.D.N.Y. 2009)........................................................12, 15, 20

iv

**CASES**                                                                    **PAGE(s)**

*Polaroid Corp. v. Polarad Electrics Corp.*,
    287 F.2d 492 (2d Cir. 1961)................................................................ *passim*

*Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*,
    754 F.2d 91 (2d Cir. 1985)....................................................................21, 23

*Rodgers v. Wright*,
    544 F. Supp. 2d 302 (S.D.N.Y. 2008)..............................................................17

*Rolex Watch U.S.A., Inc. v. Rolex Deli Corp.*,
    No. 11 cv 9321 (BSJ), 2012 U.S. Dist. LEXIS 151569 (S.D.N.Y. Oct. 17, 2012) ..........12

*Savin Corp. v. Savin Group*,
    391 F.3d 439 (2d Cir. 2004)................................................................12, 14

*TCPIP Holding Co. v. Haar Communs. Inc.*,
    No. 99 Civ. 1825 (RCC), 2004 U.S. Dist. LEXIS 13543 (S.D.N.Y. July 19, 2004)........16

*Telerate System, Inc. v. Caro*,
    689 F. Supp. 221 (S.D.N.Y.1988) ..................................................................11

*UBS Finance Services, Inc. v. W. Va. University Hospitals, Inc.*,
    660 F.3d 643 (2d Cir. 2011)........................................................................8

*United States Polo Association v. PRL USA Holdings, Inc.*,
    800 F. Supp. 2d 515 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013)............21, 23

*Virgin Enterprises v. Nawab*,
    335 F.3d 141 (2d Cir. 2003)................................................................ *passim*

**STATUTES**

15 U.S.C. § 1065.....................................................................................3

15 U.S.C. § 1114(1)................................................................................12

15 U.S.C. § 1125(a) ...............................................................................12

Plaintiff Chefs Diet Acquisition Corp. d/b/a Chefs Diet ("Plaintiff" or "CDAC") respectfully submits this memorandum of law in support of its motion for a preliminary injunction, enjoining and restraining defendants Lean Chefs, LLC ("Lean Chefs"), Nicholas Zazza ("Zazza") and Arthur Gunning ("Gunning," together with Lean Chefs and Zazza, "Defendants"): (i) from using, affixing, offering for sale, selling, advertising or promoting any goods and services with the LEAN CHEFS mark, or any colorable imitation thereof, that is confusingly similar to the CHEFS DIET® mark; (ii) from using any false descriptions or representations or any false designations of origin or otherwise committing any acts of unfair competition with respect to CDAC and the CHEFS DIET® mark by using the LEAN CHEFS mark, or any colorable imitation thereof, that is confusingly similar to the CHEFS DIET® mark; (iii) from using the Customer List (as that term is defined herein) and from contacting, soliciting or otherwise providing goods or services to any of the individuals or entities identified on the Customer List; and (iv) to return the Customer List, and all copies thereof, to CDAC.

## PRELIMINARY STATEMENT

This action arises from Defendants' theft of CDAC's trade secrets to create a competing company that is deliberately infringing upon CDAC's trademarks, capitalizing on its goodwill, and creating actual confusion among consumers. Defendants' conduct is willful and malicious and warrants injunctive relief and monetary damages.

Chefs Diet, formerly Zone Chefs, was formed in 2003. Its business is delivering freshly prepared, pre-cooked meals to health-conscious customers throughout the United States and in the New York Tri-state area. In 2009, CDAC purchased certain of Chefs Diet's intellectual property and confidential information in order to run the Chefs Diet business. In particular, CDAC purchased the company's primary trade secret, a database comprising approximately

40,000 customer names and their corresponding contact information and dietary preferences. CDAC purchased that database and is the sole owner of that trade secret. That information had been developed over many years and is not available anywhere else. CDAC also purchased certain federally registered trademarks existing in connection with the Chefs Diet name.

The asset purchase agreement, defined below, provided for a three-year non-competition period during which Defendants could not conduct a competing business. Three years later, Defendants Zazza and Gunning, formerly associated with Chefs Diet, opened Lean Chefs, offering identical goods and services and targeting the same consumers as CDAC. While Defendants were and are entitled to open a competing business, they decided to wrongfully capitalize on the goodwill associated with the trademarks CDAC had purchased. Defendants chose a company name, Lean Chefs, that was calculated deliberately to confuse customers into thinking that Lean Chefs was a division or offshoot of Chefs Diet. And they designed a website that copied the look and feel of Chefs Diet's website – which, of course, they know well, since Zazza designed it.

Making matters much worse, Defendants misappropriated the very database that CDAC had purchased at great expense for its exclusive use and commenced contacting CDAC's customers and soliciting their business. Within months of Lean Chefs' opening, Chefs Diet's sales began to decline. Suspicious that its trade secret database may have been compromised, CDAC sprinkled the database with fictitious names. Sure enough, those fictitious people started receiving direct communications from Lean Chefs, confirming not only that Defendants had maintained a copy of the database that they purported to have sold to CDAC, but also that they had hacked into CDAC's database or had engaged in corporate espionage. Defendants' outrageous behavior already has eroded CDAC's goodwill and brand and threatens CDAC with

irreparable harm.  The Court should immediately enjoin Defendants from continuing to engage in such egregious wrongful conduct.

## STATEMENT OF FACTS

Plaintiff, a five-star gourmet diet delivery service, works with talented and influential diet industry professionals to deliver healthy and freshly prepared meals and snacks to health-conscious subscribers' homes throughout the United States and the New York tri-state area.  *See* the Declaration of Misha Podlog, sworn to October __, 2014 (the "Podlog Decl.") at ¶ 2.

