James S. O'Brien, Jr.
Dyan Finguerra-DuCharme
Andrew M. Goldsmith
PRYOR CASHMAN LLP
7 Times Square
New York, New York 10036
(212) 421-4100
jobrien@pryorcashman.com
dfinguerra-ducharme@pryorcashman.com
agoldsmith@pryorcashman.com

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHEFS DIET ACQUISITION CORP. d/b/a CHEFS DIET, | |
| Plaintiff, | 14-CV-8467 (JMF) |
| - against - | |
| LEAN CHEFS, LLC, NICHOLAS ZAZZA and ARTHUR GUNNING, | |
| Defendants. | |

## PLAINTIFF'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR A PRELIMINARY INJUNCTION

## <u>TABLE OF CONTENTS</u>

ARGUMENT ...................................................................................................................1

   I.   CDAC IS LIKELY TO SUCCEED ON ITS TRADE SECRET CLAIM ..........................1

       A.   Defendants Admit To Stealing 34,659 Names From CDAC's Customer List ...........1

       B.   Defendants Fail To Offer A Credible Explanation For Their Continued
            Access To The Customer List And Solicitation Of Fictitious Individuals ...............2

       C.   The CD List Is A Trade Secret ................................................................................3

       D.   Defendants Used The CD List In Breach Of A Duty Owed to CDAC......................5

  II.   CDAC IS LIKELY TO SUCCEED ON ITS TRADEMARK CLAIM .............................8

       A.   The CHEFS DIET® Mark Is Strong and Inherently Distinctive ..............................8

       B.   LEAN CHEFS Is Confusingly Similar To CHEFS DIET®
            And Actual Confusion Is Prevalent In the Marketplace ..............................................9

       C.   The Remaining *Polaroid* Factors Favor A Likelihood of Confusion ......................10

 III. ABSENT AN INJUNCTION, CDAC WILL SUFFER IRREPARABLE HARM ..........12

       A.   Defendants Fail To Rebut CDAC's Showing Of Irreparable Harm ........................12

       B.   CDAC's Short Delay In Seeking An Injunction Should Be Excused Because It
            Did Not Appreciate The Severity And Extent Of Defendants' Wrongdoing ..........14

CONCLUSION ..............................................................................................................16

# TABLE OF AUTHORITES

<u>**CASES**</u>                                                                                                           <u>**PAGE(s)**</u>

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
    722 F.2d 988 (2d Cir. 1983)..................................................................................5, 6

*A.F.A. Tours, Inc. v. Whitchurch*,
    937 F.2d 82 (2d Cir. 1991).......................................................................................5

*Anacomp, Inc. v. Shell Knob Services*,
    No. 93 CV 4003 (PKL), 1994 U.S. Dist. LEXIS 223 (S.D.N.Y. Jan. 7, 1994)...............3, 4

*B.U.S.A.Corp. v. Ecogloves, Inc.*,
    No. 08 Civ. 6372 (HB), 2006 U.S. Dist. LEXIS 85988 (S.D.N.Y. Jan. 31, 2006)........6, 13

*Banff, Ltd. v. Federated Department Stores, Inc.*,
    841 F.2d 486 (2d Cir. 1988)....................................................................................9

*Bayer Co. v. United Drug Co.*,
    272 F. 505 (S.D.N.Y. 1921)....................................................................................9

*Blue & White Food Products Corp. v. Shamir Food Industrial*,
    350 F. Supp. 2d 514 (S.D.N.Y. 2004).....................................................................8

*Byrne v. Barrett*,
    268 N.Y. 199 (1935) ............................................................................................5

*C.L.A.S.S. Promotions, Inc. v. D.S. Magazines, Inc.*,
    753 F.2d 14 (2d Cir. 1985)....................................................................................10

*Charles of Ritz Group Ltd. v. Quality King Distributors, Inc.*,
    832 F.2d 1317 (2d Cir. 1987).................................................................................8

*Clifford Ross Co. v. Nelvana, Ltd.*,
    710 F. Supp. 517 (S.D.N.Y. 1989), *aff'd without op.*, 883 F.2d 1022
    (2d Cir. 1989)..................................................................................................14, 15

*Courtenay Communications Corp. v. Hall*,
    334 F.3d 210 (2d Cir. 2003)...................................................................................9

*Cross Media Marketing Corp. v. Nixon*,
    No. 06 CV 4228 (MBM), 2006 U.S. Dist. LEXIS 56112
    (S.D.N.Y. Aug. 11, 2006) ..................................................................................3, 4

**CASES**                                                            **PAGE(s)**

*De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*,
    440 F. Supp. 2d 249 (S.D.N.Y. 2006)...............................................................................11

*Dial-A-Mattress Operating Corp. v. Mattress Madness*,
    841 F. Supp. 1339 (E.D.N.Y. 1994) ................................................................................8

*Fisher-Price, Inc. v. Well-Made Toy Manufacturing Corp.*,
    25 F.3d 119 (2d Cir. 1994)........................................................................................14, 15

*Franke v. Wiltschek*,
    209 F.2d 493 (2d Cir. 1953)..........................................................................................6

*GoSmile, Inc. v. Levine*,
    769 F. Supp. 2d 630 (S.D.N.Y. 2011)..........................................................................12

*Grout Shield Distributors, LLC v. Elio E. Salvo, Inc.*,
    824 F. Supp. 2d 389 (E.D.N.Y. 2011) .........................................................................10

*Horizon Mills Corp. v. Qvc, Inc.*,
    161 F. Supp. 2d 208 (S.D.N.Y. 2001)............................................................................9

*Kaufman v. International Business Machines Corp.*,
    97 A.D.2d 925 (3d Dep't 1983), *aff'd*, 61 N.Y.2d 930 (1984) .............................................5

*Keebler Co. v. Rovira Biscuit Corp.*,
    624 F.2d 366 (1st Cir. 1980) .......................................................................................11

