Rough Transcript

### Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------X
CHEFS DIET ACQUISITION CORP.,
d/b/a CHEFS DIET,
    Plaintiff,   CASE NO. 14-CV-8467(JMF)
    v.
LEAN CHEFS, LLC, NICHOLAS ZAZZA
and ARTHUR GUNNING,
    Defendants.
------------------------------------X

\* C O N F I D E N T I A L \*

\* A T T O R N E Y S' E Y E S O N L Y \*
DEPOSITION OF ARTHUR V. GUNNING
New York, New York
Wednesday, January 7, 2015

### Page 3

Reported by:
ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
JOB NO. 88723

### Page 4

January 7, 2015
11:00 a.m.

CONFIDENTIAL/ATTORNEYS' EYES ONLY deposition of ARTHUR V. GUNNING, held at the offices of Pryor Cashman, Seven Times Square, New York, New York, pursuant to Notice, before Annette Arlequin, a Certified Court Reporter, a Registered Professional Reporter, a Certified LiveNote Reporter, a Certified Realtime Reporter, and a Notary Public of the State of New York.

### Page 5

A P P E A R A N C E S:

PRYOR CASHMAN LLP
Attorneys for Plaintiff
   7 Times Square
   New York, New York  10036
BY: JAMES S. O'BRIEN, JR., ESQ.
    ANDREW M. GOLDSMITH, ESQ.

MEREDITH & KEYHANI PLLC
Attorneys for Defendants'
   330 Madison Avenue - 6th Floor
   New York, New York  10017
BY: DARIUS KEYHANI, ESQ.
    FRANCES H. STEPHENSON, ESQ.

Rough Transcript

Page 6

1
2    IT IS HEREBY STIPULATED AND AGREED by
3    and between the attorneys for the
4    respective parties herein, that filing and
5    sealing be and the same are hereby waived;
6    IT IS FURTHER STIPULATED AND AGREED
7    that all objections, except as to the form
8    of the question, shall be reserved to the
9    time of the trial;
10   IT IS FURTHER STIPULATED AND AGREED
11   that the within deposition may be sworn to
12   and signed before any officer authorized to
13   administer an oath, with the same force and
14   effect as if signed and sworn to before the
15   Court.
16
17              - oOo -
18
19
20
21
22
23
24
25

Page 7

1    * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2         A R T H U R   G U N N I N G, called as a
3    witness, having been duly sworn by a
4    Notary Public, was examined and testified
5    as follows:
6              *    *    *
7    EXAMINATION BY
8    MR. O'BRIEN:
9         Q.  Good morning, Mr. Gunning.  My name
10   is James O'Brien.  I represent Chefs Diet      11:10AM
11   Acquisition Corp.
12        If I refer to that entity as CDAC,
13   will we be able to keep that straight?
14        A.  Yes.
15        Q.  Okay.  I'm going to be asking you a   11:11AM
16   series of questions.  My questions are not
17   supposed to be trick questions or difficult.  If
18   I ask you a question that you don't understand,
19   just let me know and I'll work with you to get a
20   question out that you can understand, okay?     11:11AM
21        A.  Yes.
22        Q.  The court reporter takes down what
23   you say, so just give me an audible answer.  A
24   shrug or a nod of the head, she can't take that
25   down, all right?                                11:11AM

Page 8

1    * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2         A.  Of course.
3         Q.  If you need to take a break, let me
4    know.  We'll accommodate you.
5         Your attorney is here to help you.        11:11AM
6    Feel free to consult with him, but I would ask
7    you to wait until you've already given your
8    answer.  Don't consult with him during the
9    pendency of a question because it then suggests,
10   you know, that he's suggesting answers and we   11:11AM
11   don't want to have that, okay?
12        A.  Understood.
13        Q.  Okay.  All right.  So let's start
14   with some background information.
15        Did you attend college, sir?              11:12AM
16        A.  No, I didn't.
17        Q.  Did you graduate from high school?
18        A.  Yes, I did.
19        Q.  Can you give me a brief recitation of
20   your employment history?                       11:12AM
21        A.  Yes.  Employment history, when I was
22   in high school, my mother owned a restaurant.
23   The restaurant was failing so I made a decision
24   to work with her and help her build her business
25   rather than go to college, which the business  11:12AM

