Rough Transcript

Page 86

1  * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2  Q.  When you said that companies would
3  come to you, was that based on anybody
4  soliciting them?
5  A.  No. No. Nutrisystem. Companies          12:50PM
6  came to us.
7  Q.  Was the company for sale?
8  A.  We were listening to offers. That's
9  what pretty much created the interest of us
10 selling the company.                         12:50PM
11 Q.  Was there a discussion before the
12 Asset Purchase Agreement about maybe selling the
13 company?
14     MR. KEYHANI: Objection to form in
15 terms of characterization of the document.   12:50PM
16     But you can answer the question.
17 A.  Before we sold the company were there
18 discussions? We had meetings of selling the
19 company.
20 Q.  And was it discussed at those          12:50PM
21 meetings maybe we should sell the company?
22 A.  We discussed it. Yeah, we were
23 interested in selling it if the number was right
24 of course.
25 Q.  Okay. And in those discussions, what   12:51PM

Page 87

1  * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2  was the number that was being discussed?
3  A.  Nutrisystem offered us, I don't want
4  to give the wrong numbers, but somewhere around
5  $50 million.                                12:51PM
6  Q.  And do you recall what the number was
7  when the company was actually sold?
8  A.  We were originally promised somewhere
9  about $10 million and I'm not sure what happened
10 because I wasn't here, but it winded up a couple 12:51PM
11 hundred thousand dollars each partner wounded up
12 receiving.
13    That's from Kevin so something
14 happened. I'm not sure why it dropped because I
15 wasn't here, but originally it was discussed $10 12:52PM
16 million and it winded up going down to a couple
17 hundred thousand dollars. I mean really --
18 Q.  Would it be accurate --
19    MR. KEYHANI: Please let him finish.
20    Were you finished with your answer?   12:52PM
21    THE WITNESS: Yeah.
22 A.  Like I said, I wasn't here, so pretty
23 much I had no control over that because I was
24 away, but all I kept hearing was that we're
25 getting less, we're getting less, we're getting 12:52PM

Page 88

1  * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2  less and I don't know why.
3     I did the marketing and advertising
4  for the company. I mean that's my forte.
5  That's what I do. I'm very good at it. I'm not 12:52PM
6  saying it in a cocky way. It's just, you know,
7  I built two great companies and going on my
8  third company, so I definitely understand the
9  market better than anyone out there as far as I
10 have that formula and I can acquire clients    12:52PM
11 very, very easily because I have that formula, I
12 created that formula.
13    So I guess with me not being here,
14 let's go back to Zone Gourmet, they had 3,000
15 clients. When I left that company, it went down 12:52PM
16 to 500 clients.
17    I don't know what Chefs Diet is doing
18 right now, but I wouldn't assume that they're
19 doing 4,300 clients or 4,000, 3,000 clients like
20 they were when we gave them the company, but I'm 12:53PM
21 not sure. Maybe they are.
22    So but, you know, without the
23 marketing, without, you know, and I'm not going
24 to pat myself on the back, but I understand the
25 marketing better than most. And, you know,   12:53PM

Page 89

1  * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2  there's a reason why right now we're growing
3  because of my marketing efforts. And once
4  again, that's a combination of a lot of
5  different things that we do with marketing that 12:53PM
6  helps to acquire the clients.
7  Q.  Would it be accurate to say that you
8  did not have any part in the negotiations of the
9  agreement because of your incarceration?
10 A.  I was there for the beginning part    12:53PM
11 when we were talking about $10 million, but I
12 wasn't there -- I don't know what created us
13 only getting 250,r $300,000. I don't know what
14 happened to create that, and once again, I had
15 no control because of where I was.          12:54PM
16 Q.  So when you came out of prison, did
17 you seek to go back to Chefs Diet?
18 A.  Kevin, when I was in -- when I was
19 there in prison, about a month before I was
20 released, a month or two months before, Kevin 12:54PM
21 took an eight-hour trip to visit me. Kevin
22 offered me a million shares and $2,500 a week
23 because he said I could single-handedly bring
24 the company -- he knew -- he believed in me that
25 I could bring the company back to where it was. 12:55PM

### Page 90

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

2  Kevin made me that offer. Kevin sent an email
3  ou to all the shareholders saying that the old
4  CEO is coming -- he offered me $2,500 a week and
5  a million shares.                              12:55PM
6      He took that trip to visit me in
7  Allenwood right before I was released, and made
8  me that offer because he said, "You can fix the
9  company." He said the company was losing money
10 at that point. They didn't know how to do the   12:55PM
11 marketing and the advertising so he took that
12 trip to visit me and made me that offer.
13     He sent an email out to all his
14 investors, which we're looking to get that
15 email, saying that the CEO was coming back,     12:55PM
16 great news. And I'm coming back to, you know,
17 bring growth to the company again.
18     When I came home, I looked at his
19 numbers and I seen that he was losing $1 million
20 a year, and at that point I decided I didn't    12:55PM
21 want to get involved in something like that. It
22 seemed like just way too much work for me to get
23 involved in.
24     But Kevin believed in my ability and
25 that's why he took that eight-hour trip.        12:56PM

