Rough Transcript

## Page 2

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------X
CHEFS DIET ACQUISITION CORP.,
d/b/a CHEFS DIET,
    Plaintiff,   CASE NO. 14-CV-8467(JMF)
  v.
LEAN CHEFS, LLC, NICHOLAS ZAZZA
and ARTHUR GUNNING,
    Defendants.
---------------------------------------X

\* C O N F I D E N T I A L \*

\* A T T O R N E Y S'   E Y E S   O N L Y \*
DEPOSITION OF NICHOLAS ZAZZA
New York, New York
Friday, January 9, 2015

Reported by:
ANNETTE ARLEQUIN, CCR, RPR, CRR, CLR
JOB NO. 88724

## Page 3

January 9, 2015
10:48 a.m.

CONFIDENTIAL/ATTORNEYS' EYES ONLY deposition of NICHOLAS ZAZZA, held at the offices of Pryor Cashman, Seven Times Square, New York, New York, pursuant to Notice, before Annette Arlequin, a Certified Court Reporter, a Registered Professional Reporter, a Certified LiveNote Reporter, a Certified Realtime Reporter, and a Notary Public of the State of New York.

## Page 4

APPEARANCES:

PRYOR CASHMAN LLP
Attorneys for Plaintiff
  7 Times Square
  New York, New York  10036
BY: JAMES S. O'BRIEN, JR., ESQ.
    ANDREW M. GOLDSMITH, ESQ.

MEREDITH & KEYHANI PLLC
Attorneys for Defendants'
  330 Madison Avenue - 6th Floor
  New York, New York  10017
BY: DARIUS KEYHANI, ESQ.

## Page 5

    IT IS HEREBY STIPULATED AND AGREED by and between the attorneys for the respective parties herein, that filing and sealing be and the same are hereby waived;
    IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial;
    IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed and sworn to before the Court.

- oOo -

Rough Transcript

Page 38

```
 1  What time period?
 2  Q. While you were working for them.
 3  MR. KEYHANI: Well he was working
 4  before the asset --                    11:25AM
 5  MR. O'BRIEN: For CDAC.
 6  MR. KEYHANI: Okay.
 7  MR. O'BRIEN: Listen to the
 8  questions.
 9  MR. KEYHANI: You can answer the   11:25AM
10  question.
11  Q. Let me read it back.
12  A. Sure.
13  Q. Was there a recording system in place
14  at CDAC while you were working for them.  11:25AM
15  MR. KEYHANI: Objection to form. You
16  can answer the question.
17  A. Okay.
18  MR. KEYHANI: We haven't established
19  foundation whether he was working for CDAC. 11:25AM
20  MR. O'BRIEN: Counsel, the record
21  will say what it says.
22  MR. KEYHANI: You can answer the
23  question.
24  A. Was there a recording system?   11:26AM
```

Page 39

```
 1  Basically I would just say there was a recording
 2  system. That's what I would say. As far as me
 3  working for CDAC or Chefs Diet Acquisition
 4  company. Again I have no agreements with them.  11:26AM
 5  The only agreement I have with them is, you
 6  know, one where they promised to pay me back
 7  but... that never happened.
 8  Q. Were you personally doing work for
 9  CDAC?                                   11:26AM
10  MR. KEYHANI: Objection to form. You
11  can answer the question.
12  A. I was not doing work. I would say I
13  was trying to assist them.
14  Q. I don't want to play games about   11:26AM
15  words?
16  A. I don't want to either but -- when I
17  do something for somebody I expect to get paid
18  and that's kind of a work type of thing. So.
19  Q. Irrespective of your compensation,   11:27AM
20  did you perform tasks for CDAC in your personal
21  capacity?
22  MR. KEYHANI: Objection the form to
23  the extent it calls for a legal conclusion.
24  You can answer the question.           11:27AM
```

Page 40

```
 1  A. Yes, I have done work for Chefs Diet
 2  Acquisition Corp.. not work. I have done
 3  things for Chefs Diet Acquisition corp. I
 4  wouldn't call it work.                  11:27AM
 5  Q. What kinds of things did you do?
 6  A. Help them move their kitchen from the
 7  original location. I was able to help Kevin
 8  negotiate a deal for a company called merry
 9  makers to fulfill all of their meals.   11:27AM
10  I set up a photograph system where
11  they would be able to take pictures of the food
12  and it gets sent out to all the employees and
13  all the people that work there.
14  It really, countless number of         11:28AM
15  things.
16  Q. Did you assist them in marketing?
17  A. I tried to assist them in marketing,
18  yeah.
19  Q. Did you assist them in advertising?  11:28AM
20  A. Again, I would try to do something
21  with them.
22  Q. I take it it's your position that you
23  are owed money for those efforts?
24  MR. KEYHANI: Objection to form.       11:28AM
```

