UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CHEFS DIET ACQUISITION CORP, d/b/a/ CHEF'S DIET,<br><br>Plaintiffs,<br><br>-against-<br><br>LEAN CHEFS, LLC, NICHOLAS ZAZZA and ARTHUR GUNNING,<br><br>Defendants | Case No. 14-CV-8467 (JMF)<br><br>DECLARATION OF BRUCE F. WEBSTER IN CONNECTION WITH DEFENDANTS' MOTION FOR SUMMARY JUDGMENT |

Bruce F. Webster, Principal at Bruce F. Webster & Associates, submits the following expert disclosure pursuant to Federal Rule of Civil Procedure 26(a)(2)(b).

Case No. 14-CV-8467 (JMF)                                          Disclosure of Bruce F. Webster

**TABLE OF CONTENTS**

**1    INTRODUCTION** ........................................................................................................... **1**

**2    QUALIFICATIONS** ........................................................................................................ **2**

**3    SCOPE AND METHODOLOGY OF THIS REPORT** ....................................................... **4**

**4    INVESTIGATION AND FINDINGS** .................................................................................. **6**

    4.1     PREPARING THE LEAN CHEF'S CURRENT NAME LIST .......................................... 6

    4.2     CREATING THE COMMON NAMES LIST ................................................................ 7

    4.3     CHECKING THE COMMON NAMES LIST AGAINST OTHER SOURCES .................. 8

    4.4     COMPARING PAYING CUSTOMERS WITH DATASETS ......................................... 11

**5    CONCLUSIONS** .......................................................................................................... **11**

**EXHIBIT 1: CURRICULUM VITAE OF BRUCE F. WEBSTER** ................................................ **13**

**BOOKS** .................................................................................................................................. **15**

**EXHIBIT 2: PUBLICATIONS AND PRESENTATIONS OF BRUCE F. WEBSTER SINCE 2002** ............ **16**

**EXHIBIT 3: TESTIMONY OF BRUCE F. WEBSTER SINCE 2010** ........................................ **17**

Case No. 14-CV-8467 (JMF)                                    Expert Disclosure of Bruce F. Webster

# 1 Introduction

1. I have been asked to prepare this expert disclosure (the "Report") in the matter of *Chefs Diet Acquisition Corp, D/B/A/ Chef's Diet* v. *Lean Chefs, LLC, Nicholas Zazza and Arthur Gunning* (the "Litigation").

2. I have been asked to determine how many common names, if any, are found in current customer lists for both Chefs Diet (the "Plaintiff") and Lean Chefs *et al.* (the "Defendants"), and whether those same names are found in other sources that Defendants have had access to.

3. Based on my expert analysis of the data files made available to me, my findings are:

    - There are 35,894 names in common between the Plaintiff's current customer list and the set of data files provided to me by Defendants.
    - Of those 35,894 names, I found 35,483 names in other datasets that Defendants represented as being legally acquired at various times over the past 4 years.
    - That left 402 names – just over 1% of the 35,894 names in common -- unaccounted for.
    - Of those 402 names, 21 are actual paying Lean Chef customers.
    - Of the total 1,867 paying customers, 331 appear in the CD2014 (current) dataset, and 21 are not accounted for in the other datasets provided by Defendants.

4. From a data analysis perspective, the very small number (in both percentage and absolute terms) of unaccounted matching names in common, as well as the 5,471 names in the Plaintiff's customer list that did *not* show up in Defendants' data at all, strongly suggests that Defendants' customer data did not come from Plaintiff's current dataset.

5. In this Report, I will state my qualifications, scope of review, and methodology used for my investigation. I will then present my findings.

## 2 Qualifications

6. My name is Bruce F. Webster. I am a Principal at Bruce F. Webster & Associates. My business address is 2825 E. Cottonwood Parkway, Suite 500, Salt Lake City, UT 84121.

