IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

CHEFS DIET ACQUISITION CORP. d/b/a
CHEFS DIET,

               Plaintiff,              CASE NO: 14-CV-8467 (JMF)

    v.

LEAN CHEFS, LLC, NICHOLAS ZAZZA
and ARTHUR GUNNING,

               Defendants.

_____/

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

I.      PRELIMINARY STATEMENT……………………………………………………1

II.     STATEMENT OF FACTS AND BACKGROUND……………………………………...3

   A.  Zazza and Gunning's experience and expertise in the gourmet diet delivery industry…...3

   B.  CDAC's failure to maintain the confidentiality of its assets……………………………...5

   C.  CDAC attempts to keep Lean Chefs out of the gourmet diet delivery market …………...6

III.    STANDARD OF REVIEW…………………………………………………………9

IV.     ARGUMENT…………………………………………………………………...9

   A.  Plaintiff's N.Y. G.B.L. § 349 claim fails as a matter of law because Plaintiff does not allege a sufficient consumer injury ………………………………………………...9

   B.  Plaintiff's claim that Defendants misappropriated its customer list is without merit because the 2010 email data is not a trade secret and Plaintiff failed to protect the data as a confidential asset………………………………………………………10

      1.  The 2010 email data is not a trade secret……………………………………………...11

         a.    Plaintiff did not obtain the list through substantial effort………………………...11

         b.    Plaintiff did not keep its alleged trade secret confidential………………………12

      2.  Defendants have a right to use Plaintiff's alleged misappropriated customer information because Defendants did not enter into a restrictive covenant with the Plaintiff……………………………………………………………………...14

   C.  Plaintiff fails to raise a triable issue of fact that Defendants violated the Computer Fraud and Abuse Act ……………………………………………………………15

   D.  Plaintiff's breach of contract claim fails because Defendants did not enter into any contracts with Plaintiff………………………………………………………...16

   E.  Plaintiff's unjust enrichment is without merit because the 2010 email data is not a trade secret, and lacks intrinsic value and it is against equity and good conscience to allow Plaintiff to recover……………………………………………………………...17

      1.  Defendants were not enriched at Plaintiff's expense ………………………………18

      2.  It is against equity and good conscience to allow Plaintiff to recovery ……………19

F.   Plaintiff's Conversion claim is without merit …………………………………..20

   1.   CDAC was never excluded from using the 2010 email data…………………….…..21

   2.   Defendants were in lawful possession of the 2010 email data and Plaintiff failed to make a sufficient demand for its return…………………………………………………22

G.   Plaintiff's Replevin claim fails as a matter of law because CDAC does not have proprietary rights in the list and failed to make a sufficient demand for its return………………………………………………………………….…...…..23

H.   Plaintiff cannot maintain its breach of fiduciary duty claim…………………………..23

   1.   Zazza did not have a fiduciary relationship with Plaintiff…………………………....23

   2.   Zazza's gratuitous assistance with marketing was not within the scope of Zazza Technologies' role as a vendor of telephone services………………………….24

I.   Defendants' LEAN CHEFS mark does not infringe Plaintiff's CHEFS DIET mark and has not engaged in unfair competition (state and federal)…………………………..25

   1.   The term "CHEFS DIET" is invalid because it is generic………………………..25

   2.   The Defendants' use of the LEAN CHEFS mark is not likely to cause confusion……………………………………………………………………………26

     a.   Plaintiff's mark is weak……………………………………………………………27

     b.   Plaintiff's CHEFS DIET mark and Defendants' LEAN CHEFS marks are dissimilar……………………………………………………………………………27

     c.   Plaintiff and Defendants market to similar customers…………………………..28

     d.   Plaintiff has failed to demonstrate actual confusion between the marks………...28

     e.   Defendants adopted the Lean Chefs mark in good faith…………………………29

     f.   Defendants' products are superior to Plaintiff's…………………………………30

     g.   Purchasers in the gourmet diet delivery market are sophisticated ……………30

V.   CONCLUSION…………………………………………………………………..30

## TABLE OF AUTHORITIES

**Cases**

*A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, No. 12 CIV. 4828 KPF, 2015 WL 5507147
(S.D.N.Y. Sept. 18, 2015) ................................................................................ 10

*Albany Molecular Research, Inc. v. Schloemer*, No. 1:10-CV-210 LEK DRH, 2010 WL 5168890
(N.D.N.Y. Dec. 14, 2010) ................................................................................ 23

*Amana Express Int'l, Inc. v. Pier-Air Int'l, Ltd.*, 621 N.Y.S.2d 108 (N.Y. App. Div. 1995) ............. 15

*Avalon Risk Mgmt. Ins. Agency, L.L.C. v. Taylor*, No. 12 CIV. 3934 LGS, 2015 WL 5459684
(S.D.N.Y. Sept. 16, 2015) ................................................................................ 21

*Berman v. Sugo L.L.C.,* 580 F.Supp.2d 191 (S.D.N.Y.2008) ....................................................... 17

*B.U.S.A. Corp. v. Ecogloves, Inc.*, No. 05 CIV. 9988 (SCR), 2006 WL 3302841 (S.D.N.Y. Jan.
31, 2006) ................................................................................................ 11, 14

*Catalogue Service of Westchester, Inc. v. Henry*, 107 A.D.2d 783 (N.Y.App.Div.1985) ............ 15

*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ........................ 9

*Defiance Button Machine Co. v. C & C Metal Products Corp.*, 759 F.2d 1053 (2d Cir. 1985).. 11,
12, 13

*Derven v. PH Consulting, Inc.,* 427 F.Supp.2d 360 (S.D.N.Y.2006)……………………….............13

*DO Denim, LLC v. Fried Denim, Inc.*, 634 F. Supp. 2d 403 (S.D.N.Y. 2009) ........................... 10

*Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.,* 626 F.2d 193 (1st Cir.1980) ...................... 12

*Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595 (2d Cir.1991) ........................................... 24

*FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61 (2d Cir. 1984) ............................. 13

*Giordano v. Thomson*, 564 F.3d 163 (2d Cir. 2009) .................................................................. 20

*Global Crossing Estate Representative v. Winnick*, No. 04 CIV.2558(GEL), 2006 WL 2212776
(S.D.N.Y. Aug. 3, 2006) ................................................................................ 23

*Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072 (2d Cir.1993) ............................ 27

*Grynberg v. ENI S.P.A.*, 503 F. App'x 42 (2d Cir. 2012) ........................................................... 17

*H. Meer Dental Supply Co. v. Commisso*, 269 A.D.2d 662 (N.Y. App. Div. 2000) ................... 11

*Harsco Corp. v. Segui,* 91 F.3d 337 (2d Cir.1996) ...................................................... 16

*In re Central Soya Company, Inc.*, 220 U.S.P.Q. 914 (TTAB 1984) ........................... 27

*Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.,* 920 F.2d 171 (2d Cir. 1990)................................................................................................................... 10

*Iron Mountain Information Management, Inc. v. Taddeo*, 455 F.Supp.2d 124 (E.D.N.Y. 2006) 11

*IVI Envtl., Inc. v. McGovern,* 269 A.D.2d 497, 498, 707 N.Y.S.2d 107 (2d Dept.2000)............. 11

*JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514 (S.D.N.Y. 2013) ................................... 15

*Jet One Grp., Inc. v. Halcyon Jet Holdings, Inc.,* No. 08-CV-3980 JS ETB, 2009 WL 2524864 (E.D.N.Y. Aug. 14, 2009) ....................................................................................... 15

*Kaye v. Grossman,* 202 F.3d 611 (2d Cir.2000) .......................................................... 17

*Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974) .......... 12

*Kurtzman v. Bergstol,* 40 A.D.3d 588, 590, 835 N.Y.S.2d 644 (2d Dep't 2007) ........................ 23

*Lehman v. Dow Jones & Co., Inc.,* 783 F.2d 285 (2d Cir.1986) ............................................. 13

*Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387 (1972) .................................................... 11, 14

*Meyers Associates, L.P. v. Conolog Corp.*, 19 Misc. 3d 1104(A), 859 N.Y.S.2d 904 (Sup. Ct. 2008)............................................................................................................................ 18

*Old Republic Natl. Title Ins. Co. v. Cardinal Abstract Corp.,* 14 A.D.3d 678, 790 N.Y.S.2d 143 (2d Dep't 2005)........................................................................................................... 17

*Orlander v. Staples, Inc.*, 802 F.3d 289 (2d Cir. 2015) .................................................... 9