On or about March 18, 2009, CDAC purchased certain intellectual property and confidential information from Chefs Diet Delivery LLC, Z.C.C.A. Corp. and Kosher Chefs Diet Corp. (collectively, the "Sellers") in connection with a Second Amended And Restated Asset Purchase Agreement (the "APA").  *Id.* ¶ 3.  In particular, through the APA, CDAC purchased and now exclusively owns: (i) CHEFS DIET®, U.S. Reg. No. 3,473,541, in Classes 29, 30 and 46; (ii) CHEFS DIET®, U.S. Reg. No. 3,404,634, in Class 39; and (iii) certain customer lists which the Sellers had developed through substantial effort and expense (collectively, the "Customer List").[1]  *Id.*

### The CHEFS DIET Trademarks

The CHEFS DIET® trademarks, which cover prepared entrees, side dishes and meals as well as food delivery services, have been federally registered since 2008 and are incontestable within the meaning of 15 U.S.C. § 1065.  *Id.* ¶ 4.  In connection with the CHEFS DIET® mark, CDAC, and its predecessors-in-interest, have expended substantial resources in marketing and promoting the high-quality goods and services sold under the CHEFS DIET® name.  *Id.* ¶ 5. CDAC markets and promotes its services through promotional mailings, emails, phone-calls and on the Internet.  *Id.*  Due to the considerable success of the CHEFS DIET® program and

---

[1] Subsequent to closing the APA, CDAC has continued to hone and develop the Customer List.

CDAC's substantial expenditures, CHEFS DIET® has been the subject of widespread media attention, having been featured in national magazines such as *Epicurious*, *Modern Bride*, *Life & Style*, *InStyle Weddings*, *Star*, *Woman's Day*, *Built Lean* and *El Clasificado* and in television programs about healthy living, including on *CNBC*, *CNN* and on local television broadcasts. *Id.* ¶ 6. Further, *Cruise Control Diet* recently named the CHEFS DIET® program as one of the "best diets for weight loss." *Id.*

Plaintiff is a market leader in the field of home delivery pre-packaged meals designed to assist customers in losing weight and currently delivers over 45,000 meals per month. *Id.* ¶ 7. Quite plainly, CDAC's continued growth and success derives in large part from its strong reputation, the goodwill associated with the CHEFS DIET® mark and CDAC's exclusive ownership of, and access to, the Customer List. *Id.* ¶ 8. Through CDAC's exclusive and continuous use of the CHEFS DIET® mark over the past seven years, CHEFS DIET® has become widely recognized by the general consuming public as identifying CDAC as the sole source of the high quality goods and services bearing the CHEFS DIET® name. *Id.* ¶ 9. As such, the CHEFS DIET® mark represents a substantial commercial asset and is of incalculable value. *Id.*

**Defendants Form A Competing Business and Adopt A Confusingly Similar Mark**

The APA provided for a three-year non-competition period during which Defendants could not engage, directly or indirectly, in a competing business. *Id.* ¶ 10. At the expiration of that period, Zazza[2] and Gunning[3] formed a new company, which offers identical goods and

---

[2] Zazza is a principal of Lean Chefs and, prior to consummation of the APA, was the Chief Technology Officer at Chefs Diet, in charge of, *inter alia*, online security. In addition, prior to the APA, Zazza, through his company Zazza Technology, provided website and application services to Chefs Diet and had full access to its books, records, and client database. Zazza also was a principal of Digi Analytics, a company that provided telecommunications services to Chefs Diet and which had full access to its recordings of client telephone conversations and client telephone numbers through June 2011. Finally, Zazza was also CDAC's landlord post-acquisition with twenty-four hour access to CDAC's call center.

services and which targets the same consumers as CDAC. *Id.* In particular, on its website, located at <leanchefs.com>, Lean Chefs touts itself as "the best in the gourmet diet food industry" and explains that it provides "daily diet delivery service … to customers in the Tri-State NY area." *Id.* ¶ 11. Defendants thus chose a company name and adopted a mark, LEAN CHEFS, in a deliberate effort to capitalize on the goodwill associated with the CHEFS DIET® mark and to confuse customers into thinking that Lean Chefs was a division or offshoot of Chefs Diet. *Id.* ¶ 12. "Chefs" is the dominant term in each mark, each mark suggests a product or service that is healthy and diet conscious, and the parties' logos both prominently feature the color green and the latter term in each appears in a script font. *Id.* ¶ 13.

Over the last few weeks, numerous instances of actual confusion have occurred. *Id.* ¶ 14. For example, on or about September 8, 2014, a longtime Chefs Diet customer called Plaintiff's customer-service center stating: "I got this email about your Lean Chefs … what is the difference between that and what I have?" *Id.* Likewise, around that time, a different consumer called the Plaintiff's customer-service center to inquire about his account. *Id.* After the customer-service sales representative failed to locate the caller's account information, the caller queried, "this is Lean Chefs, right?" *Id.* In another instance, a consumer called Plaintiff's customer-service center and inquired regarding a special program she had been offered by an individual named Arthur. *Id.* No one by that name works at Plaintiff's company; undoubtedly, the caller was referring to defendant Arthur Gunning and had confused Lean Chefs with CDAC. *Id.* Separately, a fourth Chefs Diet customer called Plaintiff's customer-service center and advised:

---

[3] Gunning is a founder of Lean Chefs and was the CEO of a prepared food delivery business called Zone Chefs, a predecessor in interest to CDAC. He also was a shareholder and officer of CDAC's predecessors-in-interest. He also pleaded guilty to extortion charges in Federal Court in April 2007 for his role in a "pump and dump" securities scheme. Gunning resigned from Zone Chefs shortly after he was arrested on racketeering charges along with a gaggle of reputed Luchese and Colombo crime family mobsters.