*King v. Innovation Books*,
    976 F.2d 824 (2d Cir. 1992)........................................................................................14, 15

*Kraft General Foods v. Allied Old English*,
    831 F. Supp. 123 (S.D.N.Y. 1993) ................................................................................9

*Leo Silfen, Inc. v. Cream*,
    29 N.Y.2d 387 (1972) ..................................................................................................3

*Lon Tai Shing Co. v. Koch & Lowy*,
    No. 90 Civ. 4464 (DNE), 1990 U.S. Dist. LEXIS 19123
    (S.D.N.Y. Dec. 14, 1990)............................................................................................10

*Mann v. Cooper Tire Co.*,
    33 A.D.3d 24 (1st Dep't 2006) .....................................................................................7

**CASES**                                          **PAGE(s)**

*Marks Org., Inc. v. Joles,*
784 F. Supp. 2d 322, 337 (S.D.N.Y. 2011).....................................................................14

*Meinhard v. Salmon,*
249 N.Y. 458 (1928) .....................................................................................................5

*Merrill Lynch, Pierce, Fenner & Smith v. Rahn,*
73 F. Supp. 2d 425 (S.D.N.Y. 1999)...................................................................12, 13

*Morningside Group, Ltd. v. Morningside Capital Group, L.L.C.,*
182 F.3d 133 (2d Cir. 1999)................................................................................10

*Muze, Inc. v. Digital On-Demand, Inc.,*
123 F. Supp. 2d 118 (S.D.N.Y. 2000), *rev'd on other gds.*, 356 F.3d 492
(2d Cir. 2004)................................................................................................12, 13

*New Look Party, Ltd. v. Louise Paris, Ltd.,*
11 CV 6433 (NRB), 2012 U.S. Dist. LEXIS 9539 (S.D.N.Y. Jan. 11, 2012) ..................14

*New York City Triathlon, LLC v. NYC Triathlon Club, Inc.,*
704 F. Supp. 2d 305 (S.D.N.Y. 2010)................................................................10, 11, 12

*North Atlantic Instruments, Inc. v. Haber,*
188 F.3d 38 (2d Cir. 1999)................................................................................3, 6, 7

*Nutmeg Technologies v. Mashie,*
No. 89 CV 511(NPM), 1989 U.S. Dist. LEXIS 6293 (S.D.N.Y. Jun. 2, 1989) .................3

*Pfizer Inc. v. Sachs,*
652 F. Supp. 2d 512 (S.D.N.Y. 2009)................................................................8

*Power Test Petroleum Distributors, Inc. v. Calcu Gas, Inc.,*
754 F.2d 91 (2d Cir. 1985)................................................................................12, 14

*Rodgers v. Wright,*
544 F. Supp. 2d 302 (S.D.N.Y. 2008)................................................................9

*Rolex Watch U.S.A., Inc. v. Rolex Deli Corp.,*
No. 11 cv 9321 (BSJ), 2012 U.S. Dist. LEXIS 151569
(S.D.N.Y. Oct. 17, 2012) ................................................................................8, 14, 15

*Savin Corp. v. Savin Group,*
391 F.3d 439 (2d Cir. 2004)................................................................................8

**CASES**                                                                                    **PAGE(s)**

*SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*,
    11 CV 1468(WJM), 2014 U.S. Dist. LEXIS 45273 (D. Colo. Apr. 2, 2014)...................12

*Salinger v. Colting*,
    607 F.3d 68 (2d Cir. 2010).........................................................................................14

*Schanfield v. Sojitz Corp. of America*,
    663 F. Supp. 2d 305 (S.D.N.Y. 2009)..........................................................................5

*Schreyer v. Casco Products Corp.*,
    190 F.2d 921 (2d Cir. 1951)........................................................................................6

*Support System Associates, Inc. v. Tavolacci*,
    135 A.D.2d 704 (2d Dep't 1987) ................................................................................6

*Thin Film Laboratory, Inc. v. Comito*,
    218 F. Supp. 2d 513 (S.D.N.Y. 2002)..........................................................................5

*Tom Doherty Associates, Inc. v. Saban Entertainment, Inc.*,
    60 F.3d 27 (2d Cir. 1995)..........................................................................................14

*United States Polo Association v. PRL USA Holdings, Inc.*,
    800 F. Supp. 2d 515 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013).................12

*Virgin Enterprises v. Nawab*,
    335 F.3d 141 (2d Cir. 2003).......................................................................................10

*Webcraft Technologies, Inc. v. McCaw*,
    674 F. Supp. 1039 (S.D.N.Y. 1987)........................................................................3, 4

**TREATISES**

Restatement (First) of Torts § 757 (1939) ...............................................................5, 7

Restatement (Third) of Unfair Competition § 40 (1993)................................................7

Plaintiff Chefs Diet Acquisition Corp. d/b/a Chefs Diet respectfully submits this reply memorandum of law in further support of its motion for a preliminary injunction.[1]

## ARGUMENT

## I.    CDAC IS LIKELY TO SUCCEED ON ITS TRADE SECRET CLAIM

### A.    Defendants Admit To Stealing 34,659 Names From CDAC's Customer List

Through the expert report of Bruce F. Webster and their own deposition testimony, Defendants admit to procuring and then unlawfully using at least 34,659 names from the CDAC Customer List (the "CD List").[2]   In 2010, Zazza – Plaintiff's Chief Technology Officer, shareholder, trusted vendor and agent – was assisting Plaintiff in advertising and marketing campaigns.[3]   In that capacity, Zazza requested, and Plaintiff provided – on multiple occasions – a list of active and inactive clients in New York totaling at least 34,659 names ("2010 Data") in order to do email blasts, mailings, and voice blasts for Plaintiff.[4]   *See* O'Brien Decl. at Exhibit C.[5]   As Defendants concede, 96.6% of the overlap between the CD List and the LC Database derives from the 2010 Transfers.   *Id.* at Exhibit C (the "Webster Report") at ¶ 39.[6]   Defendants' position essentially is that, yes, we stole your confidential list, but we were justified in stealing it because Zazza did not have a paper agreement forbidding him from doing so.   But as Zazza himself concedes, he expressly understood that he was forbidden from using, selling or later

---

[1] Capitalized terms not otherwise defined carry the meanings ascribed to them in Plaintiff's moving papers.