Page 9

1    * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2    winded up being successful and she sold it, and
3    she wounded up doing well with it, thank God.
4         Thereafter I built routes.  Winded up
5    building routes from scratch to million dollar  11:13AM
6    businesses.
7         A&F Candy Distributors is one of
8    them.
9         Had a Reisman pretzel route, a whole
10   line of pretzels.  Built those from zero to 400  11:13AM
11   accounts.  Did that in a relatively short period
12   of time.
13        Mystic Spring Water and Juice, I
14   launched that in New York.  I was the largest
15   distributor in Brooklyn.  That was very         11:13AM
16   successful.
17        Went to Wall Street, became a large
18   broker on Wall Street.  Did that for about I
19   guess three, four years.
20        Opened up -- was a partner with Zone       11:13AM
21   Gourmet Diet Delivery.  Built that from zero to
22   a $30 million company.
23        Built Zone Chefs, which became Chefs
24   Diet.  Built that from scratch, zero
25   advertising, up to a 40 to $50 million company.  11:13AM

Rough Transcript

## Page 10

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

And now Lean Chefs.

Q. Thank you.

When you said that you were on Wall Street, when did you start working on Wall Street?   11:14AM

A. Twenty-eight years old. About twenty-one years ago.

Q. So is that about '94?

A. Yeah. '93, '94, um-hmm.   11:14AM

Q. And when you started on Wall Street, what were you doing?

A. I was a cold caller for about a year just learning the business. I really didn't do much solicitation, just started learning the   11:14AM business. Passed my Series 7 test and a 63, and then became a financial consultant.

Q. Where were you working as a cold caller in '94?

A. It was a company by the name of White   11:15AM Rock, White Rock Securities. Matter of fact, that's where I met the owner of Chefs Diet, Kevin Glodek. He was also working within the same office.

Q. When did you stop working for White   11:15AM

## Page 11

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Rock Securities?

A. Right after I got licensed, I went to a company called Toluca Pacific.

Q. When was that?   11:15AM

A. That was a year after.

Q. '95?

A. Yeah. I was at Toluca for about three years.

Q. Till about '98?   11:15AM

A. '97, 98', yeah.

Q. Okay. Where did you go after that?

A. After that there was a company by the name of -- that was the last brokerage firm that I was actually a financial consultant in. At   11:16AM that point I started looking into diet delivery. I found a company that was doing it in Long Island, so I wound up leaving the industry a few years after that to really do full time diet delivery.   11:16AM

Q. Can you give me any approximate date when you left the industry?

You've told me that you left Toluca Pacific around '97?

A. Yeah, Toluca Pacific was about '97.   11:16AM

## Page 12

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Let's see, 17 years. It was probably 2000, maybe 2000 or -- '97 to 2000. '97, '99, right around there. I'm not really sure. I don't want to give you the wrong answer, but '97, '99   11:16AM I was out of the industry.

Q. And in or about 1999, you say that you found a diet delivery company?

A. There was a gentleman making the meals in Long Island, 20 clients, very small. I   11:17AM became one of his clients and I loved the concept. I lost weight. I felt great.

I called him and I said, "Do you know what you have here?"

And he said, "Well, if I get to 100   11:17AM clients, I'll be happiest guy in the world."

And I said, "I'll get you thousands of clients. I said I believe in this. We're helping people."

So I got involved with it and we   11:17AM winded up going up to 3,000 clients with my efforts.

Q. Was the name of that company Zone Gourmet?

A. That was.   11:17AM

## Page 13

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Q. And Zone Gourmet was in Long Island?

A. Yes, it was. And I was doing the sales and marketing for that company. I was in charge of all the sales and marketing.   11:17AM

Q. So you started there about '99?

A. Roughly, yes.

Q. For how long were you with Zone Gourmet?

A. Zone Gourmet, probably about five   11:18AM years I would think.

Q. Till about 2004?

A. 2004, 2005, 6, 7, 8, 9. Couldn't have been more than 2002, 2003 because I waited two years to open up. After I left them, two   11:18AM years later we opened up Zone Chefs and Zone Chefs I built that in probably about four years, four or five years and that was up until about 2009.