### Page 91

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

2      Q.  When you say you looked at his
3  numbers, what --
4      A.  He showed me something that was like
5  a half a million dollars. He said, "We're only  12:56PM
6  losing a half a million dollars."
7      And I told Kevin, "That's a half a
8  year." I said, "You're not showing me your
9  annual numbers..." I said, "...so you're
10 probably losing about a million a year."        12:56PM
11     He said, "Right, but you can fix
12 that."
13     It's a lot of work taking a company
14 that's declining like that and trying to fix it.
15 I didn't want to get involved with that.        12:56PM
16     Q.  Is it more or less work -- strike
17 that.
18     Is it more work to try and rebuild an
19 existing company or to start a totally new
20 company?                                        12:57PM
21     MR. KEYHANI:  Objection to form.
22     You can answer.
23     A.  I don't know. I don't know. I
24 haven't done both of them together, so I can't
25 give you an accurate answer unless I've done    12:57PM

### Page 92

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

2  both of them.
3      Q.  Well, you did that with Zone Gourmet,
4  right?
5      A.  When I left Zone Gourmet, I never     12:57PM
6  came back to Zone Gourmet to help them rebuild
7  again. I never went back to any company and
8  tried to help them rebuild again, so I couldn't
9  give you that other side of the equation.
10     Q.  How was the company doing, Chefs      12:57PM
11 Diet, at the time of the Asset Purchase
12 Agreement?
13     MR. KEYHANI:  Objection to form to
14 the extent it calls for a legal conclusion
15 and the time that we're talking about.          12:57PM
16     You can answer the question.
17     A.  From what I recall, probably $28
18 million in revenue, $30 million in revenue I
19 would assume. Something like that. I'm not
20 sure. I don't want to give you an inaccurate    12:58PM
21 answer, but it's in that range.
22     Q.  And profits?
23     A.  Not sure.
24     Q.  Do you know if the company was losing
25 money?                                          12:58PM

### Page 93

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

2      A.  I know that at one point we had about
3  $2 million in the escrow account saved.
4      When we were discussing selling the
5  company, we had about 2.3, $2 million in the   12:58PM
6  escrow account saved.
7      Q.  But was the company losing money on
8  an annual basis? Do you know?
9      A.  Kevin and Keith Lyon ** and
10 Mr. Rosenbaum, even though they didn't purchase  12:58PM
11 the company, they were still giving us decisions
12 on marketing and advertising, so at that point
13 they changed the whole strategy of the marketing
14 and advertising and we did see a decline in
15 sales based on some of the ideas that they were 12:58PM
16 coming up with.
17     Q.  Do you know whether in March of 2009
18 the company was losing money?
19     A.  I don't recall.
20     Q.  Do you think that the company's       12:59PM
21 financial performance in March of 2009 was
22 factored into the sale price?
23     A.  I don't recall.
24     Q.  No one told you that the reason you
25 didn't get $10 million or $1 million was because 12:59PM

Rough Transcript

### Page 94

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

of the performance of the company?

  A.  I was coming up with advertising and marketing ideas. That's what I do. And Keith Lyon, who was the CEO for Kevin, was shooting every one of my ideas down.   12:59PM

  So at that point I was not doing the marketing and the advertising for that last year at all, so without me doing the marketing, once again, you know, I have that formula and if they wouldn't let me use my formula, there will be a decline.   12:59PM

  Q.  My question was did anyone tell you that the reason the company didn't get $10 million or $1 million was because of its financial performance?   01:00PM

  MR. KEYHANI:  Objection. Asked and answered.

  MR. O'BRIEN:  Not answered.

  A.  I wasn't speaking to anyone because I was away and I didn't have, you know, Alex or Misha or anybody else. What I was told is what we got and that was it. But from my understanding is, you know, without the marketing and the advertising, the company every   01:00PM  01:00PM

### Page 95

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

single year continued to drop.

  Q.  When was this email that Kevin Glodek sent you with the offer of employment?

  MR. KEYHANI:  Objection to form.   01:01PM

  A.  He offered me that personally in Allenwood when he took the ride eight hours, four hours there and four hours back. He made me that offer there.