Page 41

```
 1  A. I'm not really -- you know at this
 2  point I'm not -- am I expecting money now? Is
 3  that what you're saying?
 4  Q. My only question is, do you feel that  11:28AM
 5  your owed money?
 6  A. Yeah. I do feel I'm owed money, yes.
 7  Q. Are you a member of Lean Chefs?
 8  MR. KEYHANI: Objection to form. You
 9  can answer.                             11:29AM
10  Q. Do you understand what I mean?
11  A. Am I a partner in Lean Chefs?
12  Q. Partner, member, stockholder, do you
13  have an economic interest in that company?
14  A. Yes.                                11:29AM
15  Q. What is the nature of your interest?
16  A. Percentage.
17  Q. What percentage?
18  A. 45 percent. Somewhere between 45 and
19  46 percent.                             11:29AM
20  Q. Did Zazza Technologies provide
21  services to CDAC?
22  MR. KEYHANI: Objection to form. You
23  can answer the question.
24  A. I believe it was just Digi PBX at    11:30AM
```

11 (Pages 38 to 41)

Page 102

2  A. Again, during the transition of Chefs
3  Diet to Chefs Diet A C there was a lot of papers
4  floating around that time. They were taking all
5  the companies and all the entities and they were  02:23PM
6  going to be doing it. So they wanted to merge
7  everything into one type of deal.
8      The last minute they pulled out and
9  really had all the debt to that company.
10  Q. They didn't, Chefs Diet Acquisition  02:23PM
11  did not acquire the assets of the national
12  company?
13  A. Okay.
14  Q. Correct?
15  A. Not from me, that's for sure.  02:23PM
16  Q. Yet, you did get stock in CDAC?
17  A. The stock I've gotten is from CDAC,
18  yeah.
19  Q. Is it your understanding that you
20  were supposed to get any money under or from the  02:24PM
21  Asset Purchase Agreement?
22  A. I was under the impression I was
23  supposed to get some type of money from the
24  Asset Purchase Agreement as long as it entailed
25  Chefs Diet At Home.  02:24PM

Page 103

2      You know, there's conflicting reports
3  of exactly how many shares I have between Kevin
4  telling me how many shares I have versus the old
5  partners telling me how many shares I have.  02:24PM
6  Q. Have you ever written a letter or
7  written the company a letter asking them to tell
8  you how many shares you own?
9  A. Yes. And that's where I got the two
10  different answers from.  02:25PM
11  Q. Can you tell me or estimate for me
12  when it was that you or your company stopped
13  providing services to CDAC?
14  A. Which company? Zazza Technologies,
15  Digi Analytics?  02:25PM
16  Q. Let's start with Zazza Technologies.
17  A. I would have to look through my
18  bills. I don't know even know whether CDAC ever
19  paid anything to Zazza Technologies. But I do
20  have to look.  02:25PM
21  Q. You personally did work for CDAC,
22  right?
23  A. Yes.
24  Q. And correct me if I'm wrong, but I
25  think you said this morning that, there came a  02:25PM

Page 104

2  point in time when you and your companies didn't
3  do any more work for CDAC. Do I have that
4  right?
5  A. We didn't get paid for any work that  02:26PM
6  was done, I would say.
7  Q. Okay.
8  A. We didn't get compensated for any
9  work.
10  Q. Okay. There is a compensation which  02:26PM
11  stopped at a certain point; is that right?
12  A. From --
13  Q. From CDAC.
14  A. I would have to see if we have ever
15  got a payment from CDAC. I think it was still  02:26PM
16  getting payments under zone -- Chefs Diet At
17  Home, not Chefs Diet At Home, Chefs Diet
18  Delivery, which is Chefs Diet middle Chefs Diet,
19  whatever.
20  Q. But it's true, isn't it, that after  02:26PM
21  the Asset Purchase went through, you continued
22  to provide services to CDAC for some period of
23  time?
24      MR. KEYHANI: Objection to form.
25  A. When I provide a service to somebody,  02:27PM