7. I have no present or past relationships with any of the parties in this Litigation or their legal advisers.

8. I have been professionally involved in information (computer) technology since 1974, when I began as a developer (and, subsequently, a team leader) on a university-funded research project on computer-assisted translation. In the years since, I have served as a software engineer, systems administrator, development team leader, chief software architect, vice-president of R&D, chief technical officer (CTO), and information technology consultant for a variety of companies and organizations. My areas of expertise include software engineering, software architecture and design, user interface design, quality assurance and testing, object-oriented development, IT project management and failure, software licensing, IT security, and IT intellectual property issues. I have a BS in Computer Science from Brigham Young University and did graduate work in Computer Science at the University of Houston/Clear Lake. A copy of my curriculum vitae is attached as Exhibit 1.

9. During 40 years of software engineering, I have developed, helped develop, or otherwise contributed to a large number of internal, commercial, and corporate software projects; that is, I have personally created, modified, and analyzed large quantities of software source code in a wide variety of programming languages and environments. I have done this in fields as diverse as defense, flight simulation, space sciences, environmental monitoring, desktop productivity, global telecommunications, financial and investment services, insurance, e-commerce, and international supply chain management.

10. As a consultant I have conducted numerous reviews of existing and proposed IT systems, products, projects, and organizations; in the process, I have evaluated project management practices, project schedules and risks, hardware and software architecture, software design and implementation (including actual source code), quality assurance and testing practices, security issues, contract and licensing agreements, personnel qualifications and performance, Year 2000 compliance, and intellectual property protection.

11. I have written four books, three of which deal with issues in IT system development and project management. I also have contributed to two other books, which deal with information technology as well. These books are listed in Exhibit 1.

12. As a college professor, I have taught software design and implementation to undergraduate computer science students. I have also given numerous lectures and presentations on information technology at a variety of conferences, including on IT project management and leadership. As a technology journalist, I have examined and evaluated hundreds of software and hardware products and have published dozens of reviews on selected products; I have published numerous commentaries on IT markets, providers, and customers. Exhibit 2 contains a list of my publications and presentations in the last ten (10) years.

13. I have been qualified as an expert witness both inside and outside the United States; I have testified in court or arbitration several times; I have filed expert reports, declarations, and affidavits, and have been deposed under oath. I have three times served as a neutral expert and once served as sole arbitrator in IT disputes. Exhibit 3 contains a list of cases where I have testified as an expert at trial, hearing or deposition in the last four (4) years.

14. Bruce F. Webster & Associates is being compensated for my work and that of any associates assisting me in this engagement, based on our hourly billing rates. My current billing rate is $350 per hour. The billing rates of others who might assist me

range $150 to $300, depending upon their level of experience. Our fees are not contingent upon the outcome of this matter.

## 3   Scope and Methodology of This Report

15. This Litigation involves *inter alia* allegations that Defendants inappropriately acquired customer information from Plaintiff. Defendants, in response, claim that their customer list was built from a number of legitimate sources, and any similarities are incidental.

16. To allow me to analyze these claims, several datasets were made available to me:

    - Chefs Data's current (2014) customer data list ("CD2014")
    - Lean Chef's current "data universe", that is, all their current relevant data files combined into a single collected data file ("DU2014")
    - A set of spreadsheets that Defendants represent as having received freely from Plaintiff in 2010 ("CD2010")
    - A set of customer data from fall of 2013 ("Tradeshow")
    - A set of customer data purchased in 2013 and 2014 ("Epsilon")
    - A set of customer data acquired from another firm in 2014 ("Elite")
    - A set of data from Chefs Lean website form submissions ("LCWF")
    - A set of information from Chef Lean's phone system ("CLBPX")

17. All these files were in the form of Microsoft Excel spreadsheet documents, either in native spreadsheet formats (.XLS, .XLSX) or as comma-delimited text (.CSV), with one data record per row in a given worksheet. Some of the native spreadsheet files had multiple worksheets.

18. My approach was as follows:

    - Analyze and extract name records from the DU2014 to build a list of Defendants' current customer data ("LC2014").
    - Compare the LC2014 and CD2014 datasets and produce a list of all matching (last name + first name) customer names (umatches.csv).