*Otto v. Melman*, 25 Misc. 3d 1235(A), 906 N.Y.S.2d 774 (Sup. Ct. 2009) ................................ 24

*Outerbridge v. City of New York*, No. 13 CIV. 5459 AT DCF, 2015 WL 5813387 (S.D.N.Y. Sept. 30, 2015) ........................................................................................................... 9

*Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 73 U.S.P.Q. 2d 1689 (Fed. Cir. 2005)............................................................................... 27

*Plus Products v. Star-Kist Foods, Inc.,* 220 U.S.P.Q. 541 (TTAB 1983) ................................... 27

*Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961) ....................................... 27

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,* 813 F.Supp.2d 489 (S.D.N.Y. 2011)
..........................................................................................................................20, 21

*RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14CV6294-LTS-HBP, 2015 WL 5008762 (S.D.N.Y. Aug. 24, 2015) ........................................................................ 9

*Regions Bank v. Wieder & Mastroianni, P.C.*, 526 F. Supp. 2d 411 (S.D.N.Y. 2007) ............... 22

*Savin Corp. v. Savin Group,* 391 F.3d 439 (2d Cir. 2004) ........................................................ 25

*Schatzki v. Weiser Capital Mgmt., LLC,* 995 F. Supp. 2d 251 (S.D.N.Y. 2014) ........................ 18

*SE Fin., LLC v. Broadway Towing, Inc.,* 117 A.D.3d 715, 984 N.Y.S.2d 606 (2d Dep't 2014) .. 22

*Silverstein v. Flat Iron Acquisition, LLC,* 278 A.D.2d 144 (2000) ............................................ 24

*Star Indus., Inc. v. Bacardi & Co., Ltd.*, 412 F.3d 373 (2d Cir.2005) ........................................ 26

*Starbucks Corp. v. Wolfe's Borough Coffee, Inc.*, 588 F.3d 97 (2d Cir. 2009) ........................... 26

*Starlight Limousine Serv. v. Cucinella*, 713 N.Y.S.2d 195 (N.Y. App. Div. 2000) ........................ 14

*Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70 (2d Cir. 2015) ........................................ 9

*Thyroff v. Nationwide Mutual Ins. Co.,* 360 F. App'x 179 (2d Cir. 2010) ................................... 22

*U.S. v. Chestman,* 947 F.2d 551 (2d Cir.1991) ......................................................................... 23

*Univ. Sports Pub. Co. v. Playmakers Media Co.,* 725 F. Supp. 2d 378 (S.D.N.Y. 2010) ............ 15

*Wolff v. Rare Medium, Inc.,* 171 F.Supp.2d 354 (S.D.N.Y.2001) ................................................ 16

**Statutes**
Fed. R. Civ. P. 56(a) ................................................................................................................. 8
Fed. R. Civ. P. 56(c)(1)(B) ....................................................................................................... 9
N.Y. G.B.L. § 349 .................................................................................................................... 9

**Treatises**
Restatement of Torts, § 757, comment b, at 6 (1939) ............................................................... 12

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

CHEFS DIET ACQUISITION CORP. d/b/a
CHEFS DIET,

                    Plaintiff,                    CASE NO: 14-CV-8467 (JMF)
          v.

LEAN CHEFS, LLC, NICHOLAS ZAZZA and
ARTHUR GUNNING,

                    Defendants.
_____/

## I.    PRELIMINARY STATEMENT

Pursuant to Federal Rule of Civil Procedure 56, Defendants Lean Chefs, LLC ("Lean Chefs"), Nicholas Zazza ("Zazza"), and Arthur Gunning ("Gunning")(collectively "Defendants") respectfully move this Court to grant summary judgment on all twelve claims alleged in Plaintiff Chefs Diet Acquisition Corp. d/b/a Chefs Diet's ("Plaintiff" or CDAC") Complaint.   In summary, Defendants' motion for summary judgment should be granted for the following reasons.   First, no reasonable jury could find that Plaintiff's computer system was hacked by Defendants.   Plaintiff has not produced any evidence—forensic or otherwise—that Defendants accessed their computer system remotely.   Indeed, evidence related to this claim supports the opposite conclusion.   Plaintiff itself emailed a list of its current and former customer contact information ("2010 email data") to Defendants, and any customer names Plaintiff added or claims it added to its database after 2010 derive from lists Defendants purchased from third parties.

Second, Plaintiff's misappropriation of trade secrets and unjust enrichment claims are anchored on the unsubstantiated and flawed premise that there are proprietary rights associated

1

with a list of customers maintained by Plaintiff.  The 2010 email data was not developed through substantial effort; but instead is readily ascertainable in the public domain through inexpensive lists sold by lead brokers and third parties at tradeshows.  Moreover, Plaintiff fails to provide evidence that it took adequate measures to protect the secrecy of the 2010 email data.  Customer information, including the 2010 email data, was accessible to employees that were not under any verbal or written agreements of confidentiality.  Plaintiff itself made the list available to third parties without any confidentiality or nondisclosure agreement or any obligation to maintain its secrecy.  Plaintiff sent the 2010 email data to Defendants without any written or verbal agreement providing for its confidentiality.  Plaintiff simply made no effort to protect the secrecy of the data.

Third, Plaintiff's claim under N.Y. G.B.L. §349 is not cognizable because Plaintiff does not allege or produce any evidence of a specific and substantial injury to a public interest over and above ordinary trademark infringement or dilution.  Plaintiff's N.Y. G.B.L. §349 claim is identical to its trademark infringement claim and thus fails to satisfy the statute.

Fourth, Plaintiff fails to raise a triable issue of fact with respect to its breach of contract claim.  Plaintiff admits that it did not have any verbal or written contracts with Defendants. Moreover, Defendants did not breach the Asset Purchase Agreement.  The Asset Purchase Agreement applies only to property transferred at the time of the sale and cannot be understood to apply to the 2010 email data, which was compiled or obtained long after the agreement was executed.

Fifth, Plaintiff's conversion and replevin claims fail because Plaintiff did not make a sufficient demand for the return of the 2010 email data prior to filing this lawsuit.  Plaintiff's cease and desist letter did not adequately specify what Plaintiff believed Defendants took from

them.  Additionally, Plaintiff's conversion claim is meritless because Defendants did not exclude Plaintiff from using the 2010 email data.

Sixth, Plaintiff's breach of fiduciary duty claim must fail because Plaintiff lacks evidence that it had a fiduciary relationship with Zazza or Gunning.  At the time Plaintiff sent the 2010 email data to Zazza, Gunning did not have any relationship that could possibly be construed as fiduciary with Plaintiff.  Moreover, even if Zazza had a fiduciary relationship with Plaintiff as a vendor of IT services, which Plaintiff has presented no evidence to establish, Zazza's gratuitous marketing assistance provided in hope of recouping money he loaned Plaintiff falls outside the scope of that relationship.

Finally, Defendants claims of trademark infringement and unfair competition are without merit because the term Chefs Diet is invalid as generic and there is no likelihood of confusion between Chefs Diet and Lean Chefs.

Because Plaintiff has failed to raise a triable issue of fact, Defendants' motion for summary judgment should be granted in its entirety.

## II.   STATEMENT OF FACTS AND BACKGROUND

### A.   Zazza and Gunning's expertise was key to the success of Chefs Diet

Zazza and Gunning, the founders of Lean Chefs, have extensive experience and expertise in the gourmet diet delivery industry.  Deposition of Arthur Gunning 9:20-10:2; 54:20-55:22; 88:3-89:6 (Jan. 7, 2015)(**Ex. 3**).  Gunning was one of the founders of the diet delivery industry and in 1999 Gunning was one of the first to introduce diet delivery products into the market.  *See id.*  Gunning had remarkable success and experience in sales, marketing, and advertising in the industry.  *See id.* 9:20-10:2.  Zazza's significant experience in the use and management of information systems electronic technology and internet marketing in the industry compliments

Gunning's guerilla and direct marketing skills and expertise. *Id.* at 35:4-8. They are a formidable marketing and advertising duo in this niche market and were instrumental in building Chefs Diet and its predecessor companies. *Id.*

Chefs Diet was sold to CDAC in 2009. *See* Second Amended and Restated Asset Purchase Agreement, March 18, 2009 (**Ex. 17**). Without the experience and expertise of Gunning and Zazza, CDAC began a steady decline. ██████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████

CDAC understood that Gunning and Zazza were instrumental to the success of a diet delivery business and attempted to recruit their talents to assist the faltering company. Gunning Dep. at 89:16-90:17. In an attempt to drum up support and morale, Kevin Glodek, an agent and shareholder of CDAC, emailed shareholders and investors announcing that Gunning, the former CEO, would be returning to the company. *Id*. at 90:13-17. Following this announcement, Glodek drove four hours to visit Gunning while he was serving time for an unrelated charge relating to his prior work as a trader, to convince him to come back. *Id.* at 89:16-90:17; 95:4-7. Glodek offered Gunning one million shares and $2,500 a week to return. *See id.* at 90:2-5. After looking at CDAC's financials and realizing that CDAC was losing a million dollars a year, given the bad financial situation of CDAC, Gunning decided not to return. *Id.* at 90:18-23 ("It's a lot

of work taking a company that's declining like that and try to fix it."). CDAC also understood Zazza's value. Upon purchasing Chefs Diet, CDAC asked Zazza's company, Zazza Technologies, LLC ("Zazza Tech"), to manage CDAC's telephone system. *See* Deposition of Nicholas Zazza 38:25-39:19; 40:2-5; 104:5-105:17 (Jan. 9, 2015)(**Ex. 4**).