"I just got a phone call from another company that said they were going to be handling your accounts … they said you were going to be outsourcing to them." *Id.* ¶ 15. Concerned, the customer wanted to know whether, in fact, that was true. *Id.* Of course, that is a complete falsehood. *Id.* When asked from whom she received that call, the caller identified the following phone number: 212-201-0459, which, according to Google, belongs to Lean Chefs.[4] *Id.*

Making matters worse, Defendants market and sell inferior goods and services under the LEAN CHEFS mark. *Id.* ¶ 16. In particular, Defendants market and sell food products at substantially cheaper prices than CDAC, owing, among other things, to the inferior quality of their ingredients. *Id.* Consumer complaints received by CDAC confirm that the goods and services sold by Defendants are vastly inferior to those provided under the CHEFS DIET® mark. *Id.* ¶ 17. For example, one consumer recently complained to CDAC that the food she received from Lean Chefs was "the worst food [she] ever ate." *Id.*

### Defendants Misappropriate The Customer List Through Improper Means

The Customer List embodies a database that comprises approximately 44,000 customer names and includes corresponding contact information and dietary preferences. *Id.* ¶ 18. The Customer List has been developed over many years and contains a unique amalgamation of consumer information not readily ascertainable or easily duplicated. *Id.* Owing to its immense value, CDAC maintains comprehensive computer security systems and implements other reasonable and appropriate measures to safeguard the secrecy of the Customer List. *Id.* 19.

In an egregious effort to solicit business and divert sales from CDAC to Lean Chefs, Defendants have repeatedly contacted individuals on the Customer List via email, mail and telephone. *Id.* ¶ 20. The volume and style of contacts makes it clear that Defendants did not target those customers merely from memory, but made those contacts through their

---

[4] CDAC records all customer calls. *Id.* ¶ 15.

misappropriation of the Customer List.  *Id.* ¶ 21.   Upon information and belief, Defendants surreptitiously – and duplicitously – kept a copy of the Customer List when it purported to sell it to CDAC.  *Id.* ¶ 22.   To corroborate its suspicions of Defendants' wrongful conduct, CDAC sprinkled the Customer List with fictitious names with corresponding addresses belonging to CDAC and its representatives.  In due course, those fictitious individuals received mailings from Lean Chefs.  *Id.* ¶ 23.  Of course, that only could have been accomplished through continued unauthorized access to the Customer List post acquisition.  *Id.* ¶ 24.  Thus, Defendants either hacked into CDAC's computer systems post acquisition or employed other nefarious methods to obtain access to the updated version of the Customer List.  *Id.*

### CDAC Is Suffering Irreparable Harm

CDAC's business model depends upon its ability to maintain a well-respected and strong reputation for CHEFS DIET®.  *Id.* ¶ 25.   CDAC's continued success also depends upon its ability to exploit the invaluable information contained in the Customer List to the exclusion of competitors.  *Id.*  With each passing day, consumers mistakenly believe that CHEFS DIET® is affiliated with the inferior goods and services marketed and sold under the LEAN CHEFS mark, permanently impairing the reputation of CHEFS DIET® and the goodwill associated therewith. *Id.* ¶ 26.   Further, Defendants' continued unlawful exploitation of the Customer List risks irreversible losses to CDAC's customer base and its market advantage.  *Id.* ¶ 27.   Indeed, subsequent to Defendants' misappropriation and exploitation of the Customer List, CDAC has suffered a significant decrease in sales and customer base.  *Id.* ¶ 28.  CDAC submits that, unless Defendants are enjoined, it will continue to suffer irreparable harm to its reputation and goodwill and irreversible losses to its customer base and market advantage.  *Id.*

## ARGUMENT

## I.     LEGAL STANDARD

To obtain a preliminary injunction, CDAC must demonstrate: "'(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward [CDAC].'"   *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holding, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012) quoting *UBS Fin. Servs., Inc. v. W. Va. Univ. Hosps., Inc.*, 660 F.3d 643, 648 (2d Cir. 2011).   Because CDAC satisfies this test, the Court should enjoin Defendants immediately to prevent further damage to CDAC's business, reputation and goodwill.

## II.    CDAC IS LIKELY TO SUCCEED ON ITS CLAIM
##        FOR MISAPPROPRIATION OF TRADE SECRETS

Under New York law, to succeed on a claim for misappropriation of trade secrets and confidential information, a plaintiff must demonstrate that: (i) it possessed a trade secret; and (ii) the defendant misappropriated the trade secret "'in breach of an agreement, confidential relationship or duty, or as a result of discovery by improper means.'"   *B.U.S.A. Corp. v. Ecogloves, Inc.*, No. 08 Civ. 6372 (HB), 2006 U.S. Dist. LEXIS 85988, at *5 (S.D.N.Y. Jan. 31, 2006) quoting *North Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 43-44 (2d Cir. 1999).   As demonstrated below, the Customer List constitutes a trade secret within the meaning of New York law and Defendants, as former agents of Chefs Diet and CDAC's predecessors-in-interest, misappropriated the Customer List in breach of a duty owed to CDAC and through improper means.   Accordingly, CDAC is likely to succeed on its claim for misappropriation of trade secrets and confidential information.

A.       __The Customer List Is A Trade Secret__

Under New York law, a trade secret is "any formula, pattern, device or compilation of information which is used in one's business, and which gives the owner an opportunity to obtain an advantage over competitors who do not know or use it."  *North Atl.*, 188 F.3d at 44 (citation, quotation & internal brackets omitted).   In assessing whether information constitutes a trade secret, New York courts consider the following non-exhaustive factors:

> (1) the extent to which the information is known outside of the business; (2) the extent to which the information is known by employees and others involved in the business; (3) the extent of measures taken by the business to guard the secrecy of the information; (4) the value of the information to the business and its competitors; (5) the amount of effort or money expended by the business in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*See, e.g.*, *Ashland Management Inc. v. Janien*, 82 N.Y.2d 395, 407 (1993) (citation & quotations omitted; internal brackets omitted).