[2] The CD List is synonymous with the definition of the "Customer List" set forth in CDAC's moving papers.

[3] It is important to understand that Zazza was not a stranger to Chefs Diet.  He was intimately involved with CDAC, and its predecessors, from its inception in or around 2003, created the web site and ran the IT aspect of the business; as such, Zazza had access to the CD List.  When Gunning went to prison, Zazza took an active role in marketing the company; he continued in that role *after* the acquisition and continued to have access to the CD List.   *See* the Declaration of James S. O'Brien (the "O'Brien Decl.") at Exhibit A, 10:11-15, 16:4-9, 18:24—20:14, 31:15—33:25, 36:7-20, 38:22—40:20, 41:11-18, 45:7-17, 50:8-16, 52:23—53:12, 105:23—107:19, 163:23—164:8; *see also* Exhibit B at Response No. 3 and 4.

[4] For purposes of this memorandum, Plaintiff assumes, without conceding, that the 34,659 figure set forth in the Webster Report is accurate.

[5] *See also* Exhibit A, 126:12—127:20, 135:9—136:8, 143:16-18, 150:16-19, 151:23—152:9, 155:19-20.

[6] Defendants sent a database of around 538,000 "entries" to their expert.  *Id.* ¶ 27.  The 96.6% figure corresponds to the overlap between the CD List and the "entries" sent to Mr. Webster.  *Id.* ¶ 39.

starting a competing business with the 2010 Data.  *Id.* at Exhibit A, 148:24-150:5.[7]  Despite that understanding, Zazza opened Lean Chefs in November 2013 and admits that he uploaded the 2010 Data into the LC Database and solicited Plaintiff's customers.  *Id.* 151:23—152:9.

**B.    Defendants Fail To Offer A Credible Explanation For Their Continued Access To The Customer List And Solicitation Of Fictitious Individuals**

The only plausible explanation for Defendants' solicitation of fictitious individuals added to the CD List subsequent to Zazza's request for the 2010 Data is that Defendants hacked into CDAC's computers or used other nefarious methods to gain continued access to the CD List.

In 2012, CDAC added an employee's name, Christian Ledan, to the CD List with his private email account. In 2013, CDAC added a fictitious name, Peter Daniel, to the CD List with Joseph Maniscalco's CDAC email account (the "Fictitious Names" or the "Fictitious Individuals").  *See* the Reply Declaration of Joseph Maniscalco (the "Maniscalco Reply Decl.") at ¶¶ 2-3.[8]  On September 3, 2014, Lean Chefs emailed an "offer for Christian" to Mr. Ledan's private email account and an "offer for Peter" to Mr. Maniscalco's Chefs Diet email account.  *Id.*

With their hands caught squarely in the proverbial cookie-jar, Defendants have concocted the incredible story that they purchased the Fictitious Names from a man named "Victor" at a bar outside of a trade show.  *See* O'Brien Decl. at Exhibit A, 79:18—84:12, 169:11—172:4; Exhibit D 129:19—134:22.  Victor, of course, has no last name, no address of any kind, Defendants have no receipt of any kind evidencing the sale and Defendants cannot locate the USB Drive that Victor allegedly sold them.[9]  *Id.*  All that is missing from this scenario is a fake mustache and a

---

[7] Defendants' contention that CDAC provided the 2010 Data to Zazza "while he had no employment relationship [with CDAC] … and no legal obligation in connection with the data" is flatly false and belied by his own testimony.
[8] Mr. Maniscalco is the Head of Customer Service and Senior Vice President of Operations at CDAC.
[9] The names bought in the bar resided in a file on Zazza's laptop – a file that can be added to at will.  Exhibit A, 84:14-23.

trench coat.  Defendants also fail to explain how "Victor" possibly could have sold them contact information for Peter Daniel when Peter Daniel *does not exist*.

     **C.**     **<u>The CD List Is A Trade Secret</u>**

It is settled that a customer list qualifies for trade secret protection where it has been developed over many years, through substantial effort and contains a unique combination of information not readily ascertainable or duplicated.  *See, e.g.*, *North Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 44 (2d Cir. 1999) (a list comprising customers "only cultivated after extensive efforts" constitutes a trade secret), citing, *Nutmeg Techs. v. Mashie*, No. 89 CV 511 (NPM), 1989 U.S. Dist. LEXIS 6293, at \*14 (S.D.N.Y. Jun. 2, 1989); *Cross Media Mktg. Corp. v. Nixon*, No. 06 CV 4228 (MBM), 2006 U.S. Dist. LEXIS 56112, at \*12 (S.D.N.Y. Aug. 11, 2006) ("The value of the customer lists lies not in the individual pieces of information they contain but in the combination of all of the information [plaintiff] has culled over many years"); *Webcraft Technologies, Inc. v. McCaw*, 674 F. Supp. 1039, 1045 (S.D.N.Y. 1987) (the essence of whether a customer list qualifies for protection is whether customers are "only discoverable with great effort, and particularly where the patronage of such customers was secured through the expenditure of considerable time and money"), citing, *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 392-93 (1972) (other citations omitted); *Anacomp, Inc. v. Shell Knob Servs.*, No. 93 CV 4003 (PKL), 1994 U.S. Dist. LEXIS 223, at \*25-26 (S.D.N.Y. Jan. 7, 1994) ("a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage") (citations, quotations & internal brackets omitted).