Q. How did you come to learn of Zone   11:19AM Gourmet?

A. I had a personal trainer that I was working out with and like anything else, if you're working out and you're not eating correctly, you're not going to get the results.   11:19AM

### Page 34

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
name."
     Most of the partners weren't hands-on. Nick and I put a lot of hours in, a lot of work. The first year I worked 365 days straight, never took a day off. Some days were 20-hour days. Always there. That's pretty much what we do; we work hard and we build, you know?   11:43AM
     And I guess the other partners it was a lot easier for them to want to change the name. You know, for us we were attached to the name. It's our brand, we built it.   11:43AM
     Q. When the name changed to Chefs Diet, was there a new logo created?
     A. With Chefs Diet? Yes.   11:44AM
     Q. And who created that logo?
     A. Nick Zazza.
     Q. Were you involved in that at all?
     A. The name.
     Q. Well, the logo. Were you involved with the creation of that?   11:44AM
     A. Everyone gave their feedback. We had partners so we always discussed everything.
     Q. And similarly, did you discuss the look and feel of the website?   11:44AM

### Page 35

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
     MR. KEYHANI: Objection to form.
     You can answer the question.
     A. No. We just let them build the website. That's what Mr. Zazza does. He's very talented. He's great with technology. I'm great with marketing and advertising. That's why we have a great relationship.   11:44AM
     Q. Well, when he -- he built the new website for Chefs Diet, correct?   11:44AM
     A. Yes.
     Q. And did he choose the color scheme to be employed on that website?
     A. Once again, it might have been discussed with everyone. We had different colors. We had zone -- we had orange for one company. We had, you know, Zone Diet at Home was orange. We had different colors.   11:45AM
     Q. But for Chefs Diet, do you recall discussions in which you were deciding what color to use for the website?   11:45AM
     A. I don't recall.
     Q. You said you had different companies.
     What different companies did you have?   11:45AM

### Page 36

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
     A. Different companies as far as different divisions?
     Q. I'm just saying --
     A. We had different divisions within Zone Chefs.   11:45AM
     Zone Chefs had a kosher division which made kosher meals.
     Zone Chefs had a vegetarian program, which I formed a relationship with Zen Palate and they were making our vegetarian meals.   11:45AM
     Q. How about Chefs Diet?
     A. Those relationships carried over.
     Q. Once the name changed from Zone Chefs to Chefs Diet, were there divisions, as you say, in Chefs Diet?   11:46AM
     A. Yes. Same relationships just carried over and they changed the name.
     So if it was Zone Chef Kosher, then it was Chefs Diet Kosher. And the vegetarian was the same way and the kids program I designed was also the same way. The national program became I guess, I believe it's Chefs Diet Nation. I'm not -- I don't -- national. I'm not sure what their name is.   11:46AM

### Page 37

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
     Q. Now you say these are divisions.
     Are they actual entities I mean like an LLC or a corporation? Do you know?
     A. I'm not sure.   11:47AM
     MR. KEYHANI: Objection to the extent it calls for a legal conclusion.
     A. I'm not sure exactly. I don't want to give you a wrong answer on that so...
     Q. When you say "the national program," what is that or what was that under Chefs Diet?   11:47AM
     A. Well, let's go back to Zone Chefs. Zone Chefs I came up with an idea that if I could find a company that could make the meals for us, package the meals and ship them across the whole country, I thought it would be a great idea.   11:47AM
     I found that place in Iowa. Set up a meeting, went out there, formed a wonderful relationship with them and we winded up doing national meals; making the meals and delivering them across the whole country with a process called Modified Atmosphere Packaging, and we built that up pretty strong.   11:47AM
     Q. Is that dry ice?   11:48AM

Rough Transcript

### Page 38

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

2  A. It was used with dry ice, right, and
3  it was modified atmospheric where they take out
4  the oxygen and they put nitrogen within the
5  package to give it a longer shelf life.        11:48AM
6      Q. And it's frozen food.
7      A. No, fresh food.
8      Q. Packed in dry ice.
9      A. Well, to keep it nice and cold you
10 put the ice packs within the bag, but the      11:48AM
11 product itself was lettuce that would last 21
12 days because the nitrogen was in there, so it
13 just extended the shelf life.
14     Q. Okay.
15     A. But fresh food, not frozen.              11:48AM
16     Q. And that would be mailed across the
17 country?
18     A. Across the country.
19     Q. On a weekly basis?
20     A. Weekly.                                   11:48AM
21     Q. What is the name of the outfit in
22 Iowa?
23     A. It was Pure Foods was the company.
24     Q. And who entered into the agreement
25 with Pure Foods?                                 11:49AM