  Q.  And you, correct me if I'm wrong, but you said that he sent out an email to the investors notifying them that you were coming back?   01:01PM

  A.  That is correct.

  Q.  And do you recall approximately when that was?   01:01PM

  A.  It was -- I came home August 20th. Within a month. Within a month after that.

  Q.  So September of 2011?

  A.  It could have been anywhere from August after he visited me. It could have been -- let me give you something, a better gauge because he might have sent the email out to the investors after he had the meeting with me in Allenwood. So let's say it could have been from   01:01PM  01:02PM

### Page 96

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

anywhere late July to September, within that range.

  And when I declined, he was upset because he said he already sent an email to all the investors letting them know I'm coming back, so he was a little bit upset over that.   01:02PM

  Q.  When did you first consider creating another diet delivery company?

  A.  Not when I first came home. I mean we had a noncompete so I had to make sure we honored the noncompete.   01:02PM

  Pretty much I got involved with helping Mr. Zazza with the DigiPBX, doing sales for that. Pretty much, yeah, really didn't do anything until, you know, until I guess a couple years after, a year or a year-and-a-half after, year later. I'm not really sure exactly what the dates are.   01:03PM

  Q.  Give me your best approximation of when you first formulated a plan to create a competing company?   01:03PM

  A.  It had to be maybe 2013 I'm thinking. I'm not sure. I don't want to give you an inaccurate number, an inaccurate date. I'm   01:03PM

### Page 97

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

under oath so I want to make sure I'm giving you the accurate number.

  Q.  Sometime in 2013.

  Is that your best answer?   01:03PM

  A.  It could have been 2013, yeah. Close to it I would think, yes.

  The noncompete was already -- before we opened, the noncompete was already done.

  Q.  When did you communicate your idea with anybody else about creating a competing company?   01:04PM

  MR. KEYHANI:  Objection to form.

  A.  When you say anyone else.

  Q.  When did you tell somebody? When was the first time you said to somebody hey, I've got this great idea of starting up a new company?   01:04PM

  A.  I don't know what the exact date is.

  Q.  Who did you talk to?   01:04PM

  MR. KEYHANI:  Objection to form.

  A.  I don't know. My wife? I don't know. My daughter maybe? I'm not sure who I told, but probably family would be the first people I would speak to.   01:04PM

Rough Transcript

### Page 102

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Q. That was just a for instance.
Did you make any search anywhere for documents in connection with this lawsuit?
A. I know Mr. Zazza did that of course.   01:10PM
Q. But did you personally do that?
A. I don't deal with servers and things like that so I don't know. I don't know where to look. I'm not a technology guy.
Q. Is the answer to my question no?   01:10PM
MR. KEYHANI: Objection to form.
BY MR. O'BRIEN:
Q. You can answer.
MR. KEYHANI: You can answer the question.   01:10PM
A. Personally I don't -- I'm not a technology guy. That's not what I do. So, you know, personally do -- where would I look? I don't know where I would look.
Mr. Zazza could find anything. With   01:10PM email, he would be able to find that himself.
Q. So you personally did not undertake to search for any documents, correct?
MR. KEYHANI: Objection. Asked and answered.   01:10PM

### Page 103

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

You can answer the question.
A. Correct.
Q. How did you come up with the name Lean Chefs?   01:11PM
A. Once again, the same way; pretty much looking at a bunch of names, going through a list, going onto, let's say, GoDaddy domain, Buy domain, seeing what's available and then whatever was available, that's how you determine   01:12PM a name. Same way I've always done it.
Q. And just so that we're clear, I'm not asking you how you chose to determine whether a name you were thinking of was free to use. I was asking how did you come up with names to   01:12PM even search if they were created.
A. Just brainstorming.
Q. And with whom did you brainstorm?
A. Mr. Zazza.
Q. Where were you when you brainstormed?   01:13PM
A. I don't recall. It could have been, you know, a phone conversation. It could have been in person. I'm not sure.
I mean brainstorming is not a one-time thing. It's just continuously coming   01:13PM

### Page 104

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

up with names and names and names, and what do you think and back and forth until you have a bunch names and then you see what's available, and then you pick which one you feel is your   01:13PM best.
Q. Did Mr. Zazza make some suggestions about possible names?
A. We both do. We both did.
Q. Anybody else chime in with   01:13PM suggestions about possible names to use?
A. His wife might have. Lisa Zazza might have helped us with the names.
Q. She might have or she did?
A. I would think she did possibly.   01:13PM
Q. Do you have a specific recollection of her being part of your conversations about this?
A. I would think that through the brainstorming we share ideas, and if she gave us   01:14PM some ideas also. I think she was there with the conversation, in the conversation, so probably the three of us. No one else probably brainstormed beyond that. It's just the three of us until we came up with a name.   01:14PM