Page 105

2  I expect compensation. This was me trying to do
3  the right thing in order to get my money back.
4  Q. I understand. I'm not saying you
5  didn't do the right thing. I'm trying to find  02:27PM
6  out, did there come a point in time when you no
7  longer provided any services to CDAC?
8      MR. KEYHANI: Objection to form.
9  A. I don't do anything for them now so
10  there had to be a time that I stopped doing  02:27PM
11  services for CDAC.
12  Q. You don't know when that was?
13  A. Paid services or?
14  Q. Any services. Forget about paid.
15  A. You mean helping them out?  02:27PM
16  Q. Yes.
17  A. I don't have an exact date of that.
18  Q. Let's talk about Lean Chefs for a
19  moment.
20  A. Sure.  02:28PM
21  Q. When did you first hear about the
22  possible creation of the company that would come
23  to be Lean Chefs?
24  A. When have we... one more time, I'm
25  sorry.  02:28PM

27 (Pages 102 to 105)

Rough Transcript

Page 142

2  (Document review.)
3  A. The same email.
4  Q. This is a series of or a couple of
5  emails between you and USA Web Solutions, right?   03:18PM
6  A. This is a lesser version of this
7  email, of the first Exhibit 10. This is part of
8  the chain. Unless you marked the wrong one?
9  Q. Do you recall --
10  A. Is this the same email or -- is this   03:19PM
11  two separate exhibits or is this the same.
12  Q. Two separate exhibits?
13  A. But the same email.
14  Q. Slightly different. Sorry, we'll
15  move on?   03:19PM
16  A. Okay.
17  Q. Let me show you -- well, before I do
18  that, what do you recall about your request to
19  USA Web Solutions for the entire database of
20  Chefs Diet for the active and inactive clients?   03:19PM
21  What do you recall about their response to you?
22  MR. KEYHANI: Objection to form.
23  Q. If they responded.
24  MR. KEYHANI: Objection to form.
25  A. Raz --   03:20PM

Page 143

2  MR. KEYHANI: Objection to form. You
3  can go ahead.
4  A. I believe Raz had a problem with it
5  because, you know, you just don't want to give   03:20PM
6  out the database, a database. I'm sorry, ask
7  the question one more time?
8  Q. I asked you what do you recall about
9  USA Web's response to your request for the
10  database?   03:20PM
11  MR. KEYHANI: Objection to form. You
12  can answer the question.
13  A. I believe they just asked for
14  approval. They wanted approval from management.
15  Q. And you said that, just a moment ago,   03:20PM
16  you know, you just don't want to give out the
17  database. Why is that?
18  A. Give me the whole context, how I put
19  that?
20  Q. Your answer was --   03:21PM
21  A. What was the context of the question?
22  Q. Do you not remember saying that?
23  A. I don't remember the context of the
24  question.
25  Q. The question was the same question,   03:21PM

Page 144

2  what do you recall about their response to you?
3  MR. KEYHANI: And I objected to the
4  form.
5  MR. O'BRIEN: Yes.   03:21PM
6  Q. And you said, I believe Raz had a
7  problem with it because, you know, you just
8  don't want to give out the database, a database.
9  My question to you is, why not?
10  MR. KEYHANI: Objection to form. You   03:21PM
11  can answer the question.
12  A. You don't want to give out a
13  database. You don't want to give it out.
14  Q. Why not?
15  MR. KEYHANI: Objection to form. You   03:21PM
16  can answer.
17  A. I'm trying to think about, you know,
18  how to answer. It's company data.
19  Q. It's confidential, right?
20  MR. KEYHANI: Objection. To form.   03:22PM
21  MR. O'BRIEN: What is your objection,
22  counsel.
23  MR. KEYHANI: It's a legal conclusion
24  whether or not it's confidential or not.
25  That's an issue of dispute in this case.   03:22PM

Page 145

2  MR. O'BRIEN: He's not a lawyer.
3  It's okay.
4  Q. It's confidential, right?
5  MR. KEYHANI:   03:22PM
6  A.
7  MR. KEYHANI: Objection calls for
8  speculation for a legal conclusion.
9  A. It's company data.
10  Q. Which is confidential, right?   03:22PM
11  MR. KEYHANI: Objection to form. It
12  calls for a legal conclusion.
13  MR. O'BRIEN: Counsel you made.
14  A. It wasn't confidential to me.
15  Q. Why not?   03:22PM
16  A. Nobody ever asked me to signed a
17  confidentiality agreement.
18  Q. Was it your understanding when you
19  requested the Chefs Diet database for purposes
20  of launching a marketing campaign and the   03:22PM
21  company gave it to you, that you were free to
22  use it in any way you wanted?
23  MR. KEYHANI: Objection to form. You
24  can answer the question.
25  A. No, I did not believe that.   03:23PM

37 (Pages 142 to 145)

TSG Reporting - Worldwide     877-702-9580