- Winnow out names within umatches.csv found in other sources (CD2010, Tradeshow, Epsilon, Elite) by doing successive comparisons, with each following comparison being done against any non-matched names from the prior comparison.

19. The final goal was to produce a number indicating the names in common between LC2014 and CD2014 that could not be found in other datasets that Defendants had acquired.

20. The methodology I used to carry out this approach follows standard dataset analysis long established in information technology and computer science, and which I have used myself on prior occasions, both as a software engineer and as a testifying expert:

- As necessary, extract appropriate data records and set aside irrelevant ones.
- As necessary, convert and/or rearrange data fields to allow direct comparison.
- Determine set intersection (common elements) between two sets of data by doing record-by-record comparison and writing out matching records to a separate file (and, in some cases, not-matching records out to another file).

21. Several factors required a computational approach to this analysis, that is, the creation, modification, and execution of custom software. First was the sheer number of records involved – all together, roughly 1.5 million data records. Second, the fields in a given record structure were often in different order than required for comparison and needed to be changed around, either before or during the comparison itself. Third, time-efficient comparisons required that datasets be sorted ahead of time. Fourth, comparisons needed to be run in a repeatable fashion, that is, the same operation on the same datasets yielding the same results.

22. Even so, such data mining has a certain small measure of error for several reasons. Data formatting within record fields, particularly where humans are concerned, can be wildly inconsistent. The data itself may be junk or placeholder data, or it may attempt to fit more or different types of data into a given field than that field was designed for. The software applications used to create and/or manipulate this data may make silent conversions or have actual defects ("bugs") of their own.

23. Beyond that, when you are dealing with many large, diverse sets of data, such as in this case, there is a certain diminishing-return effect in extracting more data; that is, having taken a certain amount of time to extract 95% or even 99% of the data, it may take twice that amount of time – or longer – to extract some portion of the remaining data.

24. During my work for this report, I ran through my entire end-to-end analysis several times, each time refining the software tools and cleaning up the datasets a bit more.

25. All work was done in a Microsoft Windows 7 Profession (64-bit) environment. I used Microsoft Excel 2010, Excel 2013 and UltraEdit (v. 21.30) for examination of files. All programming was done in the Python programming language (v. 3.4.2), developed and run under Microsoft Visual Studio 2013 Express.

## 4   Investigation and Findings

26. My investigation consisted of four major steps:

- Creating the LC2014 dataset from the DU2014 dataset.
- Comparing the LC2014 and CD2014 dataset to create a list of unique customer names (the "common names list") that the two datasets have in common.
- Comparing the common names list against other sources provided to me by Defendants and which they contends their acquired appropriately, in order to come up with a final set of "unmatched" customer names in common between LC2014 and CD2014.
- Comparing the Defendants' paying customers list against specific datasets to see how many of these paying customers are found in each.

### 4.1   PREPARING THE LEAN CHEF'S CURRENT NAME LIST

27. My first task was to analyze the Diet Chef's "data universe" file (DU2014) in order to extract all name records out of it. I performed this by a combination of visual inspection and progressive programmatic extraction of records to different destination files. The result was a (still-somewhat-raw) data file with 538,771 entries.

28. Having done that, I performed a process under Excel that I subsequently used on all data files that were to be compared:

- I ensured that the first two data columns were <lastname>,<firstname>.
- I sorted the file alphabetically by <lastname> then <firstname>.
- I stripped out (by search-and-replace or manual editing) extraneous or erroneous characters (", &, etc.).
- I deleted manually entries that were incomplete (having only a first or last name) or that otherwise were clearly 'junk' or 'garbage' entries.
- I repeated the process above until I was happy with the quality of the file.
- I used the Remove Duplicates function to remove duplicate names.
- I save the file out as comma-delimited text files (CSV) so that it could be easily read in and processed by an external program.

29. The resulting file (unames01.csv aka LC2014) was reduced down to 380,640 unique (lastname,firstname) pairs.

## 4.2  CREATING THE COMMON NAMES LIST

30. I received (under protective order) an Excel spreadsheet named "Chef's Diet confidential customer data file.csv" (aka CD2014), with 43,033 records in it. Apply the same process described above, I ended up with the file cnames01.csv, which had 41,365 records in it.