Prior to executing the APA, Glodek had convinced Zazza to personally loan Chefs Diet $218,000.[1] Zazza was not repaid despite Glodek's promises and reassurances to the contrary. *See* Declaration of Nicholas Zazza, ¶¶ 3-4 (Feb. 12, 2016). Zazza believed that if he helped CDAC generate business and increase revenue through assisting with marketing, he might recoup his personal loan. Id. at ¶ 4; Zazza Dep. 40:2-19. With that mindset, Zazza reluctantly assisted CDAC with email marketing, for which he was paid nothing. Zazza Decl. at ¶ 4.

**B.     CDAC failed to maintain the confidentiality of its assets**

CDAC's poor management decisions also extended to its failure to protect its purported assets. Prior to 2012, CDAC took no steps to keep its customer list confidential. *See* Utilla Dep. 31:6-23 (Jan. 8, 2015) (**Ex. 8**); Friedman Dep. 87:11-89:10. None of its employees were under any obligation to maintain company data as confidential, as the company did not require its employees to sign any employment or non-disclosure agreements prior to 2012. *See id.* CDAC also sent the 2010 email data to third parties, including ██████████, a marketing agency, without any agreements, verbal or written. *See* Maniscalco Dep. 28:2, 4 and accompanying errata sheet; Zazza Dep. 145:4-17. Moreover, CDAC did not protect the 2010 email data with a password when emailing outside contacts. *See id.*; ███████████████████████ ████████████████████(**Ex. 9**).

---

[1] Both former CEO Lance Friedman and Maniscalco have also loaned money to the CDAC. *See* Deposition of Lance Friedman 20:24-21:3 (July 22, 2015)(**Ex. 2**); Declaration of Brenda 76:5-77:8 (Jan. 8, 2015)(**Ex. 8**).

In the case of Zazza, CDAC did not make any effort to obtain a confidentiality agreement nor did CDAC communicate any obligation to maintain the 2010 email data's secrecy.  Zazza Dep. 145:4-17; Zazza Decl. at ¶ 5; Utilla Dep. at 56:3-58:5.  Under these conditions, ███████, at the direction of CDAC, sent the data to Zazza as an email attachment in February 2010.  *See id*.; ████████████████████████████████████████████ ████ (**Ex. 10**); Declaration of Bruce F. Webster at ¶ 36 (Feb. 19, 2016)("Webster Decl.")(**Ex. 15**).

### C.    CDAC attempts to keep Lean Chefs out of the gourmet diet delivery market

In November 2013, long after the APA's non-compete provision expired, Lean Chefs entered the gourmet diet delivery market and immediately began growing its market share and providing customers with high quality food.  Declaration of Arthur Gunning, ¶ 3 (Jan. 23, 2015)(**Ex. 5**).  Lean Chefs' entry into the gourmet diet delivery market was of great concern to the already faltering CDAC.  *See* Gunning Dep. 9:20-10:2.  Almost immediately after Lean Chefs began operating, CDAC endeavored to shut Lean Chefs out of the market.

Plaintiff sent a cease and desist letter to Defendants vaguely asserting that Lean Chefs infringed CDAC's trademark and misappropriated its trade secret.  *See* Letter from CDAC to Lean Chefs, Inc. et al. (Dec. 2, 2013)("CDAC Cease and Desist") (**Ex. 6**); Zazza Decl. at ¶ 7.  The letter, sent by CDAC CEO Lance Friedman, asserted that Defendants had been in contact with CDAC customers through the use of assets "including the intellectual property that was acquired by CDAC pursuant to the APA."  *See* CDAC Cease and Desist.  As the letter did not provide any information that would enable Defendants to investigate Plaintiff's claim, Zazza contacted Mr. Friedman to inquire.  *See id;* Zazza Decl. at ¶¶ 9-11 (describing attempts to contact Mr. Friedman on December 16th and 21st, 2013).  Zazza's attempts to investigate

CDAC's claims were met with silence.  *See* Zazza Decl. at ¶¶ 10-11 (explaining that Zazza emailed former CEO Misha Podlog on December 9, 2013 and Lance Friedman on December 16th and 21st, 2013).  On December 9, 2013 Zazza emailed Friedman and asked him for details regarding which Chefs Diet customers had been contacted, and by which sales person.  *See* email from Zazza to Friedman, December 9, 2013 6:17PM.  Friedman did not respond to Zazza's requests.  *See* Zazza Decl. at ¶ 10.  Again, on December 16, Zazza followed up requesting the same information and Friedman did not respond.  *See* email from Zazza to Friedman, December 16, 2013 2:45AM.  Zazza emailed Friedman again on December 21 and yet again, Friedman did not respond.  *See* email from Zazza to Friedman, December 21, 2013 11:23AM.

At the time Defendants received Plaintiff's letter in December of 2013, Lean Chefs had only been operating for a month and was just beginning to obtain customers.  *See* Gunning Decl. at ¶ 3.  As Lean Chefs was in its infancy, Plaintiff was in a position to provide Defendants with information to help identify the source of data contamination and prevent Defendants from securing customers and increasing revenue related to the 2010 email data, but instead Plaintiff ignored Defendants' requests for information.  Zazza Decl. at ¶¶ 9-11.

Because of Friedman's failure to provide information necessary to investigate Plaintiff's claims, Defendants were unaware their universe of data may have contained data from the 2010 email.  *Id.* at ¶ 12.  It was not until Plaintiff commenced litigation in October 2014 that Defendants obtained the necessary information to search their database and identify the source of the data contamination.  *See id.* at ¶¶ 12-13; Gunning Dep. 138:21-139:5.  Plaintiff's complaint alleged that Plaintiff "sprinkled" its own database with contacts that allegedly received mailings from Lean Chefs.  *See* Dkt. # 1, ¶ 6.  Plaintiff later identified the sprinkled contacts as Christian Ledan, Peter Daniel, and Joanne Glodek in its response to Defendants' Interrogatories.  *See* Pl's

Resp. to Def's Interrog. No. 4 (Nov. 21, 2014)(**Ex. 13**).  It wasn't until Plaintiff identified these particular names that Zazza was able to search Lean Chefs' database to determine their presence.  *See* Zazza Decl. at ¶¶ 14-15.  Zazza located the names "Christian Ledan" and "Peter Daniel" on a database purchased on or about August 2013 at the Leadcon tradeshow in New York and "Joanne Glodek" was found in the data Chefs Diet emailed Zazza on or about February 2010.  Def's Supp. Resp. to Pl.'s Interrog. No. 10 (Nov. 25, 2014)(**Ex. 14**).  Defendants' technical expert, Bruce Webster, confirmed Zazza's findings, concluding that 96.6% of the overlap existing between Plaintiff and Defendants' databases was attributable to the 2010 email data alone and over 98% of the overlap was attributable to the 2010 email data combined with lists Defendants purchased from third parties.  *See* Webster Decl. at ¶¶ 39, 51.  Upon learning that Defendants' data contained data from the 2010 email, Defendants isolated the data and immediately stopped using it, despite no legal obligation to do so.  *See id*. 164:15-168:18; Gunning Decl. at ¶ 10.