New York law is settled that "[a] customer list developed by a business through substantial effort and kept in confidence may be treated as a trade secret … provided the information it contains is not otherwise readily ascertainable."   *North Atl.*, 188 F.3d at 44 (citation & quotation omitted); *see also B.U.S.A.*, 2006 U.S. Dist. LEXIS 85988, at *11-12 (customer lists developed through substantial effort and expense held to be trade secrets); *Cross Media Mktg. Corp. v. Nixon (In re Cross Media Mktg. Corp.)*, No. 06 Civ. 4228 (MBM), 2006 U.S. Dist. LEXIS 56112, at *11 (S.D.N.Y. Aug. 11, 2006) (customer lists held to be trade secrets because they were "developed through a substantial effort spanning many years … [were] kept in confidence, and such information was not readily ascertainable to [plaintiff's] competitors").  As the Southern District has explained, "[t]he value of [] customer lists lies not in the individual

9

pieces of information they contain but in the combination of all of the information [that] has [been] culled over many years." *Cross Media Mktg.*, 2006 U.S. Dist. LEXIS 56112, at *12.

Here, the Customer List, which contains in excess of 44,000 names and corresponding dietary preferences, has been developed through substantial effort and expense over the course of many years. *See* Podlog Decl. ¶ 18. Recognizing the immense value of the Customer List, CDAC purchased it for a substantial sum in connection with the APA to exclusively own it and use it. *Id.* ¶ 3. It is thus undisputed that the Customer List represents an invaluable commercial asset and provides CDAC with a clear advantage over competitors. Further, because the Customer List comprises a truly unique amalgamation of consumer information, culled and developed over the course of many years, it cannot be acquired or otherwise duplicated. *Id.* ¶ 19. Indeed, CDAC submits that, absent misappropriation, it would be virtually impossible to duplicate the Customer List. *Id.* Finally, CDAC maintains comprehensive computer security systems and has taken reasonable and appropriate measures to maintain the secrecy of the Customer List. *Id.* ¶ 19. Accordingly, the Customer List constitutes a trade secret under New York law. *See, e.g.*, *North Atl.*, 188 F.3d at 44; *Cross Media Mktg.*, 2006 U.S. Dist. LEXIS 56112, at *12-13.

## B.   Defendants Misappropriated The Customer List In Breach Of A Duty Owed To CDAC And Through Improper Means

As repeatedly recognized by the Second Circuit and the New York Court of Appeals, an agent, including an officer or an employee, "has a duty not to use confidential knowledge acquired in his [agency] in competition with his principal." *North Atl.*, 188 F.3d at 47 quoting *Byrne v. Barrett*, 268 N.Y. 199, 206 (1935) (additional citation omitted). That duty "exists as well after the [agency] is terminated as during its continuance." *North Atl.*, 188 F.3d at 47 (citation & quotations omitted). Accordingly, under New York law, a former agent or employee

10

"cannot use trade secrets in competition with his or her former employer."  *B.U.S.A.*, 2006 U.S. Dist. LEXIS 85988, at *17 citing *North Atl.*, 188 F.3d at 49; *see also Laro Maint. Corp. v. Culkin*, 255 A.D.2d 560, 560-561 (2d Dep't 1998), *aff'd*, 267 A.D.2d 431 (2d Dep't 1999)  (former employee enjoined from using confidential information learned in the course of his employment to compete with former employer).  Further, it is settled that one misappropriates a trade secret where it procures the same through "improper means."  *North Atl.*, 188 F.3d at 43-44; *Telerate Sys., Inc. v. Caro*, 689 F. Supp. 221, 233 (S.D.N.Y. 1988) (improper means found where defendant, without authorization, used a "data scope" to collect confidential information).

As set forth above, the overwhelming evidence demonstrates that Defendants improperly gained access to CDAC's computer systems – and thus the Customer List – and have used the Customer List to compete with CDAC and to solicit business from CDAC's customers.  CDAC purposely included fictitious names within the Customer List with addresses belonging to CDAC and its representatives.  *See* Podlog Decl. ¶ 23.  Shortly thereafter, Lean Chefs sent promotional materials addressed to those fictitious individuals at the addresses set forth in the Customer List. *Id.*  There is no conceivable explanation for that other than that Defendants hacked into CDAC's computer systems, or employed another nefarious method, to procure access to the Customer List.

Apart from the obvious – that hacking into CDAC's computer systems to obtain access to the Customer List constitutes misappropriation through "improper means" – Zazza and Gunning, as former employees and officers of Chefs Diet and CDAC's predecessors-in-interest, also have breached the duty they owe to CDAC to refrain from using confidential information to compete with CDAC.  *See, e.g.*, *North Atl.*, 188 F.3d at 47-48; *B.U.S.A.*, 2006 U.S. Dist. LEXIS 85988, at *17.  As a result of Zazza and Gunning's egregious breach of trust, the Court should

11

preliminarily and permanently enjoin Defendants from soliciting and contacting any and all of the customers whose names appear on the Customer List.  *See, e.g.*, *North Atl.*, 188 F.3d at 47 ("the court may in a proper case enjoin solicitation, not necessarily as a violation of a trade secret, but as an egregious breach of trust and confidence while in plaintiffs' service") (citation & quotation omitted).

For these reasons, CDAC is likely to succeed on its claim for misappropriation of trade secrets and confidential information.[5]

**III.   CDAC IS LIKELY TO SUCCEED ON ITS CLAIMS FOR TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION**

To succeed on a claim under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), a plaintiff must demonstrate: (i) that is has a valid trademark entitled to protection; and (ii) that the defendant's mark is likely to cause confusion in the marketplace.  *Virgin Enters. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003); *New York City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 314 (S.D.N.Y. 2010).  The same standard applies to claims asserted under Section 32 of the Lanham Act, 15 U.S.C. § 1114(1).  *Virgin Enters.*, 335 F.3d at 146; *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 520 (S.D.N.Y. 2009).