Here, the CD List, which comprises over 40,000 names and corresponding dietary preferences, has been developed, culled and honed through substantial effort over the course of

many years.  *See* Maniscalco Moving Decl. ¶ 18.  Recognizing its immense commercial value, CDAC purchased it through the APA.  *Id.* ¶ 3.  Further, as Defendants concede, it is *extremely* difficult to convert a list of purchased names into paying customers.  The industry standard is that for any list of names purchased, 0.001% will result in a paying customer.  *See* O'Brien Decl. at Exhibit D, 65:22—66:2-13, 71:5:16.  All of the names on the CD List are current or former customers.  It thus encompasses a highly refined database of consumers who have *actually* subscribed to a diet delivery service.

In that regard, Lean Chefs' suggestion that it "legitimately" acquired around 7,800 names from Epsilon and other sources is misleading and meaningless.  *See* Webster Report ¶ 41.  As Defendants concede, they have purchased or "collected" millions of names "throughout the years" and the LC Database comprises "over 25 million names," or "way over that."  *See* Exhibit A, 169:7-10.  That some 7,800 of those names also appear in the CD List is entirely unremarkable.  Indeed, as the cases uniformly hold, and as common sense dictates, the value of the CD List lies in the fact that it consists of individuals who have shown an actual desire and willingness to subscribe to a diet delivery service.  By misappropriating the CD List, Lean Chefs knew *which* individuals in the "phone book" to target and were guaranteed a success far in excess of the 0.001% rate.  *See, e.g.*, *Cross-Media*, 2006 U.S. Dist. LEXIS 56112, at *12; *Webcraft*, 674 F. Supp. at 1045; *Anacomp*, 1994 U.S. Dist. LEXIS 223, at *25-26.

In addition, CDAC has taken reasonable and appropriate measures to safeguard the CD List.  For example, CDAC maintains comprehensive computer security systems to prevent unauthorized access to the CD List (Maniscalco Moving Decl. ¶ 19) and USA Web, the vendor responsible for managing and maintaining the CD List, has signed multiple non-disclosure agreements specifically addressing its confidentiality.  *See* Maniscalco Reply Decl. ¶ 5.

Moreover, and contrary to Defendants' contentions, only a limited number of sales and customer service representatives have access to the CD List and each is educated as to its confidentiality. *Id.* ¶ 6.  It is also impossible for CDAC employees to print, download or email the CD List; instead, to copy the CD list, an employee would have to transcribe each name by hand or take 40,000 separate screenshots. *Id.*[10]

Finally, while Defendants make much of an email dated November 4, 2010 (Def. Mem. at Exhibit 9), each individual on that email was an employee, officer, consultant, vendor or trusted agent of CDAC – and Defendants concede that fact.  *See* O'Brien Decl. at Exhibit A, 158:18-159:25; *Schanfield v. Sojitz Corp. of Am.*, 663 F. Supp. 2d 305, 349 (S.D.N.Y. 2009); *Byrne v. Barrett*, 268 N.Y. 199, 206 (1935) ("the duty of an agent or employee not to use confidential knowledge acquired in his employment in competition with his principal is implicit in the relation") (citations omitted); Restatement (First) of Torts § 757 (1939).

### D.    Defendants Used The CD List In Breach Of A Duty Owed to CDAC

It is undisputed that for many years, and specifically in 2010, Zazza held himself out as the Chief Technology Officer of CDAC, owned shares in CDAC, and specifically assisted CDAC in marketing and advertising campaigns.  *See* the citations set forth in n. 3 *supra*.  As such, CDAC and Zazza occupied the relation of principal and agent; as a fiduciary, Zazza owed CDAC "[n]ot honesty alone, but the punctilio of an honor the most sensitive."  *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928); *see also ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722

---

[10] The "mere fact" that CDAC did not require employees to sign confidentiality agreements until 2012 does not defeat trade secret protection because CDAC took "appropriate precautions to alert [its] employee[s] [of] the need to maintain confidentiality." *Thin Film Lab, Inc. v. Comito*, 218 F. Supp. 2d 513, 521-522 (S.D.N.Y. 2002), quoting, *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir. 1991); *see also Kaufman v. Int'l Bus. Machines Corp.*, 97 A.D.2d 925, 927 (3d Dep't 1983), *aff'd*, 61 N.Y.2d 930 (1984) ("The duty of an employee not to use or divulge confidential knowledge acquired during his employment is implicit in the employer-employee relation [and] is an absolute, and not a relative, duty") (citations & quotations omitted).  Once again, Zazza understood he could not use the CD List for any other purpose.  *See* O'Brien Decl., Exhibit A, 148:24-150:5; *Thin Film Lab*, 218 F. Supp. 2d at 522 (safeguards sufficient since former agent testified "he understood the customer information…to be proprietary").

5

F.2d 988, 994 (2d Cir. 1983) ("an agent has a duty not to use confidential knowledge acquired in his [agency] in competition with his principal…[t]his duty exists as well after the [agency] is terminated as during its continuance") (citations & quotations omitted); *Franke v. Wiltschek*, 209 F.2d 493, 495 (2d Cir. 1953) ("Where defendants obtain secret information by means of a confidential relationship, they shall be held accountable for its use to their own advantage at the expense of the rightful possessor").