### Page 39

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

2      A. That would be our -- some of the
3  partners. I guess it was probably Alex.
4      I found the company. I went out
5  there, I formed the relationship and then I let  11:49AM
6  them do all the paperwork and everything else.
7      Q. My question really was who were the
8  parties to that -- there was a written contract,
9  right?
10     A. Yes.                                      11:49AM
11     Q. Okay. And who were the parties to
12 that contract?
13     You had Pure Foods on one side and
14 then what was the entity or entities on the
15 other side?                                      11:49AM
16     A. Same partners, but now with the
17 national, Mr. Zazza was also involved.
18     Q. And I don't mean to ask you a legal
19 question, but if you can remember, was the
20 contract between Pure Foods and these            11:49AM
21 individuals or was the contract between Pure
22 Foods and a company?
23     MR. KEYHANI: I'm going to object to
24 the extent it calls for a legal conclusion.
25     But you can answer the question.             11:49AM

### Page 40

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

2      A. I'm not sure.
3      Q. Okay.
4      A. I don't want to give you a wrong
5  answer.
6      Q. Okay. Was the the national program,
7  did it have a name?
8      A. Yes. It was Zone Diet at Home.
9      And going to the color schemes that
10 you mentioned before, that site was orange.      11:50AM
11 That was a totally different color so we just --
12 we changed up the colors based on I believe that
13 the kosher was blue, so there was no real set
14 color for anything. It was just a different
15 look and feel.                                   11:50AM
16     Q. And Zone Diet at Home, was that a
17 corporation or an LLC, do you know?
18     MR. KEYHANI: Objection to the extent
19 it calls for a legal conclusion.
20     You can answer the question.                 11:50AM
21     A. I'm not sure. I don't want to -- I'm
22 not sure. I'm sure it was a corporation, but
23 I'm not sure if it was an LLC. I'm not sure.
24     Q. Did Zone Diet at Home have a
25 checkbook?                                       11:50AM

### Page 41

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

2      A. I would say yes.
3      Q. So Zone Diet at Home was able to make
4  payments.
5      A. Yes.                                      11:51AM
6      Q. Did Zone Diet at Home have a bank
7  account?
8      A. I would say yes.
9      Q. Did Zone Diet at Home have a
10 president or CEO?                                11:51AM
11     A. I'm not sure if we ever named
12 anybody as CEO for that company, but I'm sure --
13 possibly. I'm not sure. I don't want to give
14 you the wrong answer.
15     Q. Is it your understanding that Chefs     11:51AM
16 Diet owned Zone Diet at Home?
17     A. Chefs Diet -- no, different partners.
18 There were different partners with that.
19     Mr. Zazza wasn't a partner with Chefs
20 Diet, but Mr. Zazza was a partner with Zone Diet 11:51AM
21 at Home, so no, it was just a different company.
22     Q. So we've got Chefs Diet and Zone Diet
23 at Home.
24     A. Um-hmm.
25     Q. What was the name of the kosher        11:52AM

Page 42

1  * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2  company?
3      A.  Zone Chefs Kosher and I think it
4  became Chefs Diet Kosher.
5      Q.  And who were the owners of the Chefs        11:52AM
6  Diet Kosher?
7      A.  The same owners that were with Zone
8  Chefs or Chefs Diet, the same owners.
9      Q.  Were there any other companies?
10     A.  No, not that I can recall.                  11:52AM
11     Q.  After the change to Chefs Diet, did
12 Zone Diet at Home change its name?
13     A.  Yes, I would believe they did.
14     Q.  And what was the new name?
15     A.  I don't recall.  It could be Chefs          11:53AM
16 Diet National.  I'm not sure.  I don't want to
17 give you the wrong name because I don't recall
18 what the name is.
19     Q.  When you made the change from Zone
20 Chefs to Chefs Diet, can you tell me how you        11:54AM
21 came up with Chefs Diet?
22     A.  The name?
23     Q.  Um-hmm.
24     A.  We'd brainstorm.  We'd come up with a
25 bunch of names.  Then we'd go to the domain         11:54AM