### Page 105

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Q. How many names other than Lean Chefs did you come up with to search for?
A. We go through hundreds. Hundreds. We just keeping making up names and making up   01:14PM names and making up names, and some will stick, some won't. I mean I'm sure the same thing with Zone Chefs and Chefs Diet. It's the same formula, to come up with a bunch of names and whatever is available, you know, then you pick   01:14PM the best one and you go with it.
Q. Did the other names that you came up with have the word "chefs" in it?
A. Chefs is a very hot -- it's, you know, with chefs on TV, a lot of celebrity   01:15PM chefs, so yeah, I would say, you know, a lot of them had the word "chefs" in it. A lot of them could have had food. A lot of them could have had meals. Just trying to, you know, just a bunch names, but chef is a pretty hot name   01:15PM because lately there's been a lot of celebrity chefs on television at that point and chefs are getting pretty famous; Mario Batali, all these big names. Jean-Georges. So chefs is a big name so I figured that would be one of the best   01:15PM

## Page 106

1   * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2   choices.
3       Back in the days, it was zone. I
4   would come up with a bunch names for zone
5   because zone was the hot topic, the hot name.   01:15PM
6   So it's just whatever the industry is.
7       Q.  What were some of the other names
8   that were in contention?
9       A.  I don't recall. Once we throw a name
10  out, it's just a name. It's either it wasn't   01:16PM
11  available, so I really don't know what the other
12  names are.
13      Q.  The domain name for Lean Chefs was
14  available, correct?
15      A.  To purchase, yes.   01:16PM
16      Q.  And you did purchase it?
17      A.  Yes.
18      Q.  When?
19      A.  I don't recall, but I know we did
20  purchase the name.   01:16PM
21      Q.  You have a record of that purchase,
22  correct?
23      A.  I'm sure we do.
24          MR. O'BRIEN: I call for the
25  production of that record.   01:16PM

## Page 107

1   * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2   BY MR. O'BRIEN:
3       Q.  Do you remember what you paid for it?
4       A.  I'm not sure. I don't want to give
5   you the wrong answer. I'm not sure.   01:16PM
6       It was definitely not a regular
7   domain for like $9 or $10. I think it was
8   something that there was a premium on that. It
9   could have been a thousand or two. I'm not
10  sure. Once again, I don't want to give you an   01:17PM
11  inaccurate number.
12          (Plaintiff's Exhibit 3, Defendants'
13      Supplemental Responses and Objections to
14      Plaintiff's First Set of Interrogatories,
15      marked for identification, as of this
16      date.)
17  BY MR. O'BRIEN:
18      Q.  Have you seen what we marked as
19  Exhibit 3 before?
20      A.  I don't recall.   01:17PM
21      Q.  Do you understand that the plaintiff
22  in this case has made certain requests for
23  information?
24      A.  Okay. Yes. Based on this.
25      Q.  If you look at page 3 of this   01:18PM

## Page 108

1   * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2   document, do you recall providing any
3   information in response to the requests made in
4   this document?
5           MR. KEYHANI: Take a moment to look   01:18PM
6       at it.
7           (Document review.)
8           MR. KEYHANI: You can read through it
9       if you want.
10          THE WITNESS: Which part?   01:19PM
11          MR. KEYHANI: He's at page 3, but
12      take a look at it.
13      A.  One to $2,000 for domain, so that
14  seems pretty accurate. That's what it says
15  here, $2,000.   01:19PM
16      Q.  My question was not that.
17      My question was do you recall
18  providing any information in response to the
19  requests made in this document?
20      A.  I know there was a request for emails   01:19PM
21  and things like that, and I know, I think we --
22  I'm not sure because I didn't send it over,
23  Mr. Zazza sent it over. You have to ask him.
24      Q.  This is a different document. This
25  has questions in it.   01:20PM

## Page 109

1   * ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
2       My only question to you is, do you
3   recall providing information --
4       A.  Which question exactly are you --
5       Q.  Any of the questions.   01:20PM
6       A.  Can you give me an example?
7       Q.  Sure.
8       Take a look at on page 4, Question
9   No. 2.
10      A.  Right.   01:20PM
11      Q.  The answer to that question, did you
12  provide any of that information?
13          MR. KEYHANI: Read it carefully.
14          (Document review.)
15      A.  Brainstorming meeting in 2013. This   01:20PM
16  is what I just told you.
17      Domain sale $2,000. That's what I
18  just mentioned also.
19          (Document review.)
20      Q.  Is that date right?   01:21PM
21      A.  Yeah, I guess that's pretty close to
22  be accurate I would think.
23      Q.  Why do you think that now?
24      A.  Because I know it was before we
25  opened, so months before we opened so that seems   01:21PM