31. I then ran a Python program ("CheckLeads") that compared unames01.csv and cnames01.csv, converting the names to all uppercase first. Anytime the program found two records with the same first and last names, it wrote out the entry from unames01.csv in the file umatches.cvs. The result was a list of 35,894 (lastname,firstname) pairs that were found both in CD2014 and in LC2014.

32. As a quality check, I ran the same program again, but reversed the internal comparison of files (i.e., I compared cnames01.csv against unames01.csv, whereas I had previously done the opposite). Again, the result was a list of 35,894 names.

33. To verify this result, I used CheckLeads to compare umatches.cvs with both cnames01.cvs and unames01.cvs. In each case, the result was 35,894 matches and 0 failed matches (for matches.cvs).

34. This means that 344,746 names in the Lean Chef's 2014 names (LC2014) did not appear in the Chefs Diet 2014 name list (CD2014); correspondingly, CD2014 had 5,471 names that did not appear in LC2014.

4.3  CHECKING THE COMMON NAMES LIST AGAINST OTHER SOURCES

35. Defendants contend that their current list of customer names stem not from CD2014 (or its immediate predecessors), but rather from data they obtained legally at various times from 2010 on.

36. The largest such dataset comprises a set of spreadsheets dating from 2010 and represent data that Lean Chef personnel claim to have legal copies of at that time ("CD2010"). These spreadsheets include the following files:

- CA Inactive.xls
- NY CA Active CustomerList.xls
- NY & CA Leads.xls
- NY & CA ServiceExpired_Suspended_Customers.xls
- NY Inactive.xls
- Marketing ChefsDiet Leads.xls (addresses only)

37. Some of these spreadsheets had within them multiple worksheets, each with customer names (or in the case of the last, addresses only). I extracted all of the customer name data from these spreadsheets (and their constituent worksheets) to form one large file named 2010mleads3.csv, with 80,617 unique names.

38. I compared matches.csv with 2010mleads3.csv and got the following results:

- Matches: 34,659
- Not found: 1,235

Case No. 14-CV-8467 (JMF)                                              Disclosure of Bruce F. Webster

39. Thus, the vast majority (96.6%) of the names in common between CD2014 and DL2014 actually come from these files, which Defendants represented to me as files dating back to 2010 and which they had legal possession of.

40. Defendants also produced other files to me that they represented were also obtained legally.

41. One such set was produced in a series of 13 spreadsheets, which Defendants collectively named "EpsilonData" ("Epsilon").[1] I used the same process as described for the CD2010 data, resulting in a single spreadsheet named epsilon2.csv. This spreadsheet contains 383,650 unique names. When I compared directly to the matches.csv spreadsheet, it found 7,868 matches. More significantly, when I compared it to the 1,235 unmatched names from the CD2010 comparison, I got the following results:

    - Matches: 807
    - Not found: 428

42. So, by successive application of the CD2010 and Epsilon datasets, all but 428 of the original 35,894 matching names had been found in other sources.

43. Defendants provided a third dataset to me ("ZoneElite") that, after the processing described above, produced 326 unique (lastname,firstname) combinations. When I applied ZoneElite (zone_elite01.csv) against the remaining 428 names so far not found elsewhere, I got the following results:

    - Matches: 15
    - Not found: 413

44. Defendants produced another dataset – "LeanChefs Website Form Submits" ("LCWF") – which, via the standard process, became a sorted list of 2,081 sorted

unique names. When I applied this dataset against the 413 remaining names, I got the following results:

- Matches: 11
- Not found: 402

45. Defendants produces another dataset from their private-branch-exchange (PBX) phone system (LCPBX) – which, via the standard process, became a sorted list of 2,057 names. This dataset produced no new matches on the 402 remaining names.

46. In sum, by applying four sets of data – CD2010, Epsilon, ZoneElite, and LCWF – the number of unexplained matches between the CD2014 and DL2014 datasets dropped from 35,894 to 402, a reduction of 99%.