Upon locating the source of contamination as an email attachment sent to Zazza by Plaintiff a year after the APA was executed, it was apparent that Defendants did not hack into Plaintiff's computer system and Lean Chefs' use of the list was inadvertent and unknowing.  *See* Zazza Dep. 148:19-24; Gunning Dep. 141:21-142:25.  Indeed, Plaintiff's counsel conceded in a conference before this Court on February 13, 2015 that Defendants did not have any evidence that Plaintiff's computer systems were ever hacked by the Defendants.  *See* Transcript of Conference, 3:19-4:4 (February 13, 2015)(explaining that "[w]e do not have direct evidence of continued access to our database")(**Ex. 16**).  Further, there is no evidence, forensic or otherwise, that shows Defendants remotely accessed their system.

## III.    STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, a court will grant summary judgment if "the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).  Though the moving party bears the initial burden of identifying the absence of a genuine issue of material fact, the opposing party must come forward with specific materials establishing the existence of a genuine dispute.  *Celotex,* 477 U.S. at 323.  The moving party may support an assertion that there is no genuine dispute by "showing ... that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B); *Outerbridge v. City of New York*, No. 13 CIV. 5459 AT DCF, 2015 WL 5813387, at *3 (S.D.N.Y. Sept. 30, 2015).

## IV.    ARGUMENT

This Court should grant Defendants' motion for summary judgment on Plaintiff's claims of: (1) N.Y. G.B.L. § 349; (2) Misappropriation of trade secrets; (3) Computer Fraud and Abuse Act; (4) Breach of Contract; (5) Unjust enrichment; (6) Conversion; (7) replevin; (8) Breach of Fiduciary Duty; and (9) state and federal unfair competition and trademark infringement.

### A.    Plaintiff's N.Y. G.B.L. § 349 claim fails as a matter of law because Plaintiff does not allege a sufficient consumer injury

Section 349 of the New York General Business Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." *See* N.Y. G.B.L. § 349; *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015).

A section 349 claim requires: (1) that the challenged act or practice was consumer-oriented; (2) that it was misleading in a material way; and (3) that the plaintiff suffered injury as a result of the deceptive act." *Sykes v. Mel S. Harris & Associates LLC*, 780 F.3d 70, 83 (2d Cir.

2015).  "Courts have generally held that the type of injury needed to sustain a trademark violation under these provisions is limited to one 'that would trigger Federal Trade Commission intervention under 15 U.S.C. § 45, such as potential danger to the public health or safety.'" *RCA Trademark Mgmt. S.A.S. v. VOXX Int'l Corp.*, No. 14CV6294-LTS-HBP, 2015 WL 5008762, at *4 (S.D.N.Y. Aug. 24, 2015) quoting *DO Denim, LLC v. Fried Denim, Inc.*, 634 F. Supp. 2d 403, 409 (S.D.N.Y. 2009).  Claims involving trademark violations are not cognizable under N.Y. G.B.L § 349 unless "there is a specific and substantial injury to the public interest over and above ordinary trademark infringement or dilution."  *A.V.E.L.A., Inc. v. Estate of Marilyn Monroe, LLC*, No. 12 CIV. 4828 KPF, 2015 WL 5507147, at *18 (S.D.N.Y. Sept. 18, 2015).

Here, Plaintiff's N.Y. G.B.L. § 349 claim fails as a matter of law because Plaintiff does not identify any evidence of a consumer oriented injury over and above ordinary trademark infringement.  Indeed, Plaintiff's section 349 claim mirrors its trademark infringement claim, alleging that "Defendants' use of the LEAN CHEFS mark is likely to cause and is causing confusion, mistake and deception among the general purchasing public as to the origin of the infringing goods and services and is likely to deceive the public into believing that the infringing goods and services emanate from, are associated with or otherwise are affiliated with Chefs Diet."  *See* Complaint at ¶ 96.  Wholly absent from the record is any evidence that suggests Defendants caused a public health or safety violation necessary to sustain this claim.  Accordingly, Plaintiff's claim falls outside of the reach of N.Y. G.B.L. § 349 and should be dismissed.

**B.    Plaintiff's claim that Defendants misappropriated its customer list is without merit because the 2010 email data is not a trade secret and Plaintiff failed to protect the data as a confidential asset**

To bring a claim for the misappropriation of trade secrets, a plaintiff must allege that "(1)

[defendant] possessed a trade secret, and (2) defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means." *Integrated Cash Management Services, Inc. v. Digital Transactions, Inc.,* 920 F.2d 171, 173 (2d Cir. 1990). Plaintiff cannot establish a claim for misappropriation of trade secrets because: (1) the 2010 email data is not a trade secret; and (2) Defendants inadvertent use of the data was not improper.

### 1.     The 2010 email data is not a trade secret

"[C]ustomer lists are generally not considered confidential information." *Iron Mountain Information Management, Inc. v. Taddeo*, 455 F.Supp.2d 124, 138 (E.D.N.Y. 2006) quoting *H. Meer Dental Supply Co. v. Commisso*, 269 A.D.2d 662, 664 (N.Y. App. Div. 2000).  A customer list developed through substantial effort and kept in confidence may be treated as a trade secret if customers are not readily ascertainable.  *See B.U.S.A. Corp. v. Ecogloves, Inc.*, No. 05 CIV. 9988 (SCR), 2006 WL 3302841, at *3-4 (S.D.N.Y. Jan. 31, 2006); *IVI Envtl., Inc. v. McGovern,* 269 A.D.2d 497, 498, 707 N.Y.S.2d 107, 108 (2d Dept.2000)(denying trade secret protection to customer lists even in the face of a restrictive covenant where the information was readily ascertainable from outside sources); *Leo Silfen, Inc. v. Cream*, 29 N.Y.2d 387, 392 (1972).  *See also Defiance Button Machine Co. v. C & C Metal Products Corp*., 759 F.2d 1053, 1063 (2d Cir. 1985).

Here, Plaintiff's alleged customer list is not a trade secret because: (1) it was not developed through substantial effort and the list contents are readily ascertainable through outside sources; and (2) it was not kept in confidence.

### a.     Plaintiff did not obtain the list through substantial effort

The 2010 email data was not developed through substantial effort but instead was built by simply buying lists at tradeshows and from lead brokers.  *See* Gunning Dep. 58:11-60:21.  Lists

containing similar and often duplicative data are readily available from marketing firms such as Epsilon and at industry tradeshows such as Leadcon and Ad Tech. *See* Gunning Dep. 58:11-60:21; 62:14-19; 131:23-132:5. These lists are not only easy to purchase, but also inexpensive. Chefs Diet has acquired its data from these same sources and paid in the range of $1,500-$2,000 for 25,000 leads. Gunning Decl. at ¶ 8. Similarly, Lean Chefs purchased a list of 70,000 names and addresses for a mere $300. Gunning Dep. at 59:5-13; 133:15-134:25.

Lists of leads in this industry contain substantial overlap of data because the type of purchasing customers is not unique. *See* Gunning Decl. at ¶ 7. Indeed, Mr. Webster concluded that over half of Lean Chefs' current customers that appear in the 2010 email data ***also appear in three random and discrete customer lists purchased by Defendants over the course of a year***. *See* Webster Decl. at ¶ 49. The fact that this substantial overlap exists between just a few inexpensive publicly available lists illustrates that the data is both easy to obtain through outside sources and inexpensive.

In addition to the duplication of names appearing in the 2010 email data and on other lists Defendants purchased, at least two of the allegedly fictitious names Plaintiff "sprinkled" appeared on a publicly available list Defendants purchased at the 2013 Leadcon tradeshow. *See* Def.'s Resp. to Pl.'s Interrog. No. 10. That these fictitious names appear on a list publicly available underscores the fact that the data Plaintiff alleges to be confidential has freely and quickly infiltrated the customer data marketplace.

**b.    Plaintiff did not keep its alleged trade secret confidential**

The "owner [of a customer list] is entitled to such protection only as long as he maintains the list in secrecy; ***upon disclosure, even if inadvertent or accidental, the information ceases to be a trade secret and will no longer be protected***." *Defiance Button Machine Co.*, 759 F.2d at

1063 (emphasis added); *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 475–76, 94 S.Ct. 1879,

1883–84, 40 L.Ed.2d 315 (1974); *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.,* 626 F.2d

193, 196 (1st Cir.1980); Restatement of Torts, § 757, comment b, at 6 (1939) ("[A] substantial

element of secrecy must exist, so that, except by the use of improper means, there would be

difficulty in acquiring the information.").  *See also FMC Corp. v. Taiwan Tainan Giant Indus.*

*Co.*, 730 F.2d 61, 63 (2d Cir. 1984)(stating generally that New York follows Restatement of

Torts § 757, comment b).  The most important consideration in determining whether information

is a protectable trade secret "is whether or not the information is in fact secret."  *Derven v. PH*

*Consulting, Inc.,* 427 F.Supp.2d 360, 371 (S.D.N.Y.2006) (citing *Lehman v. Dow Jones & Co.,*

*Inc.,* 783 F.2d 285, 298 (2d Cir.1986)).  A database will lose its character as a trade secret if a

party fails to take reasonable steps to protect information from coming into another's hands.