CDAC owns two incontestable federal trademark registrations in connection with the CHEFS DIET® mark and thus satisfies the first element for a claim of trademark infringement. *See, e.g.*, *Savin Corp. v. Savin Group*, 391 F.3d 439, 457 (2d Cir. 2004) superseded by statute on other grounds as stated in *Rolex Watch U.S.A., Inc. v. Rolex Deli Corp.*, No. 11 cv 9321 (BSJ), 2012 U.S. Dist. LEXIS 151569, *11, n. 7 (S.D.N.Y. Oct. 17, 2012).  The Court's analysis therefore turns on whether the LEAN CHEFS mark is likely to cause confusion in the marketplace.  *See, e.g.*, *Lexington Mgmt. Corp. v. Lexington Capital Partners*, 10 F. Supp. 2d

---

[5] For these same reasons, CDAC also is likely to succeed on its claim for breach of fiduciary duty.

271, 278 (S.D.N.Y. 1998).  In assessing whether a likelihood of consumer confusion exists, the Second Circuit has articulated eight non-exhaustive factors, often referred to as the *Polaroid* factors:

> (1) the strength of the plaintiff's mark; (2) the similarity of the plaintiff's and defendant's marks; (3) the competitive proximity of the products or services; (4) the likelihood that the plaintiff will 'bridge the gap' and offer a product or service similar to the defendant's; (5) actual confusion between the products or services; (6) good faith on the defendant's part; (7) the quality of the defendant's products or services; and (8) the sophistication of buyers.

*New York City Triathlon*, 704 F. Supp. 2d at 314 quoting *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 495 (2d Cir. 1961).  These factors apply both to competing goods and non-competing goods; in assessing consumer confusion, no single factor is dispositive.  *New York City Triathlon*, 704 F. Supp. 2d at 314.

## A.   The CHEFS DIET® Mark Is Strong And Inherently Distinctive

The "strength of the mark" analysis embraces two distinct concepts: inherent distinctiveness and acquired distinctiveness.  *Virgin Enters.*, 335 F.3d at 147.  Inherent distinctiveness refers to a mark's ability, standing alone, to identify goods and services as emanating from a particular source.  *Id.*; *Kraft Gen. Foods v. Allied Old English*, 831 F. Supp. 123, 128 (S.D.N.Y. 1993).  On the other hand, acquired distinctiveness refers to the extent to which "prominent use of the mark in commerce has resulted in a high degree of consumer recognition."  *Virgin Enters.*, 335 F.3d at 147 (citations omitted).

### 1.   A Conclusive Presumption Exists That CHEFS DIET® Is Inherently Distinctive

With regard to inherent distinctiveness, four different classes of terms exist; "[a]rrayed in an ascending order which roughly reflects … the degree of protection accorded, these classes are (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful."  *Abercrombie & Fitch*

*Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976), *modified on other gds.*, 189 U.S.P.Q. (BNA) 769 (2d Cir. 1976).  Owing to their intrinsic nature – which serves to identify a particular source of goods or services – suggestive, arbitrary and fanciful marks are deemed inherently distinctive and thus accorded robust protection.  *Id.*; *Heisman Trophy Trust v. Smack Apparel Co.*, 595 F. Supp. 2d 320, 324 (S.D.N.Y. 2009).  In particular, a mark is "arbitrary" where it uses common words in an unfamiliar manner, and a mark is "suggestive" where "it requires imagination, thought and perception to reach a conclusion as to the nature of goods." *Abercrombie*, 537 F.2d at 10-11, n. 12.

Here, CDAC owns two incontestable federal trademark registrations for the CHEFS DIET® mark (Podlog Decl. ¶¶ 3-4), which creates a "conclusive presumption" that CHEFS DIET® is inherently distinctive.  *Savin Corp.*, 391 F.3d at 457; *see also Lois Sportswear, U.S.A., Inc. v. Levi Strauss & Co.*, 799 F.2d 867, 871 (2d Cir. 1986); *Dial-A-Mattress Operating Corp. v. Mattress Madness*, 841 F. Supp. 1339, 1347 (E.D.N.Y. 1994) (an "incontestable federal registration is not susceptible to challenge on the basis that the mark is merely descriptive") (citation omitted).  The CHEFS DIET® mark is arbitrary: the words "Chefs" and "Diet" are not commonly used to describe a business like Chefs Diet's, which provides home delivery pre-packaged meals designed to promote weight loss.  *See, e.g.*, *Lexington Mgmt.*, 10 F. Supp. 2d. at 279  ("an arbitrary mark has an actual dictionary meaning, but that meaning does not describe the product") (citation & quotation omitted).  At the very least, the CHEFS DIET® mark is "suggestive" because it does not describe Chefs Diet's services, features or qualities; rather, a consumer must use his or her imagination and extrapolate from the words "Chefs" and "Diet" to ascertain the nature of CDAC's goods and services.  *See, e.g.*, *Dial-A-Mattress*, 841 F. Supp. at 1347-1348 ("The phrase 'dial a mattress,' while certainly establishing a link between the

14

telephone and bedding products, does not begin to describe the nature, scope or extent of the services that name has come to represent"); *Blue & White Food Prods. Corp. v. Shamir Food Indus.*, 350 F. Supp. 2d 514, 520 (S.D.N.Y. 2004) ("Shamir Salads" suggestive where used as source identifier on food products such as hummus).

### 2.   CHEFS DIET® Also Has Acquired Distinction In The Marketplace

In the context of acquired distinctiveness, the strength of a mark can be shown through "commercial success of the product, advertising expenditures … and media coverage." *Pfizer*, 652 F. Supp. 2d at 522 citing *Charles of Ritz Group Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317, 1321 (2d Cir. 1987); *see also Virgin Enters.*, 335 F.3d at 148 ("If a mark has been long, prominently and notoriously used in commerce, there is a high likelihood that consumers will recognize it from its prior use … and [this] therefore increases the likelihood of consumer confusion if the new user is in fact not related to the first.").