In his capacity as an agent of CDAC, Zazza requested, and CDAC provided, the 2010 Data, which Zazza later integrated into the LC Database in or around November 2013 and used to solicit consumers when Lean Chefs opened.  *See* O'Brien Decl. at Exhibit C; *see also* Exhibit A, 151:23—152:9.[11]  Consistent with settled jurisprudence, Defendants breached a duty owed to CDAC, and thereby misappropriated the 2010 Data, by assimilating it into the LC Database and using it to solicit prospective customers.  *See, e.g.*, *ABKCO*, 722 F.2d at 994; *Franke*, 209 F.2d at 495; *North Atl.*, 188 F.3d at 47-48; *B.U.S.A. Corp. v. Ecogloves, Inc.*, No. 08 Civ. 6372 (HB), 2006 U.S. Dist. LEXIS 85988, at *17 (S.D.N.Y. Jan. 31, 2006).[12]  That fundamental precept persists despite the absence of a non-disclosure agreement with Zazza.  *Support Sys. Assocs., Inc. v. Tavolacci*, 135 A.D.2d 704, 706 (2d Dep't 1987) ("Even in the absence of a contract restriction, a former [agent] is not entitled to solicit customers by fraudulent means, the use of trade secrets, or confidential information") (citations omitted); *Schreyer v. Casco Products Corp.*, 190 F.2d 921, 924 (2d Cir. 1951) ("Although the [district] court found no express agreement to hold the information in confidence…there was a confidential relationship created between the

---

[11] Once again, the 2010 Data, which consists of, *inter alia*, 34,659 active and inactive Chefs Diet customers, represents 96.6% of the overlap between the CD List and the LC Database.  *See* Webster Report ¶ 39.

[12] Defendants also misappropriated additional proprietary data through "improper means," namely the Fictitious Names, which CDAC added to the CD List after 2010.  *See, e.g.*, *North Atl.*, 188 F.3d at 47-48.

parties...which restricted the right of [the defendant] to use [the information] to the purposes for which the disclosures were made") (citation omitted).

Defendants' claim that their use of the CD List was "inadvertent and unknowing" is untrue.  Defendants knowingly integrated the 2010 Data, which comprises several unique, massive files, into the LC Database and thereafter solicited those consumers.[13]  More importantly, Defendants' alleged "inadvertence" does not insulate them from liability for misappropriation. *See, e.g.*, *North Atl.*, 188 F.3d at 43-44; Restatement (First) of Torts § 757 (1939) ("One who discloses or uses another's trade secret…is liable to the other if…his disclosure or use constitutes a breach of confidence reposed in him").[14]  For the avoidance of doubt, there is no requirement of "knowledge" where, as here, the actor "acquire[s] the information through a confidential disclosure from the trade secret owner."  Restatement (Third) of Unfair Competition § 40, cmt. d. (1993).  And even where "knowledge" is otherwise required, "the actor is subject to liability for *all* use or disclosure of the trade secret" provided the actor had "actual or constructive knowledge…at the time of the *initial* acquisition of the secret," which Zazza concededly had here.  *Id.*  (Emphasis added).[15]

Finally, Defendants' hollow assurance that they "isolated the data and immediately stopped using it" (Gunning Decl. ¶ 10) is untruthful and inadequate.  Very recently, Defendants solicited Olga Podlog, a relative of Misha Podlog, whose name appears in the CD List.  *See* Maniscalco Reply Decl. ¶ 3 n. 1.  Moreover, Defendants concede that *over 17% of their paying*

---

[13] Further belying Defendants' alleged "inadvertence," CDAC notified Lean Chefs in December 2013, shortly after Lean Chefs opened, of its concerns regarding their potential misappropriation of the CD List.  *See* O'Brien Decl. at Exhibit E.

[14] New York follows the Restatement approach.  *Mann v. Cooper Tire Co.*, 33 A.D.3d 24, 31 (1st Dep't 2006).

[15] *See also* O'Brien Decl. at Exhibit A, 147;19-25 ("You don't want to give out a database…It's company data"), and 148:2-150:5.

*customers come from the CD List*.  *See* Webster Report ¶ 49.  Accordingly, Defendants must be enjoined and, at the appropriate time, ordered to compensate Plaintiff in money damages.

**II.      CDAC IS LIKELY TO SUCCEED ON ITS TRADEMARK CLAIM**

      **A.      The CHEFS DIET® Mark Is Strong And Inherently Distinctive**

CDAC owns two incontestable trademark registrations for the CHEFS DIET® mark (Maniscalco Moving Decl. ¶¶ 3-4), which creates a "conclusive presumption" that CHEFS DIET® is inherently distinctive.  *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 457 (2d Cir. 2004) superseded by statute on other grounds as stated in *Rolex Watch U.S.A., Inc. v. Rolex Deli Corp.*, No. 11 cv 9321 (BSJ), 2012 U.S. Dist. LEXIS 151569, *11, n. 7 (S.D.N.Y. Oct. 17, 2012); *see also Dial-A-Mattress Operating Corp. v. Mattress Madness*, 841 F. Supp. 1339, 1347 (E.D.N.Y. 1994).  Moreover, the CHEFS DIET® mark is arbitrary, or at the very least suggestive, because it does not describe a diet delivery service; rather, to understand the precise nature of CDAC's goods and services, a consumer must use his imagination and inference.  *See, e.g.*, *Dial-A-Mattress*, 841 F. Supp. at 1347-1348; *Blue & White Food Prods. Corp. v. Shamir Food Indus.*, 350 F. Supp. 2d 514, 520 (S.D.N.Y. 2004).

In addition, over the past seven years, CDAC has continuously and exclusively used, marketed and promoted services under the CHEFS DIET® Mark, causing the CHEFS DIET® program to receive widespread unsolicited media attention and critical acclaim.  *See* Maniscalco Moving Decl. ¶¶ 6-9.  As such, the CHEFS DIET® Mark has acquired distinction in the marketplace.  *See, e.g.*, *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 522 (S.D.N.Y. 2009), citing, *Charles of Ritz Grp. Ltd. v. Quality King Distribs., Inc.*, 832 F.2d 1317, 1321 (2d Cir. 1987).