Page 43

1  * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2  sites to see which ones are available.  Then
3  we'd look up and see which ones are already
4  taken, already corporations.  So we always have
5  a huge list and then we just eliminate based on,   11:54AM
6  you know, just a process that we go through to
7  come up with any name.
8      Q.  Can you recall any of the other names
9  that you were contemplating when you chose Chefs
10 Diet?                                               11:54AM
11     A.  It was probably hundreds of them.  I
12 mean pretty much we just come up with a bunch of
13 names.
14         At one point when I was -- the same
15 way with Zone Chefs.  You know, I would come up    11:55AM
16 with a bunch names and I guess a lot of them
17 back them were zone.  That was a word we were
18 using was zone because it seemed like the whole
19 industry was using that type of name, so with
20 this I guess some of the names, most of the        11:55AM
21 names were, you know, a lot of them had the name
22 chefs involved.  Chefs are very popular on TV, a
23 lot of celebrity chefs, so chef seemed like it
24 was a popular word to use for meals.
25     Q.  Are you familiar with an entity             11:55AM

Page 44

1  * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2  called Chefs Diet Delivery LLC?
3      A.  No, no.
4      Q.  Let me show you what we previously
5  have marked as an exhibit.                         11:56AM
6         MR. O'BRIEN:  Off the record.
7         (Discussion off the record.)
8         (Plaintiff's Exhibit 1, Second
9     Amended and Restated Asset Purchase
10    Agreement, Bates stamped CDAC 639 through
11    685, marked for identification, as of this
12    date.)
13 BY MR. O'BRIEN:
14     Q.  Mr. Gunning, I've placed before you
15 what we marked as Plaintiff's Exhibit 1 for        11:56AM
16 identification.
17        Do you recognize this document?
18        MR. KEYHANI:  Take some time to look
19 at it.
20        (Document review.)                          11:57AM
21     A.  Okay.
22     Q.  Do you recognize that?
23     A.  Yes.  This is when we sold the
24 company.  This was I guess --
25        MR. KEYHANI:  I'm going to object to        11:57AM

Page 45

1  * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2  the question to the extent it calls for a
3  legal conclusion.
4         But you can answer the question.
5  BY MR. O'BRIEN:                                    11:58AM
6      Q.  Have you seen it before?
7      A.  Yeah.  Probably a while, but I'm not
8  sure if it's the exact thing that I had seen --
9      Q.  Okay.
10     A.  -- but it could be, possibly.              11:58AM
11     Q.  Okay.  You do know that there was a
12 sale, right?
13     A.  Yes.
14     Q.  Okay.  And there was a sale
15 memorialized by some written agreement, right?     11:58AM
16     A.  Correct.
17     Q.  So in the first paragraph you see
18 this is the paragraph where they say who the
19 parties to the contract are, and they mention
20 Chefs Diet Acquisition Corp.                       11:58AM
21        That's the CDAC that I mentioned,
22 right?
23     A.  Yes.
24     Q.  And then it says on the one side, and
25 on the other side we have Chefs Diet Delivery     11:58AM

Rough Transcript

Page 54

1  * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2  that company still exist?
3  A.  I don't know.  Once again, that's
4  their business.
5  Q.  Did Chefs Diet have a program in     12:08PM
6  place to develop new customers?
7  A.  Did they have a program in place to
8  develop new customers after we sold it?
9  Q.  No, no.  While you were -- well,
10 strike that.                              12:08PM
11     After the change in name from Zone
12 Chefs to Chefs Diet, you stayed -- you were
13 still a partner?
14 A.  Correct.
15 Q.  For Zone Chefs while you were there,  12:09PM
16 I understand that you had that big pop at the
17 beginning because of the article.
18     After that time, did you have a
19 marketing program of any kind?
20 A.  Yes.  I created the marketing.       12:09PM
21 Q.  You created the marketing.
22 A.  Yes.
23 Q.  That's your thing.
24 A.  Yes, that's my forte.
25 Q.  Tell me some of the things you did at 12:09PM

Page 55

1  * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2  Zone Chefs to create the marketing.
3     MR. KEYHANI:  Objection to form.
4     What are you talking about, Chefs
5  Diet or --                               12:09PM
6     MR. O'BRIEN:  Zone Chefs.  I'm sorry.
7     MR. KEYHANI:  You were going back --
8     MR. O'BRIEN:  Yeah.
9     MR. KEYHANI:  Go ahead.
10 BY MR. O'BRIEN:                          12:09PM
11 Q.  I'm talking about while you were at
12 Zone Chefs.
13 A.  Everything.
14 Q.  You sent out mailings?
15 A.  We sent out mailings.  We did TV.  We 12:09PM
16 did radio.  We did blogs.  We did billboards,
17 gorilla marketing, taking the sales crew and
18 going out and handing out pamphlets on the
19 street; going to events; going to Fortunoff's
20 and doing cooking shows; editorials.  Unlimited 12:10PM
21 to what we did.  I'm always finding new sources
22 of trying to bring in, you know, new clients.
23 Q.  Referring now to the mailing, that's
24 one element of your marketing efforts, right?
25 A.  A small piece.                       12:10PM