### Page 130

\* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY \*

2 could help us and give us the best rates.
3 Q. And the mail service takes care of
4 taking the names that you give it and ensuring
5 that the addresses are placed on the fliers,          01:45PM
6 correct?
7   A. They would do the fulfillment on it
8 and they would mail it, yes.
9   Q. Did you hire a company such as that?
10  A. Yes. Yes. To do that type of                   01:46PM
11 fulfillment for us, yes.
12  Q. And who was that?
13  A. I forgot the exact name.
14  Q. Was it Select Mail?
15  A. Select Mail, that's it, um-hmm.                01:46PM
16  Q. When were they hired?
17  A. I don't recall. I don't want to give
18 you the wrong date.
19  Q. Does Select Mail scrub the lists that
20 you give to it?                                     01:46PM
21      MR. KEYHANI: Objection to form.
22  A. Do they scrub the list? I'm not sure
23 if they scrub it to see if people moved. We
24 used to do that with the old company. I'm not
25 sure.                                               01:47PM

### Page 131

\* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY \*

2      I mean pretty much I would say no. I
3 would say they just mail out, you know, what we
4 give them and if something bounces back and it
5 comes back to Select Mail, then they would just    01:47PM
6 take it off the list, because why mail something
7 again if the address is no good.
8   Q. So you don't know if you have anybody
9 that takes the lists that you provide and before
10 the mailing goes out, tries to determine how       01:47PM
11 many of the addresses are no longer good?
12  A. Not that I recall.
13  Q. Is there any industry standard for
14 percentage of bad addresses in a list?
15  A. Not that I know of. I'm sure there's  01:47PM
16 numbers, but I'm not aware of that.
17  Q. When was your first mailing to
18 prospective customers by Lean Chefs?
19  A. Possibly December 2013. Right when
20 we opened, right around then.                      01:48PM
21  Q. Where did you get the names and
22 addresses to mail to?
23  A. The way we got our names was from
24 Epsilon, which is a data company.
25      Also purchased names at the lead           01:48PM

### Page 132

\* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY \*

2 show, which was \*\*Leadcom and Ad Tech, so it
3 could have been from -- I'm not really sure
4 where they came from, but probably one of those
5 two I would have to assume.                       01:49PM
6   Q. Do you know?
7   A. To be accurate, I would have to -- I
8 don't want to assume, but I would think that it
9 could have been a combination of both or it
10 could have -- I'm not sure of the exact amount   01:49PM
11 we mailed. Maybe it was 50,000. If it was,
12 then it was probably from Epsilon.
13  Q. You have invoices from those sellers
14 of names, right?
15      MR. KEYHANI: Objection to form.          01:49PM
16      You can answer the question.
17  A. I would assume. From Epsilon?
18  Q. From Epsilon and --
19  A. Yeah, Epsilon. If we purchased, then
20 I would have an invoice from that.              01:49PM
21      From the lead show, I bought it from
22 an individual, just a data seller, so I don't
23 have an invoice from him, but that's common
24 practice at the shows.
25  Q. Do you have any documentation at all   01:50PM

### Page 133

\* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY \*

2 of purchases of names that you made at the shows
3 that you mentioned?
4   A. No, I don't. We have a receipt that
5 we went to the show. It cost us I think $750    01:50PM
6 each to go to the show, and we went to the show
7 to get data for diet. So I believe we have the
8 receipt for the --
9   Q. Attendance, right?
10  A. Yes, we do. And we went there to get  01:50PM
11 data for diet.
12  Q. No invoice, Bill of Sale or any other
13 document which shows that you made any purchase
14 at those shows?
15  A. No, but it's common practice. I     01:50PM
16 don't know if you're familiar with how data
17 works. These shows, what you have is you have
18 all the big players, all the guys, the big data
19 companies, they sit in the bars and they do
20 deals in the bars all day long. They don't even 01:50PM
21 go into the show.
22      I've been doing this for a long time,
23 so I know any show you go to, Leadcom, Ad Tech,
24 most of the deals are done right outside of the
25 show in the lounge area. They set meetings up   01:51PM

Rough Transcript

Page 138

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

2  A.  A customer of Chefs Diet, I mean the
3  industry, I don't know if you're familiar with
4  the industry, but a lot of these clients, they
5  bounce around to all these different companies.  01:56PM
6  So I'm not sure what is -- when you say customer
7  list it confuses me because I'm in the aware of
8  a customer list.
9      Are you saying that customers that
10 they market to? Is that what you're saying?  01:56PM
11     Q.  Listen to my question.
12         Did you understand at the time that
13 you were excellencing your marketing program for
14 Lean Chefs that Mr. Zazza had in his possession
15 a list of present customers of Chefs Diet?  01:56PM
16         MR. KEYHANI: Objection to form.
17 Calls for facts not on the record but you
18 can answer the question.
19         MR. O'BRIEN: I'm just asking him
20 questions.  01:56PM
21     A.  I became aware of a list that was
22 sent to Mr. Zazza as we're going through this I
23 guess litigation, so I became aware of the fact
24 that there was a list sent to Nick, Mr. Zazza,
25 in 2010 from one of the partners of Chefs Diet.  01:57PM