47. Given the respective size of the two datasets – 380,640 names in one, and 41,365 names in the other – and the fact they are addressing the same customer base in the same geographic regions, then from a data mining perspective, an unexplained overlap of 1.1% falls into the 'noise' level.

48. Furthermore, there were 5,471 unique names in the CD2014 dataset that did not show up at all among the 384,553 names in the DL2014 dataset. A visual inspection of these names shows that they are distributed across the full alphabet range (A to Z), without any obvious clumping. Again, from a data mining perspective, this argues against a misappropriation of the CD2014 database, since there is no clear technical explanation why a more-or-less evenly distributed subset of names would be omitted, deleted, or left behind.

---

[1] The individual spreadsheet names, as provided to me, are: 2th 50k list.csv; 3rd file 25k diet.csv; 4th file 26k.csv; 5th file 15k.csv; 6th file 26k.csv; 7thfile22k.csv; 8thfileNJ.csv; 15k Epsilon.csv; 27k epsilon.csv; 50knewyorkdiet.csv; epsilon 20k.csv; epsilon 4200.csv.

### 4.4 COMPARING PAYING CUSTOMERS WITH DATASETS

49. Defendants provided to me a spreadsheet that they represented as naming all of Lean Chef's paying customers – 1,867 unique names in all. When I compared these to the 402 unmatched customer names, there were 21 hits –5% of the unmatched remnant. Other information about the paying customers:

    - Of the total 1,867 paying customers, 324 appear in the CD2010 dataset. Of those 324, 154 appear in CD2010 and do *not* appear in the Tradeshow, Epislon, ZoneElite, LCWF, or PBX datasets.

    - Of the total 1,867 paying customers, 331 appear in the CD2014 dataset. But of those 331, 144 appear in CD2014 and do *not* appear in the Tradeshow, Epislon, ZoneElite, LCWF, or PBX datasets.

    - Again, of the total 1,867 paying customers, 21 –5% -- appear in the final set of 402 unmatched customers names.

50. Given that both Parties are competing in the same market and the same basic geographical areas, one would expect a certain degree of overlap in large datasets built from customers those markets and regions. In that light, the 21 customers not otherwise found is, if anything, less than one might reasonably expect, given that there are over 1.5 million data records in these various datasets combined.

## 5 Conclusions

51. Again, to summarize my findings based on my expert analysis:

    - There are 35,894 names in common between the Plaintiff's current customer list and the set of data files provided to me by Defendants.

    - Of those 35,894 names, I found 35,492 names in other datasets that Defendants represented as being legally acquired at various times over the past 4 years.

    - That left 402 names – just over 1% of the 35,894 names in common -- unaccounted for.

    - Of those 402 names, 30 are actual paying Lean Chef customers.

    - Of the total 1,867 paying customers, 331 (18%) appear in the CD2014 (current) dataset, and 21 (5%) are not accounted for in the other datatsets provided by Defendants.

Case No. 14-CV-8467 (JMF)                                        Disclosure of Bruce F. Webster

52. From a data mining perspective, the very small number (in both percentage and absolute terms) of unaccounted matching names in common, as well as the relatively even distribution of the 5,471 names in the Plaintiff's customer list that did not show up in Defendants' data at all, strongly argues that Defendants' customer data was not derived from Plaintiff's current dataset.

53. I reserve the right to amend, revise or supplement my opinions as my research continues and as additional discovery or other information becomes available, including without limitation expert reports and depositions. I also reserve the right to respond to any additional reports or testimony by Plaintiffs' experts.

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Signed this 19th day of February, 2016,

*[signature]*

Bruce F. Webster
Provo, Utah

Case No. 14-CV-8467 (JMF)                                                    Disclosure of Bruce F. Webster

# Exhibit 1: Curriculum Vitae of Bruce F. Webster

**Education**

- *Graduate work in Computer Science, University of Houston Clear Lake (1980-81)*. Completed graduate classes in advanced pattern recognition, numerical methods, synthesis of logic systems with 4.0 GPA.