*Defiance Button Machine Co.*, 759 F.2d at 1063.

  Here, Chefs Diet's employees, third party vendors, and Zazza had no legal obligation to

maintain the confidentiality of the 2010 email data.  Chefs Diet has employed many sales people

to market its product and service to potential customers since July 2009 and all of these

employees had access to Chefs Diet customer information, including the 2010 email data.  *See*

Utilla Dep. 25:14-17.  Chefs Diet did not have any written or verbal confidentiality agreements

or non-disclosure agreements with its employees until 2012—long after CDAC disclosed the

data to Zazza.  *See id.* at 31:6-23; 34:12-22.

  In addition to its employees, Chefs Diet's vendors also had access to Chefs Diet customer

information, including third-party vendor ███████████ *Id.* at 60:19-61:21; ███████████

████████████████████████████. ███████████████████

████████████████████████████████████████████████████████

████████████ *See* Maniscalco Dep. 28:2, 4 and accompanying errata sheet.

Notably, CDAC sent the 2010 email data to Zazza at his personal email address accessible from a personal computer at his own residence while he had no employment relationship and no agreement or legal obligation in connection with that data. ████████████████ ████████████████████████████████████████; Zazza Dep. at 145:14-17; Utilla Dep. at 56:3-58:5; Webster Decl. at ¶ 36.  In his review and comparison of CDAC's and Lean Chef's customer data, Defendants' technical expert concluded that the overlapping data originated in the 2010 email data and not from unauthorized access.[2]  *See* Webster Decl. at ¶¶ 4, 22, 23, 47, 48, 50, 52.  In sum, CDAC's complete and utter lack of effort to maintain the secrecy of the list or treat it as a confidential asset confirms that the data contained in the list is not a trade secret and this claim should be dismissed.

### 2. Defendants have a right to use Plaintiff's alleged misappropriated customer information because Defendants did not enter into a restrictive covenant with the Plaintiff

Defendants' use of the 2010 email data was not improper.  It is an "***uncontroversial proposition that a defendant can use a customer list that is not a trade secret unless the parties have entered into a restrictive covenant***."  *See B.U.S.A. Corp.*, 2006 WL 3302841, *5; *Catalogue Service of Westchester, Inc. v. Henry,* 107 A.D.2d 783, 784 (N.Y.App.Div.1985) ("It is basic law that absent a covenant not to compete ... an employee is free to compete with his or her former employer unless trade secrets are involved....").  *See also Leo Silfen,* 29 N.Y.2d at 392

---

[2] After analyzing all of CDAC's data and Defendants' corresponding data, Mr. Webster concluded that 96.6% of the overlapping data was found in the list Plaintiff disclosed to Zazza in 2010 and not from Plaintiff's current data.  That percentage rose to over 98% when three lists bought by Defendants from third parties were also taken into account. Webster explained that the remaining 1% fell into the "noise level" given the fact that both lists were addressing the same customer base, the same geographic region, and given the measure of error associated with data mining, and the diminishing-return effect of extracting the unaccounted data.  Therefore, Mr. Webster concluded to the extent Defendants obtained data from Plaintiff, that data came from Plaintiff's email disclosure in 2010 and not from unauthorized access of Plaintiff's database.  *See* Webster Decl. at ¶¶ 4, 22, 23, 39, 47, 48, 50, 51, 52.

(stating that the identity of a client is not a trade secret "where the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or product."); *Starlight Limousine Serv. v. Cucinella*, 713 N.Y.S.2d 195, 195-96 (N.Y. App. Div. 2000) (holding that a former employee was not enjoined from soliciting customers of its former employer where the former employee engaged in no wrongful conduct and the customer lists were not confidential trade secrets); *Amana Express Int'l, Inc. v. Pier-Air Int'l, Ltd.*, 621 N.Y.S.2d 108 (N.Y. App. Div. 1995).

Since the 2010 email data does not qualify as a trade secret and there was no agreement between CDAC and the Defendants—verbal, written, or otherwise—Defendants had no obligation to Plaintiff and could use the data. *See* Utilla Dep. at 56:3-58:5; Zazza Decl. at ¶ 5.

### C.     Plaintiff fails to raise a triable issue of fact that Defendants violated the Computer Fraud and Abuse Act

Plaintiff's Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2)(C), (a)(4) & (a)(5)(C) claims should be dismissed: (1) Defendants lawfully obtained the 2010 email data from Plaintiff; and (2) Plaintiff has failed to provide any evidence that Defendants hacked into its computer system.

The Computer Fraud and Abuse Act ("CFAA") is a primarily criminal statute that prohibits various computer crimes. *JBCHoldings NY, LLC v. Pakter*, 931 F. Supp. 2d 514, 520 (S.D.N.Y. 2013). While the Second Circuit has not addressed this issue, courts in this circuit have held that the CFAA does not apply to misappropriation of information where a person had lawful access to a computer system. *See, e.g.*, *JBCHoldings NY,* 931 F. Supp. at 522-23; *Univ. Sports Pub. Co. v. Playmakers Media Co.,* 725 F. Supp. 2d 378, 383 (S.D.N.Y. 2010); *Jet One Grp., Inc. v. Halcyon Jet Holdings, Inc.,* No. 08-CV-3980 JS ETB, 2009 WL 2524864, *5 (E.D.N.Y. Aug. 14, 2009) (finding that employee did not exceed authorized access by "taking [a]

15

client list from [the employer's] computer for the benefit of the defendant.").

Plaintiff's CFAA claim is without merit. The only evidence relating to this claim supports the conclusion that Defendants came into possession of the data at though the email Plaintiff sent Zazza and the purchase of lists from third parties. ███████████████████████████

███████████████████████████; Def.'s Resp. to Pl.'s Interrog. No. 10; Webster Decl. at ¶¶ 36, 39, 51. With respect to the allegedly fictitious names CDAC "sprinkled" their database with after the 2010 email, CDAC provides no evidence, other than its own speculative and conclusory allegations, that Defendants obtained this information from hacking Plaintiff's computer. Plaintiff has not presented any forensic evidence or otherwise that could support Plaintiff's allegation that Defendants remotely accessed CDAC's computer system. To the contrary, Plaintiff's counsel conceded that CDAC does not have direct evidence of hacking. *See* Transcript of Conference, 3:19-4:4 ("[w]e do not have direct evidence of continued access to our database.").

All of the names Plaintiff identifies appear in the 2010 email data or lists Defendants purchased from third parties. *See* Def.'s Resp. to Pl.'s Interrog. No. 10. Moreover, given Plaintiff's systemic failure to protect its purported confidential information through agreements with employees or vendors, it is not surprising that these sprinkled contacts entered the customer data marketplace and have since been incorporated into lists sold by third parties. *See* Zazza Decl. ¶¶ 14-15. With respect to CFAA subsection (a)(4), Plaintiff has not presented any evidence that Defendants had any intent to defraud. Because Plaintiff has no evidence supporting any asserted subsections of the CFAA, the court should dismiss this claim.

**D.      Plaintiff's breach of contract claim fails because Defendants did not enter into any contracts with Plaintiff**

Under New York law, there are four elements to a breach of contract claim: "(1) the

existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach

of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui,* 91 F.3d 337, 348 (2d

Cir.1996).  "[A] plaintiff must identify what provisions of the contract were breached as a result

of the acts at issue."  *Wolff v. Rare Medium, Inc.,* 171 F.Supp.2d 354, 358 (S.D.N.Y.2001)

(dismissing breach of contract claim because plaintiffs failed to identify the contractual

provisions that defendant breached).   Moreover, "[s]tating in a conclusory manner that an

agreement was breached does not sustain a claim of breach of contract."  *Berman v. Sugo L.L.C.,*

580 F.Supp.2d 191, 202 (S.D.N.Y.2008).

In the instant case, Plaintiff's breach of contract claim should be dismissed because there

is no contract (verbal or written) between the parties.  *See* Zazza Dep. 145:4-17; Utilla Dep. at

56:3-58:5; Friedman Dep. at 87:11-89:10.  Defendants were never under any written or verbal

agreements with CDAC and did not agree to safeguard any of CDAC's purported property.