Over the past seven years, CDAC has continually and exclusively used the CHEFS DIET® mark in connection with its high-quality goods and services.  *See* Podlog Decl. ¶ 5. CDAC has invested substantial resources in marketing and promoting the CHEFS DIET® mark through promotional mailings, emails, phone calls and on the Internet, at its website located at <chefsdiet.com>, through pay-per-click advertising and through search engine optimization.  *Id.* As a result of those efforts, the CHEFS DIET® program has been the subject of widespread media attention, including articles in mainstream national publications.  *Id.* ¶6.  In turn, CDAC's business has experienced exponential growth owing in large part to the strength of the CHEFS DIET® mark.  *Id.* ¶¶ 7-9.

The success of the CHEFS DIET® program for customers and the unsolicited media attention the program has received, combined with the substantial sales and marketing of the

products and services bearing the CHEFS DIET® name, have resulted in the CHEFS DIET® mark being recognized and relied upon as identifying CDAC's goods and services and as distinguishing them from the goods and services of others. *Id.* ¶ 9. Without doubt, the CHEFS DIET® mark has acquired distinctiveness in the relevant marketplace. *See, e.g.*, *TCPIP Holding Co. v. Haar Communs. Inc.*, No. 99 Civ. 1825 (RCC), 2004 U.S. Dist. LEXIS 13543, at *18 (S.D.N.Y. July 19, 2004); *Blue & White Food Prods.*, 350 F. Supp. 2d at 521 ("widespread use, and the registration … indicate that the mark is strong").

## B.    Defendants Use A Substantially Similar Mark

In assessing the similarity of the marks at issue, courts analyze the marks' "overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." *Louis Vuitton Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2d Cir. 2005) (citation & quotation omitted). In that regard, "the test of confusion under the Lanham Act is not whether the products can be differentiated when they are subject to a side-by-side comparison" but rather "whether they create the same general overall impression such that a consumer who has seen [the senior user's mark], would, upon *later* seeing [the junior user's mark] *alone*, be confused." *Id.* at 538 quoting *Fun-Damental Too, Ltd. v. Gemmy Indus. Corp.*, 111 F.3d 993, 1004 (2d Cir. 1997) (emphases in original, original brackets omitted & new brackets supplied).

Here, the LEAN CHEFS mark is substantially similar to the CHEFS DIET® mark in sight, sound, meaning and overall commercial impression. In particular, the marks are visually and aurally similar given that the word "Chefs" is the dominant term in each mark. Each mark suggests an image of a product or service that is healthy and diet conscious and prepared by a culinary expert. Further, the parties' logos each prominently feature the color green and the

latter term in each appears in a script font. *See* Podlog Decl. ¶ 13. Taken together, these similarities create the same overall commercial impression, especially given that Defendants market and sell identical goods and services under the LEAN CHEFS mark. *See, e.g.*, *Kraft*, 831 F. Supp. at 130 (preliminary injunction granted upon finding that "Bulls-eye" mark was substantially similar to "Raging Bull"); *Rodgers v. Wright*, 544 F. Supp. 2d 302, 311 (S.D.N.Y. 2008) ("First Ladies of Chic" sufficiently similar to "Chic" so as to create likely confusion). Accordingly, the substantial similarity that exists between the marks strongly favors a finding of likely confusion.

### C.    Defendants Market And Offer For Sale Identical Goods And Services

The next two *Polaroid* factors examine the competitive proximity of the goods and services and the intent of the senior user to "bridge the gap" between the two. *See, e.g.*, *New York City Triathlon*, 704 F. Supp. 2d at 317. In that regard, "the closer the secondary user's goods [or services] are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source." *Virgin Enters.*, 335 F.3d at 150 (citation omitted).

Here, Lean Chefs openly touts itself as "the best in the gourmet diet food industry" and explains that it provides "daily diet delivery service … to customers in the Tri-State NY area." *See* Podlog Decl. ¶ 11. It is thus undisputed that Defendants offer and sell identical goods and services – namely pre-packaged meal plans designed to assist consumers in losing weight – and market those identical goods and services to exactly the same individuals. *Id.* ¶¶ 10-11 Further, because CDAC already operates in the same "channel of trade" as Defendants, it already satisfies the "bridge the gap" factor. *New York City Triathlon*, 704 F. Supp. 2d at 318. Accordingly, these factors strongly favor a finding of likely confusion.

**D.**   **Actual Confusion Is Prevalent**

While actual confusion need not be shown to prevail on a trademark infringement claim (*Lois Sportswear*, 799 F.2d at 875), evidence of actual confusion "is often the most telling indication that confusion is likely." *Morningside Group, Ltd. v. Morningside Capital Group, L.L.C.*, 182 F.3d 133, 141-142 (2d Cir. 1999); *see also Virgin Enters.*, 335 F.3d at 151 ("It is self-evident that the existence of actual consumer confusion indicates a likelihood of consumer confusion.  We have therefore deemed evidence of actual confusion particularly relevant to the inquiry.") (citations & quotations omitted).   Actual  confusion exists, for example, where "consumers place[] phone calls to the wrong party and mistakenly believe[] that plaintiff's and defendant's services [are] affiliated because of their similar names." *Morningside Group*, 182 F.3d at 141 (citation omitted).   Actual confusion also exists, for example, where consumers inquire as to whether the plaintiff is affiliated with the defendant. *See, e.g.*, *Virgin Enters.*, 335 F.3d at 151.   Significantly, even where a plaintiff "shows actual confusion by only a small percentage of buyers, [it] may sustain [its] case based on the inference that a few proven instances of actual confusion betoken a more substantial likelihood of confusion." *Lon Tai Shing Co. v. Koch & Lowy*, No. 90 Civ. 4464 (DNE), 1990 U.S. Dist. LEXIS 19123, at *33-34 (S.D.N.Y. Dec. 14, 1990).