Defendants also fundamentally misunderstand the concept of a "generic" mark.  Where, as here, a mark has been registered and granted trademark protection, it can only become generic

if the consuming public "appropriates" the mark and thereafter associates it with the product or service itself. *Horizon Mills Corp. v. Qvc, Inc.*, 161 F. Supp. 2d 208, 213-14 (S.D.N.Y. 2001) (issue of fact as to whether the term "slinky" had become generic); *Bayer Co. v. United Drug Co.*, 272 F. 505 (S.D.N.Y. 1921) (assessing "Aspirin"). Here, the composite mark, CHEFS DIET®, is recognized and relied upon by consumers as identifying CDAC's goods and services and has attained incontestable status. *See* Maniscalco Moving Decl. ¶¶ 4-9. Defendants fail to adduce any evidence demonstrating, or even suggesting, that the public has appropriated the CHEFS DIET® mark to be synonymous with diet delivery services as a general matter. Further, while Defendants myopically focus on the terms "Chefs" and "Diet" as stand-alone terms, it is fundamental that a court must assess the entire mark as a single expression. *Courtenay Commc'ns. Corp. v. Hall*, 334 F.3d 210, 215-216 (2d Cir. 2003); *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 491 (2d Cir. 1988).[16]

**B.      LEAN CHEFS Is Confusingly Similar To CHEFS DIET®
            And Actual Confusion Is Prevalent In The Marketplace**

Defendants fail to rebut that LEAN CHEFS is substantially similar to CHEFS DIET® in sight, sound, meaning and overall commercial impression. The dominant term of each mark is "Chefs," and each conveys imagery of a product or service that is healthy, diet conscious and prepared by a culinary expert; each mark also prominently features the color green and cursive font. *See* Maniscalco Moving Decl. ¶ 13. Given that Defendants concededly market and sell identical goods and services to the same class of consumers, the foregoing similarities create the same overall commercial impression. *See, e.g.*, *Kraft Gen. Foods v. Allied Old English*, 831 F. Supp. 123, 130 (S.D.N.Y. 1993); *Rodgers v. Wright*, 544 F. Supp. 2d 302, 311 (S.D.N.Y. 2008).

---

[16] The thrust of Defendants' defense rests entirely on this faulty premise. Indeed, Defendants have failed to adduce any evidence showing widespread third party use of "Chefs Diet" to describe food delivery services. That is the test for genericism—competitors are free to use generic terms where there is no other way to identify their services; here, however, CHEFS DIET® has not fallen into the public domain like "escalator," "trampoline" or "Yo-Yo."

9

Unsurprisingly, *actual* confusion in the marketplace is prevalent between CHEFS DIET®
and LEAN CHEFS (Maniscalco Moving Decl. ¶¶ 14-15), and such evidence "is often the most
telling indication that confusion is likely."  *Morningside Grp., Ltd. v. Morningside Capital Grp.,
L.L.C.,*, 182 F.3d 133, 141-142 (2d Cir. 1999); *see also Virgin Enters. v. Nawab*, 335 F.3d 141,
151 (2d Cir. 2003).  CDAC has adduced multiple examples of textbook actual confusion—
consumers have placed misdirected calls to CDAC thinking it is Lean Chefs and have
specifically asked whether Lean Chefs is a new program offered by CDAC or otherwise
affiliated with CDAC.  *See, e.g.*, *Morningside*, 182 F.3d at 141; *Virgin*, 335 F.3d at 151.  Further,
even where a plaintiff "shows actual confusion by only a small percentage of buyers, [it] may
sustain [its] case based on the inference that a few proven instances of actual confusion betoken a
more substantial likelihood of confusion."  *Lon Tai Shing Co. v. Koch & Lowy*, No. 90 Civ. 4464
(DNE), 1990 U.S. Dist. LEXIS 19123, at *33-34 (S.D.N.Y. Dec. 14, 1990); *see also New York
City Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 319 (S.D.N.Y. 2010) (if
actual confusion shown, "[i]t is safe to assume that others have been confused").[17]

### C.    The Remaining *Polaroid* Factors Favor A Likelihood of Confusion

First, it is undisputed that Defendants sell identical goods and services and market those
goods and services to the same consumers.  *See* Def Mem. p. 2; *see also Virgin*, 335 F.3d at 150
("the closer the secondary user's goods are to those the consumer has seen marketed under the
prior user's brand, the more likely that the consumer will mistakenly assume a common source")
(citation omitted).

---

[17] The cases upon which Defendants rely (Def. Mem. p. 20) confirm they have no rejoinder to the multiple instances
of actual confusion exposed to date.  Indeed, four of those cases were decided at summary judgment or after trial
and thus required the plaintiff to make a greater evidentiary showing with respect to actual confusion.  The other
two cases involved products and services that had been sold to hundreds of thousands of consumers.  *Grout Shield
Distribs., LLC v. Elio E. Salvo, Inc.*, 824 F. Supp. 2d 389, 416 (E.D.N.Y. 2011); *C.L.A.S.S. Promotions, Inc. v. D.S.
Magazines, Inc.*, 753 F.2d 14, 18 (2d Cir. 1985).  Because only a handful of those consumers had expressed actual
confusion, each Court found the evidence of actual confusion "de minimis."  *Id.*

10

Second, the conclusory assertion that Lean Chefs targets "sophisticated" consumers simply because Lean Chefs sells "expensive" services must be rejected. Lean Chefs charges consumers as little as $22.99 per day for three meals and one snack, which is hardly "expensive" or "luxurious." *See* O'Brien Aff. at Exhibit F; *c.f. De Beers LV Trademark Ltd. v. DeBeers Diamond Syndicate Inc.*, 440 F. Supp. 2d 249, 279 (S.D.N.Y. 2006) (diamond consumers are sophisticated and exercise great care in purchasing same). Defendants thus fail to rebut CDAC's showing that Lean Chefs targets unsophisticated consumers, which increases the likelihood of consumer confusion. *See, e.g.*, *New York City Triathlon*, 704 F. Supp. 2d at 320.