Page 56

1  * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2  Q.  Mailings.
3  A.  A small piece of it, right.
4  Q.  And how do you get names of people to
5  mail fliers to?                          12:10PM
6  A.  From different companies, but I found
7  one company that I'm still using to this day
8  that really provides, you know, the right type
9  of demographic.
10 Q.  What company is that?                12:10PM
11 A.  Is this confidential where the other
12 company won't get this name?  Because this is
13 part of my --
14    MR. KEYHANI:  We're going to
15 designate the entire deposition            12:11PM
16 confidential and then we'll in 30 days
17 clarify that.
18    THE WITNESS:  Because I don't want to
19 give them my marketing strategies of
20 course.                                    12:11PM
21    MR. KEYHANI:  Are you okay with that?
22    MR. O'BRIEN:  I'm not going to give
23 anyone your marketing strategies.
24    MR. KEYHANI:  No, no, but
25 disclosing -- you're not going to disclose 12:11PM

Page 57

1  * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2  the transcript of this deposition until
3  we've had a chance to review it and
4  designate certain areas.
5     MR. GOLDSTMITH:  I think that's part  12:11PM
6  of the protective order, yes.
7     MR. KEYHANI:  Is that part of the
8  protective order?
9     MR. GOLDSTMITH:  I'm pretty sure it
10 is.                                       12:11PM
11    MR. KEYHANI:  Well, just in case,
12 because it's not in front of me, I want to
13 make sure that this deposition is
14 designated as highly confidential,
15 attorneys' eyes only, and then we will    12:11PM
16 review it and then indicate specifically
17 what parts we want designated as highly
18 confidential.
19    MR. O'BRIEN:  That's fine.
20    MR. KEYHANI:  Go ahead.              12:11PM
21 A.  **Epsilon is the name of the company.
22 Q.  Okay.  And where is Epsilon located?
23 A.  I'm not sure.  I'm not sure, but
24 Epsilon, you can look them up on line.  They're
25 one of the biggest data companies out there. 12:11PM

### Page 58

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

I've been using them forever.
Q. They're one of the biggest data companies out there.
A. For what we do.                              12:12PM
Q. Okay. So their name is not a secret, right?
A. No, no.
Q. And how do you purchase names from them?   12:12PM
A. I go by a certain demographic. What I look for is a certain income; people who are interested in health products; have purchased any type of health product in the past; certain age. You know, our demographic.   12:12PM
And they would let me know how many names they have within a geographic area that fit pretty much the demographic that I'm looking for. They would let me know how many names and we would purchase.   12:12PM
We purchased millions and millions of names with the last company and to date right now we've purchased hundreds of thousands of names. That's what we do. We collect data.
Q. So with Zone Chefs you purchased   12:12PM

### Page 59

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

millions and millions of names?
A. We did. We used to mail 400,000 a month. A small percentage of that will become clients of course.   12:13PM
Q. When you -- any idea where Epsilon gets these names from?
A. I have no idea, but it's --
Q. Really? I mean --
A. I don't know how they do their   12:13PM
business, but I know they -- it's a data company.
Q. Right.
A. Like any data company. I don't know how they get their names, but I know that it   12:13PM
definitely fits the demographic because when the clients do call up, they can afford the product.
It's an expensive product. We want to make sure that we're not getting a lot of tire kickers wasting our salespeople's time, so   12:13PM
as long as they're calling up and they can afford the product and they're interested, then they're giving us the right list.
Q. Did you use Epsilon at Zone Chefs?
A. I did.   12:13PM

### Page 60

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Q. So you've been using Epsilon for years.
A. Forever. That's my company, yeah.
Q. And how much does Epsilon charge you   12:13PM
for names or how much did they charge you while you were at Zone Chefs?
A. I don't know the numbers back then. Roughly, it's not really that expensive. Maybe for 25,000 names it could be anywhere from   12:14PM
$1,500 or something like that to $2,000, and if we did more volume, we got lower breaks, lower pricing.
Q. So there's an agreement in place whereby if you buy so many names, you pay so   12:14PM
much money; is that right?
A. Pretty much, yes.
And then we would go to data shows. Data shows is also something that, you know, you find new connections. Data shows, people   12:14PM
providing data for different industries.
Q. Okay. Does Epsilon, again, while you were at Zone Chefs, did Epsilon send an invoice to you that you'd pay?
A. Of course. They still do to this   12:14PM