Page 139

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

2  He was given a list from Misha Podlog, that's
3  correct. If that's the list that you are
4  talking about, I just became aware of that
5  recently with this case.  01:57PM
6      Q.  And in addition to a list of active
7  customers of Chefs Diet, were you aware that
8  Mr. Zazza also had a list of inactive customers
9  of Chefs Diet?
10     A.  You would have --  01:57PM
11         MR. KEYHANI: Objection to form you
12 can answer.
13     A.  You have to ask Mr. Zazza about that.
14     Q.  I will, but I'm asking you, were you
15 aware --  01:57PM
16     A.  Was I aware no, you have to ask
17 Mr. Zazza about that.
18     Q.  Do you, as you sit here today, have
19 an understanding that at the time you started
20 operations of Lean Chefs, Mr. Zazza had a list  01:57PM
21 of inactive customers of Chefs Diet?
22         MR. KEYHANI: Objection. Asked and
23 answered. But you can answer the question.
24     A.  You have to ask Mr. Zazza.
25 Personally, I'm not aware -- as we're doing this  01:58PM

Page 140

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

2  case now and we're going through the data and
3  Mr. Zazza was telling me that, you know, in 2010
4  he received a list from Misha Podlog and some of
5  the names I guess that were given to us of  01:58PM
6  clients that were solicited to, some of them
7  were on that list and some of those clients were
8  actually on the list of the data that we bought
9  at the shows. So I became aware of this during
10 this case.  01:58PM
11     Q.  And did Lean Chefs send fliers to the
12 people on the list that Mr. Zazza had?
13         MR. KEYHANI: Objection to form.
14 Had, when, where, what? Which list?
15         MR. O'BRIEN: Counsel.  01:58PM
16         MR. KEYHANI: You can answer the
17 question if you can.
18         MR. O'BRIEN: Just make your
19 objection. Don't speak.
20         MR. KEYHANI: I'm objecting because  01:58PM
21 the question to form is vague and
22 incomprehensible.
23         MR. O'BRIEN: Then make your
24 objection.
25         MR. KEYHANI: I have.  01:59PM

Page 141

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

2         MR. O'BRIEN: Leave it at that.
3         MR. KEYHANI: I have.
4     A.  And again when you say --
5         MR. O'BRIEN: Let me clear it up.  01:59PM
6  BY MR. O'BRIEN:
7     Q.  The list that you just explained you
8  became aware of --
9     A.  Yes.
10    Q.  That Mr. Zazza had in his possession  01:59PM
11 --
12    A.  Right, that was given to him from
13 Misha Podlog.
14    Q.  In 2010?
15    A.  Right.  01:59PM
16    Q.  Let me ask the question before you
17 answer, okay?
18    A.  Um-hmm.
19    Q.  Wait for me to finish?
20    A.  Of course, always.  01:59PM
21    Q.  The list that you told me about a
22 moment ago that Mr. Zazza had, that he had in
23 2010, were those people sent fliers by Lean
24 Chefs in its first or second mailing?
25        MR. KEYHANI: Objection to form. You  01:59PM

Page 142

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
can answer the question.
   A.  If they were sent, it wasn't
intentional. But if some of those names, the
names that you have given us that were mailed    01:59PM
to, they came from, we've isolated where they've
come from and some of the names were on the list
that was given to Mr. Zazza in 2010 and some of
the names were on the leads -- on the data that
was purchased at the show. Once again, not    02:00PM
intentional.
   Q.  And how do you know that?
   A.  Because the way we build the routes
in the area I would tell Mr. Zazza I would need
names for certain areas so it was all done    02:00PM
through geographic in order to keep the routes
growing because you have drivers and you want to
make sure the drivers continue to have stops
otherwise they're not going to work for you. So
I would just tell Mr. Zazza I need X amount of    02:00PM
names in a certain area to mail and he would
send me the list. And you know he has hundreds
of thousands of names so he would pull it
probably based on the area. So with that said,
I know it was never done intentional.    02:00PM