- *B.S. in Computer Science, Brigham Young University (1978)*. Spent two years doing missionary work in Central America. Minored in languages and linguistics; became fluent in Spanish; studied Chinese, ancient Greek. Awarded "Highest Honors" and "University Scholar" designations at graduation.

**Professional and Business Experience**

- **Partner, Ironwood Experts, LLC (2014 – present) /
  Principal, Webster & Associates LLC (2001 - present)**. Conducting international practice as IT consultant (organizational and project management, systems architecture, intellectual property, security) and as expert witness in IT-related matters, including IT project failure, intellectual property (copyright, trade secrets, and source code analysis), IT security, IT contract and licensing practices, IT consulting practices, Web technologies, software engineering. Have written expert reports, provided testimony via affidavit, and testified in federal court, state court, arbitration, and deposition. Have served three times as a neutral expert and once as an arbitrator in IT-related disputes.

- *Director, PricewaterhouseCoopers LLP (1999-01)*. Built up nationally-recognized practice in IT-related litigation support. Published white paper and articles, co-chaired conference on systems failure litigation. Performed architecture & project reviews for PwC e-commerce joint ventures. Recruited and managed staff.

- *Chief Technical Officer, Object Systems Group (1996-99).* Consulted with Fortune 1000 clients in IT project management, Year 2000 project management and contingency planning, risk assessment, object technology, project architecture, quality assurance. Performed project and technical reviews; made recommendations and helped rescue projects. Hired and managed consultants at multiple sites. Traveled to establish new accounts and strengthen existing ones.

- *Independent Consultant (1995-96).* Served as Chief Software Architect (consulting basis) for transportation communications firm; brought in to rescue OO-based network management development effort for Motorola's IRIDIUM global telecommunications project, resulting in on-schedule delivery of NM software. Assessed and upgraded developers' OO/C++ skills; developed general OO software development process. Organized and managed architecture and class design team for TMN-based implementation of network management software for next-generation telecommunications backbone.

- *Co-Founder/Chief Technical Officer, Pages Software Inc (1990-95).* Built R&D/engineering division from scratch, hiring engineers, office manager, system administrator, director of quality. Helped raise $3M in initial venture funding ($7M total). Did original object-oriented architecture and GUI prototyping for groundbreaking desktop publishing software for UNIX workstations. Served as chief architect, leading product specification, object analysis, design, and development. Shipped multiple versions of DTP package and supporting products. Co-authored business plans; made visits with CEO to potential customers, partners, and investors. Involved in development effort for commercial Web editing tools (Windows, C++); attended WebWorld conferences; participated in HTML standards mailing list.

- *Independent Consultant (1984-90).* Did consulting in software engineering, object-oriented programming, commercial product development, industry and technology analysis, product evaluation, technical writing, technical support.

- *Guest Instructor, Computer Science Department, Brigham Young University (1985-87).* Taught BYU computer science department classes on introduction to programming, assembly language, data structures & algorithms, computers & society.

- *Consulting Editor/Columnist,* **BYTE** *Magazine (1984-87).* Placed on monthly retainer by *BYTE* to write articles on software and hardware technology. Authored influential and highly rated column ("According to Webster") containing industry analysis, technical exposition, hardware and software reviews.

- *Vice-President, R&D, Oasis Systems (1982-84).* Helped build highly successful word processing utility start-up; contributed to market-leading spell check package; adapted for commercial word processors. Started up and ran entertainment software division; was co-designer and chief developer of award-winning entertainment software. Managed programmers; performed marketing.

- *Chief Programmer/Analyst, Monitor Labs (1981-82).* Developed firmware for new products (environmental monitoring devices); fixed bugs, extended functionality in existing products; managed computing facilities for engineering division, including selection and acquisition of new systems.

Case No. 14-CV-8467 (JMF)                                               Disclosure of Bruce F. Webster

- *Scientific Programmer/Analyst, Lunar and Planetary Institute (1980-81)*. Worked with space scientists to apply computer technology to research efforts, including geological simulations and analysis of data from space probes.