Zazza Decl. at ¶ 5.  Even if the APA is construed as preventing Defendants from using customer

data sold to Plaintiff at that time cannot be understood apply to any data compiled or obtained

after the agreement was executed.  The 2010 email data—sent to Zazza a year after the APA was

executed—was therefore independent of the material transferred under the APA and thus there

are no obligations stemming from the APA with respect to that data.

### E.   Plaintiff's unjust enrichment is without merit because the 2010 email data is not a trade secret, and lacks intrinsic value and it is against equity and good conscience to allow Plaintiff to recover

To establish a defendant's liability for unjust enrichment, a plaintiff must prove that "(1)

defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate

against permitting defendant to retain what plaintiff is seeking to recover."  *Grynberg v. ENI*

*S.P.A.*, 503 F. App'x 42, 43 (2d Cir. 2012)*; Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir.2000).

### 1.   Defendants were not enriched at Plaintiff's expense

A plaintiff's allegation that a defendant received benefits, standing alone, is insufficient. *Old Republic Natl. Title Ins. Co. v. Cardinal Abstract Corp.,* 14 A.D.3d 678, 680, 790 N.Y.S.2d 143 (2d Dep't 2005).   The plaintiff has the burden to demonstrate not only that a benefit was conferred upon the defendants, but also that the defendants should have to compensate the plaintiff for the benefit conferred.  *Schatzki v. Weiser Capital Mgmt., LLC,* 995 F. Supp. 2d 251, 252-53 (S.D.N.Y. 2014).

A customer list that is not a trade secret and is not intrinsically valuable cannot support an unjust enrichment claim.  *See Meyers Associates, L.P. v. Conolog Corp.*, 19 Misc. 3d 1104(A), *5, 859 N.Y.S.2d 904 (Sup. Ct. 2008) *aff'd*, 61 A.D.3d 547, 878 N.Y.S.2d 304 (2009).   In *Meyers Associates v. Conolog*, the plaintiff sued the defendant for trade secret misappropriation and unjust enrichment over an investor list plaintiff sent to defendant in a letter.  *See id.* at *1. The court found that the investor list was not a trade secret because the investors were known in the trade, and even if the list were considered a trade secret or confidential information, it lost its confidentiality when the plaintiff disclosed the list to defendant in a letter.  *See id.* at *4. Likewise, the court determined that the investor list was not subject to a claim for unjust enrichment because it was not a trade secret and had no intrinsic value.  *Id.* at *5.

Here, Plaintiff cannot maintain its unjust enrichment claim because the 2010 email data is not a trade secret and has no intrinsic value.  The email data is readily available in the public domain and can be purchased in bulk at tradeshows and from lead brokers.  *See* Gunning Dep. 58:11-60:21; 62:14-19; 131:23-132:5.  Indeed, over half of Lean Chefs' current customers that appear in the 2010 email data overlap with merely three discrete customer lists purchased by Defendants in just one year.  *See* Webster Decl. at ¶ 49.  Additionally, the customers appearing

in the 2010 email data were not new, undiscovered market participants—they have been targeted and marketed to by Plaintiff for at least the last five years.  *See id.* 143:7-144:5 ("…that data has been hit seven years in a row it [is] probably some of the wors[t] data you want to get involved with definitely that wouldn't be our choice.").  Defendants did not benefit at the expense of Plaintiff because the data in the 2010 email is in the public domain and can be accessed by anyone.  Accordingly, because the 2010 email data is not a trade secret, has no intrinsic value, and Plaintiff does not have any proprietary rights in the list, this claim should be dismissed.

### 2.     It is against equity and good conscience to allow Plaintiff to recovery

Even if the 2010 email data is found to have some intrinsic value, it is against equity and good conscience to allow Plaintiff to reap the benefits of Defendants' marketing efforts and industry experience when Plaintiff made no effort to prevent damages from accruing.  Because Plaintiff's cease and desist letter failed to identify any specific property Plaintiff believed Defendants had taken, Zazza made a good faith effort to get more information by contacting Friedman on multiple occasions to no avail.  *See* Zazza Decl. at ¶¶ 9-11 (explaining that Zazza emailed former CEO Misha Podlog on December 9, 2013 and Lance Friedman on December 16th and 21st, 2013); CDAC Cease and Desist Letter.  At the time Defendants received Plaintiff's letter in December of 2013, Lean Chefs had only been operating for a month and was just beginning to obtain customers.  *See* Gunning Decl. ¶ 3.  Lean Chefs was in its infancy and Plaintiff was in a position to prevent Defendants from pursuing customers appearing in the 2010 email data, but instead did nothing.  Zazza Decl. at ¶¶ 9-14.

Defendants were unaware of any identifiable data allegedly belonging to Plaintiff until nearly a year later, when Plaintiff provided more information during discovery in this case.  Zazza Decl. at ¶¶ 11-13.  Upon learning the names Plaintiff added to its database, Zazza searched

Lean Chefs' database and located the source of contamination as the email Plaintiff sent him in 2010 and lists purchased from third parties. *Id.* at ¶¶ 14-15. Defendants' technical expert confirmed Zazza's determination and concluded that over 98% of the overlap existing between Plaintiff and Defendants' databases was attributable to the list Plaintiff emailed Zazza in 2010 and lists Defendants purchased from third parties. *See* Webster Decl. at ¶ 51. Once the 2010 email data was isolated, Defendants immediately stopped using it, despite no legal obligation to do so. Zazza Decl. at ¶ 15. Defendants did everything they could to investigate Plaintiff's allegations and immediately stopped using the data once the source was identified, while Plaintiff did nothing. Zazza Decl. at ¶¶ 9-14. Plaintiff should not be allowed to lie in wait for Lean Chefs to invest money and resources to secure paying customers and generate revenue and then attempt to exploit Defendants' efforts. Even if the Court were to find that the data has some intrinsic value, Plaintiff was in a position to prevent any enrichment by the Defendants in December 2013, but Plaintiff did not. *See e.g. Giordano v. Thomson*, 564 F.3d 163, 170 (2d Cir. 2009); *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC,* 813 F.Supp.2d 489, 534 (S.D.N.Y.2011) (explaining that the measure of damages for an unjust enrichment claim "is restricted to the reasonable value of the benefit conferred upon the defendants," and is "measured by a defendant's unjust gain, rather than by a plaintiffs loss").

**F.     Plaintiff's Conversion claim is without merit**

A party alleging conversion must establish: "(1) the plaintiff has an immediate right to possession of the property converted; (2) the defendant's possession of the property was unauthorized; (3) the defendant acted to exclude the rights of the lawful owner of the property; (4) the property is specifically identifiable; and (5) the defendant is obligated to return the property." *Pure Power Boot Camp,* 813 F. Supp. 2d at 535. Plaintiff's claim of conversion fails

as a matter of law because: (1) Plaintiff was never excluded from using the list because Zazza merely possessed a copy; and (2) Defendants lawfully possessed the customer list because it was provided to Zazza at the direction of CDAC in 2010 and CDAC failed to make sufficient demand for its return.

### 1. CDAC was never excluded from using the 2010 email data

An essential element of conversion is "unauthorized dominion" to the exclusion of the rights of the plaintiff. *Avalon Risk Mgmt. Ins. Agency, L.L.C. v. Taylor*, No. 12 CIV. 3934 LGS, 2015 WL 5459684, at *6 (S.D.N.Y. Sept. 16, 2015)(denying plaintiffs motion for summary judgment because it did not produce sufficient evidence to prove that defendant limited or otherwise deprived it of possession or use of client information).