Consumers have repeatedly called Plaintiff's customer-service center over the last few weeks mistakenly believing that CHEFS DIET® is affiliated with LEAN CHEFS.  *See* Podlog Decl. ¶¶ 14-15.  For example, on or about September 8, 2014, a longtime Chefs Diet customer called Plaintiff's customer-service center stating: "I got this email about your Lean Chefs … what is the difference between that and what I have?" *Id.*  Likewise, around that time, a different consumer called Plaintiff's customer-service center to inquire about his account. *Id.*  After the

customer-service sales representative failed to locate the caller's account information, the caller queried, "this is Lean Chefs, right?" *Id.* In another instance, a third consumer called Plaintiff's customer-service center and inquired regarding a special program she had been offered by an individual named Arthur. *Id.* No one by that name works at Plaintiff's company; undoubtedly, the caller was referring to defendant Arthur Gunning and had confused Lean Chefs with CDAC. *Id.* These well-documented classic instances of actual confusion strongly portend a likelihood of confusion. *See, e.g.*, *Morningside Group*, 182 F.3d at 141-142; *Virgin Enters.*, 335 F.3d at 151. Accordingly, this factor heavily weighs in favor of finding a likelihood of confusion.

### E.  Defendants Adopted The LEAN CHEFS Mark In Bad Faith

The next *Polaroid* factor assesses whether the defendant adopted its mark "with the intention of capitalizing on [the] plaintiff's reputation and goodwill." *New York City Triathlon*, 704 F. Supp. 2d at 319 (citation & quotation omitted). Significantly, where a defendant intentionally copies a plaintiff's mark, a presumption arises that "the second comer intended to create a confusing similarity." *Charles of the Ritz Group*, 832 F.2d at 1322 (citation omitted); *see also New York City Triathlon*, 704 F. Supp. 2d at 319 ("The defendant's awareness of plaintiff's mark may give rise to an inference of bad faith, which is bolstered if the defendant offers no credible explanation for its adoption of the mark.") (citation & quotation omitted).

Here, Zazza and Gunning previously worked for and were associated with Chefs Diet and were intimately involved with the CHEFS DIET® program. *See* Podlog Decl. ¶ 10. Indeed, Zazza and Gunning played an integral role in the negotiation and consummation of the APA in which CDAC acquired exclusive ownership to the CHEFS DIET® mark. *Id.* ¶ 3, n.1. Recently, Defendants have inundated CHEFS DIET® customers with phone-calls, mailings and emails in an effort to solicit customers and divert sales from CDAC to Lean Chefs. Defendants even have

19

gone so far as to falsely represent that it is affiliated with CHEFS DIET® and will be "handling" CDAC's accounts in the New York tri-state area.  *Id.* ¶ 15.  Accordingly, it cannot be disputed that Defendants are operating in bad faith; they knowingly and intentionally adopted the LEAN CHEFS mark intending to capitalize on CHEFS DIET® reputation and goodwill.

### F.   Defendants Offer Low Quality Goods And Services

Under this *Polaroid* factor, a court examines "whether the senior user's reputation could be jeopardized by virtue of the fact that the junior user's product is of inferior quality." *Pfizer*, 652 F. Supp. 2d at 523 (citation & quotations omitted).  This factor more squarely addresses "'the harm that confusion can cause the plaintiff's mark and reputation than…the likelihood of confusion.'"  *New York City Triathlon*, 704 F. Supp. 2d at 320 quoting *Virgin Enters.*, 335 F.3d at 152.

Here, the continued success of CDAC's business depends upon the strong and well-respected reputation of the CHEFS DIET® program.  As demonstrated above, Lean Chefs offers inferior goods and services at substantially depressed prices.  *See* Podlog Decl. ¶¶ 16-17. Consumer complaints regarding the gustatory qualities of Lean Chefs' products confirms that Defendants provide goods and services vastly inferior to those provided under the CHEFS DIET® mark.  *Id.* Quite plainly, the inferior quality of Defendants' goods and services jeopardizes the highly regarded reputation of CHEFS DIET®.

### G.   Consumers Are Not Particularly Sophisticated

In assessing this *Polaroid* factor, courts examine "the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market."  *Guinness United Distillers & Vintners B.V. v. Anheuser-Busch, Inc.*, No. 02 Civ. 0861 (LMM), 2002 U.S. Dist. LEXIS 12722, at *17-18 (S.D.N.Y. July 12, 2002), *aff'd*, 50 F. App'x 52 (2d Cir. 2002) (citation

& quotation omitted).  In particular, "[t]his factor is based upon a notion that unsophisticated buyers increase the likelihood of confusion."  *Id.* at *18 (citation & quotation omitted); *see also New York City Triathlon*, 704 F. Supp. 2d at 320 (consumer confusion is "especially likely" where the parties market goods and services to the general consuming public, which, as a general matter, is unsophisticated).

Here, CDAC and Defendants market their goods and services to the general consuming public without regard to consumer sophistication.  *See* Podlog Decl. ¶ 5.  Consistent with settled jurisprudence, this fact only increases the likelihood that consumers will be confused by the LEAN CHEFS mark.  *See, e.g.*, *New York City Triathlon*, 704 F. Supp. 2d at 320.