Third, Defendants fail to rebut CDAC's objectively corroborated allegations of bad faith and the corresponding presumption that Lean Chefs intended to create a confusing similarity. *Id.* at 319 (citation & quotation omitted). In that regard, Defendants admit that Zazza and Gunning played an integral role in the creation and adoption of the CHEFS DIET® Mark as well as the LEAN CHEFS Mark. *See* O'Brien Decl. at Exhibit A, 114:4—118:13, 172:20-24 and Exhibit D, 32:13—33:5, 101:2—103:9. Mr. Zazza also designed the Chefs Diet website and the Lean Chefs website. *Id.* at Exhibit A, 45:-17, 52:23—53:12. Further betraying bad faith, Defendants have failed to produce a *single* document concerning the creation or adoption of the LEAN CHEFS Mark, or their consideration of other potential names, despite claiming they considered hundreds of names in the course of several discrete "brainstorming sessions" and then searched to see if they were available. *Id.* at Exhibit A, 115:15-17, Exhibit D, 101:2—103:9.[18]

Finally, the bald assertion that Lean Chefs offers superior goods and services – based solely on several inherently unreliable Yelp reviews – does not rebut the impartial and

---

[18] That Gunning "gratuitously" forwarded several potential kosher and national clients to an old friend at CDAC is meaningless. Unlike CDAC, Lean Chefs does not have a subsidiary that sells to kosher or national customers, respectively. *See* O'Brien Decl. at Exhibit D, 179:13—180:16. Further, CDAC's failure to oppose Defendants' trademark application has no bearing on Defendants' bad faith or the instant motion for a preliminary injunction. *See, e.g.*, *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 373 n. 5 (1st Cir. 1980).

unsolicited consumer complaints received by CDAC concerning the poor quality of Lean Chefs. *See* Maniscalco Moving Decl. ¶ 17.  Because Defendants rely upon the Yelp reviews for the truth of the matter asserted, they are inadmissible hearsay.  *See, e.g.*, *GoSmile, Inc. v. Levine*, 769 F. Supp. 2d 630, 647 (S.D.N.Y. 2011) (online product reviews cannot be considered for the truth of their contents); *SOLIDFX, LLC v. Jeppesen Sanderson, Inc.*, 11 CV 1468 (WJM), 2014 U.S. Dist. LEXIS 45273, at *16 (D. Colo. Apr. 2, 2014) ("because the iTunes reviews are essentially anonymous online comments, they are inherently unreliable") (citation omitted).[19]  Defendants' claim that "Lean Chefs is the leader in the diet delivery market" is belied by its own letter dated December 22, 2014, in which Lean Chefs advised this Court that Lean Chefs is "a very small start-up business with small sales" and that "Defendants have been operating on a negative net income since they began business in 2013."  *See* O'Brien Decl. at Exhibit G.

## III.  ABSENT AN INJUNCTION, CDAC WILL SUFFER IRREPARABLE HARM

### A.  Defendants Fail To Rebut CDAC's Showing Of Irreparable Harm

Irreparable harm sufficient to warrant a preliminary injunction exists where a business owner demonstrates prospective loss of goodwill or that it has lost control over its reputation and goodwill.  *See, e.g.*, *New York City Triathlon*, 704 F. Supp. 2d at 343; *United States Polo Ass'n v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 540-541 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013); *Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*, 754 F.2d 91, 95 (2d Cir. 1985).  In addition, "[t]he potential loss of market advantage has been recognized to constitute irreparable harm."  *Muze, Inc. v. Digital On-Demand, Inc.*, 123 F. Supp. 2d 118, 131 (S.D.N.Y. 2000), *rev'd on other gds.*, 356 F.3d 492 (2d Cir. 2004) (citations omitted); *see also Merrill Lynch, Pierce, Fenner & Smith v. Rahn*, 73 F. Supp. 2d 425, 428 (S.D.N.Y. 1999) ("By

---

[19] That Yelp is not trustworthy is also well-documented.  *See* <www.huffingtonpost.com/2011/09/28/yelp-reviews_n_985513.html>; <www.bu.edu/today/2013/yelp-reviews-can-you-trust-them>.

attempting to solicit and siphon off [Plaintiff's] clients, Defendants threaten the lifeblood of Plaintiff's business…Plaintiff will suffer irreparable harm absent a preliminary injunction.") (citations & internal quotations omitted); *B.U.S.A. Corp.*, 2006 U.S. Dist. LEXIS 85988, at *23 (where plaintiff demonstrated a likelihood of success that defendant misappropriated its customer list, the Court held "if this Court did not grant the preliminary injunction, the harm to Plaintiffs would be irreparable as Defendants would be allowed to unfairly compete").

Here, Defendants admit to stealing at least 34,659 names from the CD List and further admit that at least 327 of those individuals are presently paying Lean Chefs customers.  Since Defendants started soliciting CDAC's present and former clients from the stolen CD List in November 2013, CDAC has suffered a significant decrease in sales and customer base.  *See* Maniscalco Moving Decl. ¶ 27.[20]  Defendants have thus eroded the competitive advantage CDAC once enjoyed with respect to the CD List and have "threaten[ed] the lifeblood of [Plaintiff's] business." *Merrill Lynch*, 73 F. Supp. 2d at 428.  Absent an injunction, Defendants likely will poach additional individuals from the CD List during the pendency of this action, Defendants will be allowed to unfairly compete with CDAC, and CDAC's market advantage will be eroded further.  *Muze, Inc.*, 123 F. Supp. 2d at 131; *B.U.S.A. Corp.*, 2006 U.S. Dist. LEXIS 85988, at *23.  Further, owing to the likelihood of confusion between LEAN CHEFS and the CHEFS DIET® Mark, Defendants' corresponding theft of the CD List and the poor quality of Defendants' good and services, CDAC has lost control over its reputation and has suffered incalculable damage to its goodwill.  Finally, because losses to CDAC's customer base, market advantage, reputation and goodwill cannot be quantified with precision, remedies at law are inadequate to compensate CDAC.  *See, e.g.*, *Muze, Inc.*, 123 F. Supp. 2d at 131 ("The short- and

---

[20] In the testimony cited to by Lean Chefs, Mr. Maniscalco did not testify concerning CDAC's revenues subsequent to Lean Chefs' opening; he only testifies concerning 2009-2013.  *See* Def. Mem. p. 23, Exhibit 7, 95:4-97:8.

long-term harm concomitant to [the potential loss of market advantage] is not readily identifiable, or precisely calculable in money damages"); *Tom Doherty Assocs., Inc. v. Saban Entm't., Inc.*, 60 F.3d 27, 38 (2d Cir. 1995) ("Where the loss of a product will cause the destruction of a business itself or indeterminate losses … the availability of money damages may be a hollow promise and a preliminary injunction appropriate"); *Power Test Petroleum*, 754 F.2d at 95.