### Page 61

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

day. We still use Epsilon, they still send us invoices.
Q. Do you have a written agreement?
A. A written agreement that we purchase   12:15PM
their data? I guess they would give us an invoice and we would pay that invoice.
Q. I'm just curious if there's some, you know, some agreement that you have with them or it's just you order what you order and they send   12:15PM
you an invoice.
A. It's public information. You know, it's data. It's just names and phone numbers and addresses, and these are people that are the right people, you know, because we don't want to   12:15PM
waste the mailer. Mailers are expensive, so the last thing you want to do is mail to the wrong demo, you're not going to get the clients. So they would provide the right list for us and that's always been one of my go-to if not the   12:15PM
go-to company for me. They provide quality.
Q. So when you buy these names, they're not customers yet, right?
A. No, people.
Q. So do you call them leads?   12:15PM

Rough Transcript

Page 62

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
A. Data. They're just data.
Q. What are leads then?
A. A lead I guess would be considered somebody who called us, somebody -- if they're not a client, to me a lead and data is all the same thing.                                              12:16PM
Q. So if I were to say when you buy these names they're leads, that would be okay?
A. I guess you can name it whatever you want to name it.                                            12:16PM
Q. But you just said that they're the same to you and I'm just --
A. We buy data from them.
Q. Okay.
A. We buy data. Some people do call it leads. You know, the shows that we go to Leadcom, it's data, you know? So people have different names for it.
Q. Did Zone Chefs keep a database of its customers?                                            12:16PM
A. I'm sure we did.
Q. And in that database, would you have information about your customers such as what they like, what they don't like, things like      12:16PM

Page 63

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
that?
A. Yes.
Q. Would it be fair to say that over time with a customer, you would develop a      12:17PM
increasingly detailed profile of what they like and don't like?
A. Over time, usually at the initial sale.
Q. If I sign up for your product --          12:17PM
A. Yes.
Q. -- and I order what I order --
A. Right. You would tell us at that point what you like or --
MR. KEYHANI: Objection to form.     12:17PM
Are you talking about the current company or previous company or both companies? What time period?
MR. O'BRIEN: Today.
MR. KEYHANI: With Lean Chefs?        12:17PM
MR. O'BRIEN: Yes.
BY MR. O'BRIEN:
Q. I call you up today, I'll tell you what I want to order.
A. Yes.                                        12:17PM

Page 64

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
Q. I'll make an order.
But over time would you come to learn things that I like more than others?
A. For the most part, the client would     12:17PM
let us know that at the initial sale. They would tell us their likes and their dislikes, and then that's how we would design the program for them.
Q. Does your menu ever change?            12:18PM
A. Does our menu change? We have a set menu and then we add to it.
Q. So does your menu change over time?
A. It changes -- the original menu stays pretty much the same. We just add more weeks.     12:18PM
Q. Okay. You add other dishes.
A. Yes. More variety.
Q. And over time as you add more dishes, would you try and come to learn which of them I like and which of them I don't like?           12:18PM
A. Your restrictions are probably your restrictions for the most part. Maybe if you don't like one of those dishes, you will let us know, but for the most part if a person doesn't like an I don't eat seafood or fish, if the new      12:18PM

Page 65

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
weeks come up and it's fish and shellfish in there, then it's going to stay the same restrictions. It's not going to change because there's new dishes. If I don't eat tuna and cod     12:18PM
comes up, I don't like cod either because I just don't eat fish in general, so it would just carry over.
Q. How detailed is the -- was the questionnaire that Zone Chefs would give to the     12:19PM
customer at the outset?
A. Basic questions. Every company does the same thing. Every company pretty much asks the same questions. Really it's just a basic question; name, address, phone number, all of      12:19PM
that; height, weight, things like that and then different allergies or restrictions. It seems like every company does the same thing.
Q. Did Zone Chefs try and periodically learn more about its customers in an effort to     12:19PM
possibly sell them more product?
MR. KEYHANI: Objection to form.
You can answer the question if you understand.
A. Not that I recall.                      12:20PM