Page 143

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
   Q.  Listen to my question, okay? Because
mine was a little different.
   A.  Okay.
   Q.  You said that you isolated where the    02:01PM
names came from and some of the names were on
the list that was given to Mr. Zazza in 2010 and
some of the names were on the list lists that
you purchased on the show.
   A.  Yes.    02:01PM
   Q.  Okay. My question to you is, how do
you know that?
   A.  Because I became aware of it during
this case.
   Q.  How did you become aware of it?    02:01PM
   A.  It was brought up to me from
Mr. Zazza.
       MR. KEYHANI:  I want to note an
objection to form because you say names I
don't know what names you're talking about    02:01PM
but if you understand the question, you can
absent it.
       MR. O'BRIEN:  I think we're pretty
clear.
   A.  Once again you're saying customers,    02:01PM

Page 144

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
people that Chefs Diet markets to, is that what
you're saying?
   Q.  People specifically mailed to.
   A.  That Chefs Diet mails to?    02:01PM
   Q.  No.
   A.  See that data you have to understand
one thing, that if we would have thought at any
time that that data was from Chefs Diet, you
know, that's not great data. I wouldn't that    02:02PM
type of data. We wouldn't waste our time mailing
to that type of data because Chefs Diet doesn't
advertise. They have no money for advertising
as far as I understand. They're not on TV,
they're not on radio. So from what I    02:02PM
understand, that data is beat up. All they do
is call that data every single day and harass
these people. The majority of those people are
on a do not call list. It's wasted data. For
us, it wouldn't be -- if we had a choice of data    02:02PM
that we want to market to, we want fresh leads
that come from Epsilon, brand new consumers,
brand new people started X amount of dollars.
We want to make them aware of the industry.
That data to me wouldn't be good data because    02:02PM

Page 145

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
that data has been hit seven years in a row it
eat actually probably some of the worse data you
want to get involved with definitely that
wouldn't be our choice.    02:02PM
   Q.  When you say that the list that was
given to Mr. Zazza in 2010 by Misha Podlog,
that's what he told you?
   A.  Yes.
   Q.  You have no personal knowledge of    02:03PM
that, right?
   A.  I wasn't here in 2010.
   Q.  So you have no personal knowledge of
that, right?
   A.  I wasn't there. Unless I was cc'd    02:03PM
where I was at, which was impossible so, no.
   Q.  And when you say that it was given to
Mr. Zazza in 2010, do you know if he was
performing services for Chefs Diet in 2010?
   A.  I would assume he was. But once    02:03PM
again you have to ask Mr. Zazza. I don't want
to speculate.
       MR. O'BRIEN:  Let's take a break.
       MR. KEYHANI:  A short lunch break.
       MR. O'BRIEN:  Yeah.    02:04PM

37

Rough Transcript

Page 166

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
marked for identification, as of this
date.)
BY MR. O'BRIEN:
   Q. Let me show you what we marked as   03:31PM
Exhibit 7 for identification. Again, that's
your address at the top, right? You sent this?
   A. Um-hmm.
   Q. In January of 2014, who determined
how often the company would make mailings?   03:32PM
   A. Who would determine that? Pretty
much based on the geographic of the routing, I
would use that as a gauge. So if the drivers
will tell me they need more stops let's say in
New Jersey, then I would do a mailing in New   03:32PM
Jersey. If they want to fill up routes because
they have certain employees that work in each
one of these areas and if they don't have stops
then it's going to lose the drivers. When he
would let me know certain routes are down that   03:32PM
would help plea to determine where we're going
to do the drops to and if the routes were going
well, then I would pretty much not have to do
mailers around I would go more with TV and radio
but other way mailers targets areas.   03:32PM

Page 167

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
   Q. My question was just who made the
determination. I take it it was you?
   A. It was me from the drivers letting me
know the areas to me that I would figure it out   03:33PM
exactly what area needed help.
   Q. Down about a little less than halfway
down it says Lisa, this is for the mailer
tomorrow to New Jersey and for half the
fulfillment for next week's 25,000 drop?   03:33PM
   A. Okay.
   Q. This is mid-January and the previous
exhibit was late December. Does that help you
remember how often mailings were made at the
beginning of Lean Chefs?   03:33PM
   A. It's just part of our advertising
campaign. I mean we're doing radio too.
   Q. I'm just asking about the mailings.
   A. Right. It's a combination of
everything. You can look at one thing but it's   03:33PM
not one thing. It's a combination of
everything. If you're looking at the whole
picture yes we did some mailings, some radio, a
little bit of everything we did, you know,
during that time.   03:34PM

Page 168

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
   Q. Who is George Fiala?
   A. Select Mail.
   Q. You got an address at the bottom
pipeline.com, is that a different company?   03:34PM
   A. I'm not sure. I don't think so. I
think Select Mail is a company. I am not sure
about a company named pipeline or anything like
that.
   Q. Turn the page it says, "Arthur, I got   03:34PM
it down to 4,054 names by eliminating
duplicates, doubtful addresses and people that
have moved."
     Do you see that?
   A. Yes.   03:34PM
   Q. Earlier I was asking you about
scrubbing and you weren't sure if that even
occurs at Lean Chefs.
     Does it help you remember that it
does?   03:34PM
     MR. KEYHANI: Objection to form. You
can answer the question.
   A. Right. I wasn't aware of it but if
he scrub it I guess he got rid of duplicates.
Maybe there were duplicates I'm not sure.   03:34PM