- *Systems Engineer, Singer/Link Simulations (1979-80).* Debugged and enhanced software for the Space Shuttle flight simulators at NASA/JSC.

- *Associate Software Engineer, General Dynamics/WDCS (1978-79).* Provided software development for various aerospace engineering projects, including pattern recognition and classification in radar signatures, cruise missile and large space structure simulations.

- *Programmer/Team Leader, BYU Translation Sciences Institute (1974-78).* Developed software for computer-assisted language translation project; served as team leader for Chinese Synthesis team.

**Professional Affiliations**

- Senior Member, Association of Computing Machinery (ACM)

- Member, Institute of Electrical and Electronic Engineering (IEEE) Computer Society

- Member, Information Systems and Audit Control Association (ISACA)

- Associate Member, American Bar Association (ABA)

**Books**

- *The Y2K Survival Guide: Getting To, Getting Through, and Getting Past the Year 2000 Problem*, Prentice Hall PTR (Upper Saddle River, NJ, 1999).

- *The Art of 'Ware*, M&T Books (New York, 1995).

- *Pitfalls of Object Oriented Development*, M&T Books (New York, 1995).

- *Microsoft Press Computer Dictionary* (contributor), Microsoft Press (Redmond, WA, 1991).

- *The Way Things Work: Computers* (contributor), Time-Life Books (Richmond, VA, 1990).

- *The NeXT Book*, Addison-Wesley (Reading, MA, 1989).

# Exhibit 2: Publications and Presentations
# of Bruce F. Webster since 2002

- Online columnist, *Baseline* (http://www.baselinemag.com), 2008 to 2009.

- "The Longest Yard: Reorganizing IT for Success" (with Ruby Raley), *Cutter IT Journal* (September 2006).

**Presentations since 2002**

- Invited speaker at TechAssure Spring Member Conference (April 2010)

# Exhibit 3: Testimony of Bruce F. Webster since 2011

| Case | Jurisdiction | Testimony |
|---|---|---|
| GoDaddy.Com, LLC v. RPost Communications Limited, et al. (Patent) | US District Court District of Arizona | Deposed by opposing counsel. |
| HealthNow New York Inc. v. Meridian Technologies, Inc. et al. (IT systems failure) | State of New York County Court: Court of Erie | Deposed by opposing counsel. |
| The Robert Larson Automotive Group v. A-Plus LLC et al. (IT systems failure) | Superior Court of the State of Washington in and for the County of Pierce | Deposed by opposing counsel. |
| Intellectual Ventures I & II v. Symantec Corp. (Patent) | US District Court District of Delaware | Deposed by opposing counsel. |
| Planet Bingo, LLC et al. v. VKGS, LLC, (Intellectual property) | State of Michigan in the Circuit Court for the County of Ingham | Serving as neutral expert to the Court; deposed by counsel on both sides. |
| Emerald Home Furniture, Inc. v. IBS, Inc. (IT systems failure) | American Arbitration Association (Tacoma, WA) | Deposed by opposing counsel; testified at hearing. |
| Clarkston-Potomac Group, Inc. et al. v. IT Broadcasting Corporation, et al. (IT systems failure) | Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida | Deposed by opposing counsel; testified at trial. |
| BanxCorp v. Costco Wholesale et al. (Copyright) | US District Court for the Southern District of New York | Deposed by opposing counsel. |
| Trading Technologies Int'l, Inc. v. GL Trade SA, et al. (Patent) | US District Court for the Northern District of Illinois, Eastern Division | Deposed by opposing counsel. |
| Gavel International v. Remington (IT systems failure) | American Arbitration Association (Chicago, IL) | Deposed by opposing counsel; testified at hearing. |
| Horizon Ag-Products v. Precision Systems Engineering, Inc. et al. (IT systems failure) | US District Court for the District of New Mexico | Deposed by opposing counsel. |
| Mallinckrodt *et al.* v. E-Z-EM Inc., et al. (Patent) | US District Court for the Eastern District of Texas | Testified at trial. |