In *Pure Power Boot Camp v. Warrior Fitness Boot Camp,* plaintiffs sued defendants for conversion, claiming that a defendant downloaded a copy of the plaintiff's client list on a thumb drive and used the contacts to start a competing fitness business. *Pure Power Boot Camp,* 813 F. Supp. 2d at 503. The court explained that while the defendant exercised control over the client list by downloading it, he did not limit or otherwise deprive the plaintiff of possession or use of the list because he only downloaded a copy. *Id*. at 536. Accordingly, the court held that plaintiffs' claim of conversion failed as a matter of law. *Id.*

Here, even if Plaintiff had a possessory interest in the customer list, which they do not, this claim fails because Defendants never excluded or otherwise deprived CDAC from possession or use of the list. As in *Pure Power Boot Camp*, Defendants merely possessed an electronic copy—which was emailed to Zazza at the direction of Plaintiff—not the sole version of the list. ███████████████████████████████████████████████; Zazza Dep. at 155:3-11. Plaintiff retained the list at all times concurrent with Defendants'

possession of the list.  Moreover, Defendants were unaware that they even had possession of the 2010 email data until Plaintiff commenced litigation in October 2014.  *See* Gunning Dep. 138:21-139:5; Zazza Decl. at  ¶¶ 14-15.  Upon learning that Defendants' data contained data from the 2010 email, Defendants isolated the data and stopped using it.  *See* Gunning Dep. 143:7-144:5; Gunning Decl. ¶ 10.

## 2. Defendants were in lawful possession of the 2010 email data and Plaintiff failed to make a sufficient demand for its return

When a defendant's possession of the property was initially lawful, there is no conversion unless the defendant refuses the owner's demand to return the property or wrongfully transfers or disposes of it before a demand is made.  *See Regions Bank v. Wieder & Mastroianni, P.C.*, 526 F. Supp. 2d 411, 414 (S.D.N.Y. 2007) aff'd, 268 F. App'x 17 (2d Cir. 2008).  A demand must be sufficiently definite and complete to apprise the defendant of the specific property claimed.  *Thyroff v. Nationwide Mutual Ins. Co.,* 360 F. App'x 179, 181 (2d Cir. 2010)(explaining that a letter that demanded a computer contained "lots of personal info" without identifying specific files was insufficient to support the plaintiff's conversion claim).

Here, Plaintiff's purported demand is inadequate to support this cause of action.  The letter sent by Plaintiff did not identify any property absent vaguely stating that Lean Chefs had been in contact with CDAC customers "through unauthorized misuse of its proprietary customer list…"  *See* Zazza Decl. ¶¶ 8-9.  Despite Zazza's attempts to gain more specific information from Friedman, CDAC failed to follow up or provide any additional information relating to its demand.  *Id.* ¶¶ 9-11.  Accordingly, as Defendants did not exclude Plaintiff from using the 2010 email data and CDAC's demand for return of the list was insufficient, this claim should be dismissed.

**G.    Plaintiff's Replevin claim fails as a matter of law because CDAC does not have proprietary rights in the list and failed to make a sufficient demand for its return**

"A cause of action sounding in replevin must establish that the defendant is in possession of certain property of which the plaintiff claims to have a superior right."  *SE Fin., LLC v. Broadway Towing, Inc.,* 117 A.D.3d 715, 715, 984 N.Y.S.2d 606 (2d Dep't 2014).  Even if there is a question of fact as to the proprietary nature of the 2010 email data, this claim fails as a matter of law because Plaintiff's demand for return was insufficient.  As with Plaintiff's conversion claim, Plaintiff failed to sufficiently identify the files or data Defendants possessed that Plaintiff claimed ownership of.  *See* Zazza Decl. ¶¶ 7-10.  Nevertheless, when the list was adequately identified during discovery, Defendants immediately ceased using it and have continued to refrain from marketing to any customers uniquely appearing in the 2010 email data pursuant to the parties' Stipulation & Order entered into on February 23, 2015.  *See* Gunning Dep. 138:21-139:5; Dkt. # 58.

**H.    Plaintiff cannot maintain its breach of fiduciary duty claim**

"Under New York law, the elements of a cause of action for breach of fiduciary duty are: (1) the existence of a fiduciary relationship; (2) misconduct by the defendant; and (3) damages that were directly caused by the defendant's misconduct." *Kurtzman v. Bergstol,* 40 A.D.3d 588, 590, 835 N.Y.S.2d 644, 646 (2d Dep't 2007).

**1.    Zazza did not have a fiduciary relationship with Plaintiff**

"A fiduciary relationship involves discretionary authority and dependency," and is marked by "reliance, and de facto control and dominance." *U.S. v. Chestman,* 947 F.2d 551, 568 (2d Cir.1991).  The mere fact that a party shares confidential information with another party does not create a fiduciary duty. *Albany Molecular Research, Inc. v. Schloemer*, No. 1:10-CV-210

LEK DRH, 2010 WL 5168890, at *4 (N.D.N.Y. Dec. 14, 2010)(finding no fiduciary relationship despite the plaintiff working closely with and sharing confidential information with the defendant). A shareholder does not owe a fiduciary duty to a corporation unless the shareholder dominates and controls a corporation. *See Global Crossing Estate Representative v. Winnick*, No. 04 CIV.2558(GEL), 2006 WL 2212776, at *18 (S.D.N.Y. Aug. 3, 2006)(stating that even majority shareholders do not have a trust relationship with other shareholders or a corporation absent evidence demonstrating control).

In this case, Zazza and Gunning did not have a fiduciary relationship with Plaintiff. Zazza was not an employee or agent of Plaintiff when he gratuitously assisted Plaintiff with email marketing and Zazza was sent the 2010 email data. *See* Zazza Decl. at ¶ 4; Zazza Dep. 38:25-39:14. Moreover, the parties did not agree to any duties with respect to Plaintiff's allegedly confidential information that would establish a relationship of higher trust. *See* Utilla Dep. at 56:3-58:5. The mere fact that Plaintiff, of its own volition, sent Zazza a data it now claims is confidential does not create a special fiduciary relationship between the parties. Plaintiff fails to provide any evidence that would suggest its relationship with Zazza or Gunning was one of heightened duties.

Further, while Zazza owns shares in CDAC, he has never had any control or influence over the management or direction of the company. Accordingly, Zazza does not have any fiduciary obligations on account of his ownership of shares and the claim should be dismissed.

### 2. Zazza's gratuitous assistance with marketing was not within the scope of Zazza Technologies' role as a vendor of telephone services

Even when there is a fiduciary relationship, the fiduciary duty of a party is limited to "matters *within the scope of the relation.*" *Flickinger v. Harold C. Brown & Co.,* 947 F.2d 595, 599 (2d Cir.1991)(emphasis added); *Otto v. Melman*, 25 Misc. 3d 1235(A), *3-4, 906 N.Y.S.2d

774 (Sup. Ct. 2009) *aff'd*, 80 A.D.3d 738, 915 N.Y.S.2d 503 (2011)(dismissing breach of fiduciary duty claim because physician's fiduciary relationship with the plaintiff did not extend to investment advice); *Silverstein v. Flat Iron Acquisition, LLC*, 278 A.D.2d 144, 145 (2000)(manager and leasing agent's duties did not extend to brokering vendor's purchase of interest in a building).

Even if Zazza and Plaintiff had a fiduciary relationship with respect to telephone services, which he did not, Zazza's assistance with Plaintiff's email marketing falls outside of that relationship. Zazza was not an employee or vendor of Plaintiff and merely assisted CDAC with marketing with the hope that if it was successful, Plaintiff repay the money it owed him. *See* Zazza Decl. at ¶¶ 3-4; Zazza Dep. 39:9-14. Any fiduciary obligation with respect to Zazza's role as it relates to CDAC's telephone system, which Defendants dispute, does not extend to safeguarding data sent to him for marketing purposes. There is no evidence that Plaintiff and Zazza agreed to any heightened or special responsibility with respect to this data. Zazza Decl. at ¶ 5. Accordingly, this claim should be dismissed.

## I.    Defendants' LEAN CHEFS mark does not infringe Plaintiff's CHEFS DIET mark and has not engaged in unfair competition (state and federal)

To prevail on an infringement action, a plaintiff must demonstrate: (1) that it has a valid mark entitled to protection; and (2) that the defendant's use of that mark is likely to cause confusion. *Savin Corp. v. Savin Group,* 391 F.3d 439, 456 (2d Cir. 2004).

### 1.    The term "CHEFS DIET" is invalid because it is generic

The term "CHEFS DIET" is invalid because it is generic. According to the Merriam-Webster Dictionary, the term Chef means "a person who prepares food for people to eat"[3] and the term Diet means "food and drink regularly provided or consumed" and "a regimen of eating

---

[3] http://www.merriam-webster.com/dictionary/chef

and drinking sparingly so as to reduce one's weight [going on a *diet*].[4]"  There are hundreds of independent companies and products that use the term "CHEFS" and "DIET" or permutations thereof as part of their trademark, trade name, logo or slogan.  According to the USPTO database, there are 5356 trademark records (e.g. pending, not pending and registered marks) for marks that use the term CHEF and 3487 trademark records for marks that use the term DIET.  *See* Declaration of Frances Stephenson ¶ 2 (Jan. 23, 2015)(**Ex. 11**).  By way of example, the lists includes "DIET CHEF" for weight control meals; "LIFESTYLE CHEFS" for primarily frozen vegetable dishes; "CHEFS GOURMET" for food preparation services featuring fresh fish; and "CHEF'S STYLE" for prepackaged meals consisting of seafood, chicken and meats with vegetables and sauces.  Plaintiff has adopted a mark with generic words that make the mark generic and invalid as a trademark.