For these reasons, all of the *Polaroid* factors strongly favor a finding of likely confusion; CDAC is likely to succeed on its claims for trademark infringement and unfair competition.[6]

## IV.    ABSENT AN INJUNCTION, CDAC WILL SUFFER IRREPARABLE HARM

In the context of trademark infringement, irreparable harm sufficient to warrant a preliminary injunction exists where a trademark owner demonstrates prospective loss of goodwill or that it has lost control over the reputation and goodwill of its mark.  *See, e.g.*, *United States Polo Ass'n v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 540-541 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013) ("Irreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark … because loss of control over one's reputation is neither calculable nor precisely compensable") quoting *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985) (additional citation omitted); *see also New York City Triathlon*, 704 F. Supp. 2d at 343

---

[6] For these same reasons, CDAC also is likely to succeed on its State law claims for trademark infringement and unfair competition.

("Prospective loss of… goodwill alone is sufficient to support a finding of irreparable harm.") (citation omitted).

Likewise, the "'loss of trade secrets cannot be measured in money damages because a trade secret once lost is, of course, lost forever.'" *B.U.S.A.*, 2006 U.S. Dist. LEXIS 85988, at *22 quoting *North Atl.*, 188 F.3d at 49 (other citations omitted); *see also Muze, Inc. v. Digital On-Demand, Inc.*, 123 F. Supp. 2d 118, 131 (S.D.N.Y. 2000), *rev'd on other gds.*, 356 F.3d 492 (2d Cir. 2004) ("The potential loss of market advantage has been recognized to constitute irreparable harm") (citation omitted); *Merrill Lynch, Pierce, Fenner & Smith v. Rahn*, 73 F. Supp. 2d 425, 428 (S.D.N.Y. 1999) ("By attempting to solicit and siphon off [Plaintiff's] clients, Defendants threaten the lifeblood of Plaintiff's business … Plaintiff will suffer irreparable harm absent a preliminary injunction.") (brackets supplied; internal quotations omitted).

Here, Defendants have repeatedly inundated CHEFS DIET® customers with phone-calls, emails, mailings and other marketing materials, which contain the confusingly similar LEAN CHEFS mark and falsely suggest an affiliation between CHEFS DIET® and the inferior goods and services sold under the LEAN CHEFS mark.[7]  In doing so, Defendants have seized upon their misappropriation of the Customer List to solicit and poach CDAC customers and to divert sales from CDAC to Lean Chefs, eroding the competitive advantage CDAC once enjoyed in the Customer List.  Indeed, since Defendants misappropriated the Customer List and started using the LEAN CHEFS mark, CDAC has suffered a significant decrease in sales and customer base. *See* Podlog Decl. ¶ 27.  Further, despite its good faith efforts, CDAC has been unable to persuade Defendants to cease their egregious unlawful activities.  *Id.*

---

[7] As noted above, Defendants even have gone so far as to falsely advise a longtime CHEFS DIET® customer that LEAN CHEFS will be "handling" CDAC's accounts in the New York Tri-state area.  *See* Podlog Decl. ¶ 15.

22

As such, CDAC finds itself witnessing its goodwill and reputation – which it has worked so hard to achieve – harmed and damaged on a daily basis with no remedy apart from judicial intervention.  Further, Defendants' misappropriation of the Customer List threatens continuing and permanent losses to CDAC's customer base and its market advantage.  Manifestly, if Defendants continue to solicit CDAC's customers using the Customer List, while simultaneously impressing upon them the inferior goods and services sold under the LEAN CHEFS mark, it will exacerbate consumer confusion and further impair CDAC's goodwill.  Accordingly, because losses to CDAC's reputation and goodwill, and corresponding losses to CDAC's customer base and market advantage, cannot be quantified with precision, CDAC succeeds in demonstrating irreparable harm.  *See, e.g.*, *United States Polo Ass'n*, 800 F. Supp. 2d at 540-541; *Power Test Petroleum*, 754 F.2d at 95; *Muze, Inc.*, 123 F. Supp. 2d at 131; *Merrill Lynch*, 73 F. Supp. 2d at 428.

**V.     CDAC DOES NOT POSSESS ADEQUATE REMEDIES AT LAW**

Once again, damage to CDAC's reputation and goodwill, and corresponding losses to its customer base and market advantage, cannot be calculated with certainty, rendering remedies at law inadequate to compensate CDAC.  *Id.*

**VI.    THE BALANCE OF HARDSHIPS AND EQUITIES
         ENTIRELY FAVORS CDAC AND AN INJUNCTION
         IS CONSISTENT WITH THE PUBLIC INTEREST**

The balance of hardships and equities weighs entirely in CDAC's favor because Defendants have engaged in egregious unlawful activities whereas CDAC has committed no wrongs.  Moreover, an injunction is consistent with the public interest which is best "served by preventing customer confusion [and] deception."  *CJ Prods. LLC v. Snuggly Plushez, LLC*, 809 F. Supp. 2d 127, 149 (E.D.N.Y. 2011) (citation & quotation omitted); *see also Gayle Martz, Inc. v.*

23

*Sherpa Pet Group, LLC*, 651 F. Supp. 2d 72, 85 (S.D.N.Y. 2009), *amended on other gds.,* 2009 U.S. Dist. LEXIS 80929 (S.D.N.Y. Sept. 2, 2009) ("the public interest lies in the enforcement of the Acts of Congress, especially the prevention of consumer confusion as espoused by the Lanham Act") (citation & quotation omitted).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that its motion be granted in its entirety and that it be granted such other and further relief as the Court deems just and proper.

Dated: New York, New York
        October 21, 2014

PRYOR CASHMAN LLP


By: __/s/ James S. O'Brien_____
        James S. O'Brien (JO-0858)
        jobrien@pryorcashman.com
        Dyan Finguerra-DuCharme (DF-9228)
        dfinguerra-ducharme@pryorcashman.com
7 Times Square
New York, New York 10036-6569
Telephone:  (212) 421-4100
Facsimile:   (212) 326-0806

*Attorneys for Plaintiff Chefs Diet*
*Acquisition Corp. d/b/a Chefs Diet*