**B.     CDAC's Short Delay In Seeking An Injunction Should Be Excused Because It Did Not Appreciate The Severity And Extent Of Defendants' Wrongdoing**

To sustain a finding of irreparable harm, a plaintiff generally must demonstrate a threatened imminent loss.  *See, e.g.*, *Tom Doherty*, 60 F.3d at 37.  Regardless, a delay in seeking injunctive relief will not defeat a finding of irreparable harm where the plaintiff does not understand "the true and pervasive extent" of the wrongful conduct engaged in by the defendant. *Clifford Ross Co. v. Nelvana, Ltd.*, 710 F. Supp. 517, 521 (S.D.N.Y. 1989), *aff'd without op.*, 883 F.2d 1022 (2d Cir. 1989) (eight month delay); *see also Fisher-Price, Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 124 (2d Cir. 1994) (six month delay in seeking injunctive relief excused because the plaintiff did "not know how severe the infringement" was) (citations omitted). Likewise, a delay in seeking injunctive relief will be excused where it results from the plaintiff's good faith efforts to investigate the defendant's wrongful conduct.  *Fisher-Price*, 25 F.3d at 124-125; *King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir. 1992) (eight month delay excused owing to good faith effort of plaintiff to resolve dispute without resort to litigation).[21]

Here, CDAC first learned of Lean Chefs' potentially unlawful conduct in November 2013 and immediately sent Lean Chefs a cease-and-desist letter in an effort to resolve any

---

[21] Prior to the Second Circuit's decision in *Salinger v. Colting*, 607 F.3d 68 (2d Cir. 2010), a finding of delay served to rebut a presumption of irreparable harm; subsequent to *Salinger*, however, delay "is now simply one factor to be considered in determining whether a plaintiff will, in fact, suffer irreparable harm."  *New Look Party, Ltd. v. Louise Paris, Ltd.*, 11 CV 6433 (NRB), 2012 U.S. Dist. LEXIS 9539, at *34-35 (S.D.N.Y. Jan. 11, 2012), *citing*, *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 337 (S.D.N.Y. 2011) (granting preliminary injunction despite delay of almost sixteen months) (other citations omitted).

potential dispute without resort to litigation.  *See* O'Brien Decl. at Exhibit E.  In response, Lean Chefs unequivocally responded that it had not stolen the CD List and that it would "never take the approach of poaching clients" from CDAC.  *Id.* at Exhibit H.  Accepting that representation at face value, CDAC stood down for the time being as it did not wish to engage in costly litigation, especially given that Zazza, a longtime vendor and trusted agent, assured CDAC that Lean Chefs had not engaged in any unseemly conduct.  *See* Maniscalco Reply Decl. ¶¶ 8-9.  As time progressed, however, it became increasingly clear to CDAC that Lean Chefs had, in fact, misappropriated the CD List and that substantial confusion existed in the marketplace between the CHEFS DIET® Mark and Lean Chefs.

That understanding reached its zenith in September 2014 when Lean Chefs sent an "email blast" solicitation to certain individuals on the CD List, including the Fictitious Individuals, Peter Daniel and Christian Ledan.  *Id.* at Exhibit I.  At that point, CDAC confirmed beyond any reasonable doubt that Lean Chefs had stolen the CD List.  *Id.* ¶ 11.  Worse, soon after the September "email blast," consumers began flooding CDAC's customer-service center with misdirected phone calls and inquiries concerning CDAC's affiliation with Lean Chefs.  *Id.*.  At that point, CDAC appreciated the "true and pervasive extent" of Defendants' wrongful conduct and resolved to seek preliminary injunctive relief.  *Id.*[22]  In light of the foregoing, CDAC's short delay in seeking injunctive relief should be excused because CDAC diligently investigated its claims in good faith and because CDAC did not appreciate the true severity and extent of Defendants' unlawful conduct until September 2014.  *See, e.g.*, *Clifford Ross*, 710 F. Supp. at 521; *Fisher-Price*, 25 F.3d at 124; *King*, 976 F.2d at 831.

---

[22] CDAC retained Pryor Cashman LLP in September 2014; owing to the hospitalization of CDAC's former President Misha Podlog, who has since departed the company due to related health issues, CDAC commenced the instant action on October 23, 2014.  *Id.* ¶ 11 n. 2.

**<u>CONCLUSION</u>**

For the foregoing reasons, Plaintiff respectfully requests that its motion be granted in its

entirety and that it be granted such other and further relief as the Court deems just and proper.

Dated: New York, New York
       February 9, 2014

                        PRYOR CASHMAN LLP

                        By: __/s/ James S. O'Brien_____
                              James S. O'Brien (JO-0858)
                              jobrien@pryorcashman.com
                              Dyan Finguerra-DuCharme (DF-9228)
                              dfinguerra-ducharme@pryorcashman.com
                              Andrew M. Goldsmith (AG-2486)
                              agoldsmith@pryorcashman.com
                        7 Times Square
                        New York, New York 10036-6569
                        Telephone:  (212) 421-4100
                        Facsimile:  (212) 326-0806

                        *Attorneys for Plaintiff Chefs Diet*
                        *Acquisition Corp. d/b/a Chefs Diet*