Page 169

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *
   Q. That's one of the things he gets paid
to do, right?
   A. Scrubbing the list? No it's mailing.
If you look at his invoice, there's nothing in   03:35PM
there for scrubbing. If he does that, he's
doing it, just because he's doing it. He also
helps me with creative sometimes for free, you
know? So it's just -- he wants us to succeed.
   Q. Does Lean Chefs keep a record of   03:35PM
customer complaints?
   A. A record of customer complaints...
Lean Chefs doesn't really get a lot of customer
complaints. We put out a good product.
Actually the best product in the market. So you   03:35PM
don't really get a lot of customer complaints.
But if there is a customer complaint, it guess
addressed immediately. Our customer service if
you look at Yelp we have the highest review in
the industry. Everybody raves about our   03:36PM
customer service and they also rave about us
having the best quality. Other companies have
two stars, we have almost five stars so everyone
says we are the best in the industry we take a
lot of pride in that and it's not only food,   03:36PM

Rough Transcript

Page 170

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

it's customer service also. It's the whole experience on our program. With that said, we don't get a lot of cusp complaints but if we do get a complaint, it gets addressed immediately.   03:36PM

Q. Again, thank you for that. But my question was does Lean Chefs keep a record of customer complaints?

A. That's a data question. Once again I do sales, marketing. I have my hands in a   03:36PM little bit of everything but I don't know exactly how that's kept. So I don't want to give you the wrong answer.

Q. When a customer calls to complain, is it brought to your attention?   03:36PM

A. We have a lot of customers. If they brought up every complaint or every happy client, I mean it would inundate my day, so no I don't hear everything that's going on.

Q. Do you hear some things that are   03:37PM going on with respect to customer complaints?

A. Periodically I'll hear, you know, by being involved in the company, I might hear things from time to time but I make sure everything is addressed. Every customer leaves   03:37PM

Page 171

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

us for the most part we try to make it their experience even if they have a complaint we try to rectify it and compensate them and make them happy.   03:37PM

(Plaintiff's Exhibit 8, Email dated 7/22/14 from Murawsky to Support@leanchefs.com with attachment, Bates stamped LC NATIVE 85.001 through 402.001, marked for identification, as of this date.)

BY MR. O'BRIEN:

Q. Let me show you what we marked as Exhibit 8 for identification. I'll represent that it's a number of emails of different dates.   03:38PM

Have you have seen any of those before?

A. Jodie Kramer. That was during the storms in February, Jodie Kramer came back on the program months later, loved the program and   03:38PM she was compensated, we gave her free days and she became a happy client and did nothing but praise the program thereafter but unfortunately with the storm, she couldn't get her delivery.

Q. You've seen that email before?   03:39PM

Page 172

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

A. I haven't seen this email but I know Jodie Kramer.

Q. That was my question. Have you seen any of these emails before?   03:39PM

A. I get a lot of emails that come through but I don't read every one of them so I'm not really sure.

Q. When they come through --

A. Customer service deals with it.   03:39PM

Q. And do you know whether customer service keeps a record --

A. I'm not sure. I'm not sure.

THE REPORTER: Wait until he finishes his completely because the record will not make any sense.

A. I'm sorry, that was the same question as before.

(Plaintiff's Exhibit 9, Email dated 8/27/14 from Arthur Vincent to Fiala and others with attachment, beginning with Bate stamp LC NATIVE 310.001, marked for identification, as of this date.)

BY MR. O'BRIEN:

Q. Let me show you what we marked as   03:40PM

Page 173

* ROUGH - CONFIDENTIAL - ATTORNEYS' EYES ONLY *

Exhibit 9 for identification. That's your email, right?

A. Yes.

Q. You say, we will re-mail what we have   03:41PM left to this list again in two weeks.

What does that mean?

A. I would think based on the email before that from list a complete list of Jeff it from Jeff at sewn elite, this includes   03:41PM addresses, emails and phone numbers, so based on the email before that, I would assume that that's the list. We took over all the clients from Zone Diet Elite during the summer when they went out of business. They called us and they   03:41PM said they were looking at a company to service their clients because they couldn't afford to feed them similar to what happened in the past from Zone Gourmet. They said that being that we have the best quality in the industry, that they   03:42PM want us to service their clients so we fed their clients, their database for one week for free and they gave us their database in exchange for that. That was Zone Diet Elite because we're the best.   03:42PM