### 2.  The Defendants' use of the LEAN CHEFS mark is not likely to cause confusion

In determining whether there is a likelihood of confusion, the Second Circuit applies an eight factors test.  *See Polaroid Corp. v. Polarad Elecs. Corp*., 287 F.2d 492, 495 (2d Cir. 1961); *Kelly-Brown v. Winfrey*, 717 F.3d 295, 307 (2d Cir. 2013).  The eight factors are: (1) strength of the trademark; (2) similarity of the marks; (3) proximity of the products and their competitiveness with one another; (4) evidence that the senior user may 'bridge the gap' by developing a product for sale in the market of the alleged infringer's product; (5) evidence of actual consumer confusion; (6) evidence that the imitative mark was adopted in bad faith; (7) respective quality of the products; and (8) sophistication of consumers in the relevant market."  *See id.*  "The application of the *Polaroid* test is 'not mechanical, but rather, focuses on the ultimate question of whether, looking at the products in their totality, consumers are likely to be

---

[4] http://www.merriam-webster.com/dictionary/diet

confused." *Starbucks Corp. v. Wolfe's Borough Coffee, Inc*., 588 F.3d 97, 115 (2d Cir. 2009) (quoting *Star Indus., Inc. v. Bacardi & Co., Ltd.,* 412 F.3d 373, 384 (2d Cir.2005)).

**a.**    **Plaintiff's mark is weak**

Plaintiff's mark consists of two terms that are both descriptive of their prepared meals/ entrees and are frequently used by other marks that appear in the same context.   Marks incorporating commonly used descriptive designations are considered to be weak and entitled to a narrow scope of protection.  *In re Central Soya Company, Inc.*, 220 U.S.P.Q. 914, 916 (TTAB 1984); *see also Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee en 1772*, 396 F.3d 1369, 1373, 73 U.S.P.Q. 2d 1689, 1693 (Fed. Cir. 2005).  Third party registrations are relevant to show the weakness of a particular term. *See, e.g*., *Plus Products v. Star-Kist Foods, Inc.,* 220 U.S.P.Q. 541, 544 (TTAB 1983).  As indicated above, Plaintiff has chosen to use a mark incorporating commonly used, descriptive designations and therefore the mark is generic, or at least very weak.

**b.**    **Plaintiff's CHEFS DIET mark and Defendants' LEAN CHEFS marks are dissimilar**

When evaluating the similarity of marks, "courts look to the overall impression created by the [marks] and the context in which they are found and consider the totality of factors that could cause confusion among prospective purchasers."  *Gruner + Jahr USA Publ'g v. Meredith Corp.,* 991 F.2d 1072, 1078 (2d Cir.1993).  Here, while comparing similarities and dissimilarities between the disputed marks under the "sound sight meaning" test as laid down by the courts, it is amply clear that the marks are different in every way other than the use of the generic term "Chefs."  The sight of the words are different, with the word Chefs appearing first in the Plaintiff's mark and second in the Defendants' mark.  The sound is also entirely different, as Chefs Diet sounds entirely dissimilar from Lean Chefs, and thus the meaning is also entirely

27

different.  The word Chefs Diet indicates a Chef prepared a diet, as the word Chef modifies the word diet.

Plaintiff's claim that Defendants' trademark LEAN CHEFS is confusingly similar to CHEFS DIET is untenable.  The only common term between the marks is the highly descriptive term "CHEFS."  There are over one thousand applications and over one hundred registrations with the United States Patent and Trademark Office ("USPTO") that use or incorporate the word CHEFS in connection with products and services relating to food products and services. Stephenson Decl. ¶ 3.  In allowing Defendants' registration of LEAN CHEFS as a trademark for goods/services relating to food preparation and delivery, the USPTO never once cited nor referenced CHEFS DIET, which was already registered with the USPTO as being confusingly similar mark and/or in any manner precluding Defendants' registration of its LEAN CHEFS trademark.  Moreover, during the opposition in period at the USPTO in December of 2013 the Plaintiff never opposed Defendants' application for registration for LEAN CHEFS despite being aware of Defendants' use of the mark since at least December of 2013.  *See* CDAC Cease and Desist.

### c.      Plaintiff and Defendants market to similar customers

The products are sold to similar customers so the issue of bridging the gap is irrelevant; however, Defendants products are of much higher quality.  *See* Gunning Dep. 169:10-170:5. Unlike Plaintiff, Lean Chefs' kitchen prepares meals solely for Lean Chefs and Gunning is heavily involved with quality control.  Gunning Decl. ¶ 5.

### d.      Plaintiff has failed to demonstrate actual confusion between the marks

The alleged instances of "actual confusion" proffered by CHEFS DIET are not instances of actual confusion.  For example, Plaintiff states, "a consumer called Plaintiff's customer-

service center and inquired regarding a special program she had been offered by an individual named Arthur." *See* Declaration of Misha Podlog ¶14 (Oct. 21, 2014)(**Ex. 12**).  This shows they were confused about the name of an individual they spoke to.  It does not show any confusion regarding the trademarks.

### e.  Defendants adopted the Lean Chefs mark in good faith

The term CHEFS was chosen because it was a popular word in the industry.  *See* Gunning Dep. 103:4- 107:11.  It is also not surprising that a mark would have similar words that are used commonly in the diet industry.  Still further, there was a great deal of overlap in the individuals (e.g. Arthur Gunning) brainstorming to come up with the name CHEFS DIET as the individuals that brainstormed to come up with the name LEAN CHEFS.  *See* Gunning Dep. 103:4-107:11 and 42:3- 43:24.  Defendants have also testified that they went to great lengths to distinguish their marketing and advertising from anybody in the market.  *See* Gunning Dep. 119:21- 120:3.

Defendants have invested nearly one million dollars in marketing and advertising to distinguish and build the Lean Chefs brand.  *See* Gunning Decl. ¶ 4.  This severely undercuts Plaintiff's argument that Defendants are attempting to capitalize on CHEFS DIET's reputation and goodwill.  Still further, Defendants filed a trademark application with the USPTO and did not try to hide their use of the LEAN CHEFS mark and despite Plaintiff's knowledge of the LEAN CHEFS mark in November 2013, Plaintiff never opposed the mark when it was published for opposition in December 2013.  Defendants trademark Serial Number 86020475 is currently at the final review prior to registration and at no point did anyone from the USPTO assert any likelihood of confusion with Plaintiff's trademarks.

#### f.      Defendants' products are superior to Plaintiff's

While Plaintiff's tout their brand as being a "five-star gourmet diet delivery service," this phrase is not the product of an independent review, but was instead created for marketing and advertising purposes.   Gunning Decl. ¶ 12.   It is wholly irrelevant and not indicative of the quality of Plaintiff's business.   When comparing independent reviews from Yelp, the disparity between customer opinion on the quality of Plaintiff and Defendants' food and service is evident. While Defendants have a nearly five star rating on Yelp, Plaintiff's rating is only two and a half stars.   *See* Stephenson Decl. ¶¶ 4-5.

#### g.      Purchasers in the gourmet diet delivery market are sophisticated

Customers of gourmet diet delivery are sophisticated.   The products in this market are expensive and Defendants target customers who earn at least $75,000 a year.   Gunning Decl. ¶ 9. These customers care about their health and quality and make careful decisions.   *Id.*

### V.      CONCLUSION

Based on the foregoing, Defendants' motion for summary judgment should be granted with respect to claims four, five, six, eight, nine, ten, eleven, and twelve of Plaintiff's Complaint.

RESPECTFULLY SUBMITTED this 22 day of February, 2015.

MEREDITH & KEYHANI, PLLC

By: */s/ Dariush Keyhani___*
DARIUSH KEYHANI
125 Park Ave, 25th Floor
New York, New York 10017
Direct Dial: (212) 380-1325
Facsimile: (212) 202-3819
dkeyhani@meredithkeyhani.com