IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

CHEFS DIET ACQUISITION CORP. d/b/a
CHEFS DIET,

                Plaintiff,              CASE NO: 14-CV-8467 (JMF)

      v.

LEAN CHEFS, LLC, NICHOLAS ZAZZA
And ARTHUR GUNNING,

                Defendants.
_____/


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' DAUBERT MOTION TO
EXCLUDE THE TESTIMONY OF MARIO PEREZ**

**TABLE OF CONTENTS**

I.      PRELIMINARY STATEMENT……………………………………………………1

II.     STATEMENT OF FACTS AND BACKGROUND…………………………………...…2

    A.  Perez fails to use Lean Chefs' actual sales data…………………………………..2

    B.  Perez uses flawed methodology…………………………………………………..3

    C.  Perez fails to provide support for key assumptions………………………………4

III.    ARGUMENT………………………………………………………………………5

    A.  Standard………………………………………………………………………...5

    B.  Analysis…………………………………………………………………………6

        1.  Perez fails to use the actual data that was provided to him………………………6

        2.  Perez uses flawed methodology………………………………………………...7

            a.  Perez uses flawed methodology in determining the value of Chefs Diet…………7

                i.  Perez does not consider the best evidence of the value of Chefs Diet……………7

                ii. Even if Perez's reliance on the IRS Formula were proper, his application is incorrect………………………………………………………………………...9

            b.  Perez selects data on which to base favorable projections, grossly overstating the expected growth of the company……………………………………………...9

            c.  Perez fails to account for the effects of market risks as well as CDAC's market share……………………………………………………………………10

        3.  Perez fails to provide support for key assumptions……………………………...11

            a.  Perez relies on assumptions from management without supporting them………14

            b.  Perez's reliance on statements from management constitutes unreliable hearsay……………………………………………………………………...16

IV.     CONCLUSION……………………………………………………………………...17

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 566 F.Supp.2d 305 (S.D.N.Y. 2008)...... 11

*Adams v. Lindblad Travel, Inc.*, 730 F.2d 89 (2d Cir. 1984) ......................................................... 9

*Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256 (2d Cir. 2002) ....................... 5

*Ashland Mgmt. v. Janien*, 82 N.Y.2d 395 (1993) ........................................................................ 12

*Billion Tower Int'l LLC v. MDCT Corp.*, No. 08-CV-4185, 2010 WL 5536513 (S.D.N.Y. Dec. 10, 2010) ...................................................................................................................................... 12

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996).................................................. 6

*Celebrity Cruises Inc. v. Essef Corp.*, 434 F.Supp.2d 169 (S.D.N.Y. 2006)........................... 9, 12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)......................................... 5

*Faulkner v. Arista Records LLC*, 46 F.Supp.3d 365 (S.D.N.Y. 2014) ......................................... 6

*General Electric Co. v. Joiner*, 522 U.S. 136 (1997) ................................................................... 5

*Island Intellectual Prop. LLC v. Deutsche Bank AG*, No. 09-CV-2675 KBF, 2012 WL 526722 (S.D.N.Y. Feb. 14, 2012) ........................................................................................................... 16

*Josten's v. C.I.R.*, 58 T.C.M. (CCH) 933 (T.C. 1989) .................................................................. 8

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .................................................................. 5

*Lava Trading, Inc. v. Hartford Fire Ins. Co.*, No. 03 CIV. 7037 PKC, 2005 WL 4684238 (S.D.N.Y. April 11, 2005)............................................................................................... 9, 14, 15

*Lippe v. Bairnco Corp.*, 288 B.R. 678 (S.D.N.Y. 2003)............................................................... 6

*Riegel v. Medtronic, Inc.*, 451 F.3d 104 (2d Cir. 2006)............................................................... 6

*Schonfeld v. Hillard*, 218 F.3d 164 (2d. Cir. 2000) ......................................................... 8, 11, 12

*United States v. Cartwright*, 411 U.S. 546 (1973)....................................................................... 7

*United States v. Mejia*, 545 F.3d 179 (2d Cir. 2008) .................................................................. 16

*United States v. Williams*, 506 F.3d 151 (2d Cir. 2007). ............................................................. 6

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206 (2d Cir. 2009) ..... 12

**Statutes**

Fed. R. Evid. 703 .................................................................................................................... 16

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

CHEFS DIET ACQUISITION CORP. d/b/a
CHEFS DIET,

                    Plaintiff,                CASE NO: 14-CV-8467 (JMF)

          v.

LEAN CHEFS, LLC, NICHOLAS ZAZZA
And ARTHUR GUNNING,

                    Defendants.

_____/

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' DAUBERT MOTION TO EXCLUDE THE TESTIMONY OF MARIO PEREZ**

**I.    PRELIMINARY STATEMENT**

      Pursuant to Federal Rule of Evidence 702, Defendants Lean Chefs, LLC ("Lean Chefs"), Nicholas Zazza ("Zazza"), and Arthur Gunning ("Gunning") (collectively "Defendants") respectfully submit this motion to exclude the report and opinions therein of Mario Perez. On September 30, 2015, Perez submitted a report purporting to provide a damages assessment based on Plaintiff Chefs Diet Acquisition Corp. d/b/a Chefs Diet's ("Plaintiff" or "CDAC") alleged loss of profits and loss at disposition of business in connection to the above captioned litigation. *See* Expert Disclosure of Mario Perez at 1 (Sept. 30, 2015) ("Perez Report")(**Ex. 1**).

      Defendants' *Daubert* motion should be granted for the following reasons. First, in determining loss of profits, Perez does not consider Lean Chefs' actual historical sales data. Perez was provided all sales made by Lean Chefs on a customer-by-customer basis since Lean Chefs went into business.  Instead of using this data to precisely calculate sales Lean Chefs made to the customers allegedly misappropriated, Perez uses Chefs Diet's own sales data to speculate as to what Lean Chefs' sales would have been.

Second, Perez uses flawed methodology in determining the value of Chefs Diet.  Perez ignores what this Circuit considers the best evidence of market value—what CDAC actually paid for Chefs Diet—and instead applies a valuation approach that should only be used if there is no better valuation method available. Moreover, his application of this approach is incorrect because he fails to analyze necessary factors or consider any facts in choosing a capitalization rate. Perez's method of determining sales growth rate is also flawed because he improperly selects a narrow sales history that is unrepresentative of CDAC's overall performance to calculate his profit projections. Perez also fails to consider any adverse market conditions, including the entry of new competitors into the market.

Third, Perez makes a number of unreasonable assumptions that are without any factual support. Perez continuously bases his analysis on numbers that are not grounded in actual data and fails to support them. For example, Perez improperly accepts statements "stressed" by management regarding a hypothetical marketing return on investment without any support from historical records or elsewhere. Perez's decision to blindly accept management statements as true without any support or explanation renders his testimony unreliable.

Because Perez's report is unreliable, Defendants' *Daubert* motion to exclude his testimony should be granted.

## II.   STATEMENT OF FACTS AND BACKGROUND

### A.   Perez fails to use Lean Chefs' actual sales data

Perez claims that Defendants failed to provide him with all its sales information for its customers on which to base his assessment. *Id.* at 5-6. Defendants did provide all sales for each customer on a customer-by-customer basis since Lean Chefs went into business. Declaration of

Lisa Zazza Decl. at 4-5 (Feb. 18, 2016)(**Ex. 2**). Indeed, just two months later, CDAC's second proposed expert did an analysis of the sales data Perez claimed was not provided. Perez did not use Lean Chefs' actual sales data from the relevant periods and instead took Chefs Diet's own historical data and speculated as to what Lean Chefs' sales would have been. Perez Report at 6-7, 8-10. Any references to Lean Chefs' data concern wholly inaccurate assumptions. *Id.* at 5.

### B. Perez uses flawed methodology

In valuing the company, Perez fails to accord any weight to the sales price in 2009—the best evidence of Chefs Diet's value.[1] Lisa Zazza Decl. at 8. Instead, Perez incorrectly relies on Revenue Ruling 68-609 ("IRS Formula")[2], which should be used "*only if* there is no better basis [for determining the fair market value] available." Rev. Rul. 68-609, 1968-2 C.B. 327. Moreover, Perez's application of the IRS Formula is flawed because he fails to consider any of the required factors or relevant facts specific to this case in determining a capitalization rate.

His methodology in determining sales growth rate is also flawed. Perez cherry picks CDAC sales data that grossly overstates its success and projects this into the future without properly considering CDAC's actual sales history. Perez Report at 8. Perez arbitrarily picks a particular data point where CDAC had an increase in sales, ignoring all the other fluctuations. *Id.* at 8. His use of this narrow, self-serving data point to represent CDAC's sales trend as increasing is flawed and misrepresents CDAC's actual sales trend, which is flat. *See* Giuffré Report at 16-18. Given CDAC's flat sales growth, the company should not be worth any more than it was sold for in 2009.

---

[1] In 2009 Chefs Diet Delivery LLC, and two other entities, Z.C.C.A. Corp., and Kosher Chefs Diet Corp., were sold to CDAC.  *See* Second Amended and Restated Asset Purchase Agreement, March 18, 2009.
[2] Perez refers to the Revenue Ruling 68-609 method as the "IRS Formula."  *See* Perez Report at 10.

Perez fails to consider any market risks and their potential impact on CDAC's market share. Perez completely ignores other market competitors, assuming that every customer CDAC loses has been misappropriated by Lean Chefs without considering that there are others in the market. Giuffré Report at 9. His testimony should thus be precluded as unreliable under *Daubert*.[3]

### C.     Perez fails to provide support for key assumptions

Perez makes a number of assumptions without any support or explanation. Perez assumes that Lean Chefs' paying customers appearing on Chef's Diet's 2010 list and Lean Chefs' paying customers appearing on Chef's Diet's 2014 list are mutually exclusive and comes to a sales analysis that is grossly exaggerated and wholly incorrect.  Perez does not explain the basis for this assumption and makes no effort to analyze the lists themselves to determine whether his assumption is reasonable. *Id.* at 4-5. Furthermore, Perez assumes that none of the overlapping customers were obtained from a public database and instead treats all overlapping customers as being misappropriated. Expert Disclosure of Dennis Giuffré at 25 (Nov. 12, 2015) ("Giuffré Report")(**Ex. 3**). Moreover, Perez assumes that each of these customers would have purchased a certain amount of food at an inflated reorder rate. Perez Report at 7. These assumptions are not supported and contradict his assumption that the customers are mutually exclusive. *Id.*

Perez speculates about sales growth based on a hypothetical return on marketing investment without any support from historical records or elsewhere, that grossly inflates alleged lost sales and profits. *Id.*at 7. These statements are belied by CDAC's own 30(b)(6) corporate representative. Deposition of Joseph Maniscalco, 104:20-105:12 (Nov. 25, 2014)(**Ex. 5**); Giuffré

---

[3] It should briefly be noted that Perez's report is so riddled with inconsistent numbers that it is difficult to follow his analysis. Indeed, even attempting to check his equations results in numbers different from the conclusions provided in his report. Perez Report at 3-4, 10.

Report at 12-14. Perez does not provide any support as to how he calculates cost variables in his analysis of profit margins, and his cost estimation is inconsistent and wholly unreasonable in considering CDAC's historical data. Perez Report at 4.

## III.   ARGUMENT

### A.   Standard

Under Rule 702,

> "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

The Supreme Court has held that the trial judge acts as a gatekeeper to ensure that the expert's opinion "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). This gatekeeping role is not limited to scientific knowledge and extends to testimony based on "technical" and "other specialized" knowledge as well. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 146-46 (1999).

The Supreme Court set forth a number of specific factors to test reliability in *Daubert*; however, "[t]hese factors do not constitute...a 'definitive checklist or test.'" *Amorgianos v. National Railroad Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002). In this sense, "the test of reliability is flexible." *Kumho Tire Co.*, 526 U.S. at 146-46.

While a "minor flaw" in an expert's reasoning is insufficient to exclude an expert's opinion, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266-67.

Even though the Court must focus on the methodology of the expert without regard to the correctness of the expert's conclusions, the Supreme Court has explained that conclusions and methodology are not wholly severable. *General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data *only by the ipse dixit of the expert*. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.* (emphasis added). In this sense, if expert testimony is "speculative," "conjectural," or based on assumptions "so unrealistic and contradictory as to suggest bad faith," then it must be excluded. *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996). *See Riegel v. Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006) ("An expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence substantiate that conclusion.")

The party offering the expert's opinion bears the burden of establishing its admissibility by a preponderance of the evidence. *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

**B.     Analysis**

Perez's report and opinions contained therein should be excluded because: (1) Perez does not use Lean Chefs' actual sales data in determining loss profits; (2) Perez's methodology is flawed; and (3) Perez fails to provide support for key assumptions.

**1.     Perez fails to use the actual data that was provided to him**

This Court has held that where an expert failed to review data he "believed to be unavailable, when the data was, in fact, produced," a report lacks reliability. *Faulkner v. Arista Records LLC*, 46 F.Supp.3d 365, 380 (S.D.N.Y. 2014). *See Lippe v. Bairnco Corp.*, 288 B.R.

678, 694 (S.D.N.Y. 2003) (finding analysis unreliable where expert failed to use full calendar year numbers in belief that numbers were unavailable when, in fact, they were provided).

Perez was provided with all of Lean Chefs' historical sales data since its inception. He was provided all sales made by Lean Chefs on a customer-by-customer basis since Lean Chefs went into business and this data was produced to Chefs Diet as the records were maintained in the ordinary course of business. Lisa Zazza Decl. at 5-7. As such, Perez could have calculated the total revenue from each of Lean Chefs' customers with exact precision based on actual numbers. Rather than use actual data, Perez instead made assumptions regarding Lean Chefs' sales based on select data from CDAC's own sales records. *Id.* at 8-10. Because Perez's did not use the actual numbers to calculate damages, his analysis is inadmissible.

### 2.    Perez uses flawed methodology

Perez's methodology is flawed in three respects. First, he fails to consider the best evidence of the value of Chefs Diet. Second, rather than look at the entire sales history when projecting future profits, he picks two extremely limited ranges in which CDAC was performing well to grossly overstate CDAC's production. Third, Perez fails to consider the potential impacts of market risks on CDAC's market share.

### a.    Perez uses flawed methodology in determining the value of Chefs Diet

Perez's methodology in determining the value of Chefs Diet is flawed because he ignores the best evidence of Chefs Diet's value and incorrectly applies an inferior valuation method.

### i.    Perez does not consider the best evidence of the value of Chefs Diet

The United States Supreme Court has held that the fair market value is the price a willing buyer would pay a willing seller for property absent compulsion to buy or sell or hidden facts.

*United States v. Cartwright*, 411 U.S. 546, 661 (1973). A recent sale price is thus highly probative evidence of the company's value. *See Schonfeld v. Hillard*, 218 F.3d 164, 178 (2d. Cir. 2000) ("Indeed, it is well-established that a recent sale price for the subject asset, negotiated by parties at arm's length, is the best evidence of its market value") (internal quotations omitted). Once defendant has offered this evidence, the burden is on the plaintiff to show "special circumstances which would negate [the relevance] of a prior arm's-length purchase price." *Id.* at 179 (citations omitted). Only if no prior sales history is available may an expert give their opinion on an asset's value. *See Id.* at 178-80 (accepting expert's market value assessment when he established it by looking at two supply agreements, within which was a purchase price, despite contracts never being finalized).

Here, in assessing Plaintiff's purported loss at disposition of business, Perez incorrectly relies on Revenue Ruling 68-609 ("IRS Formula"). Despite this Circuit explicitly stating that a recent sales price is the best evidence of market value, Perez did not consider the sale price of Chefs Diet in 2009 nor explain why he chose not to consider it.[4] *See* Second Amended and Restated Asset Purchase Agreement, March 18, 2009 (**Ex. 6**). Even the valuation method Perez relies on itself states that its use is only appropriate if there is no better method. Rev. Rul. 68-609, 1968-2 C.B. 327 (stating that the method "may be used for determining the fair market value of intangible assets of a business *only if* there is no better basis therefor available."). *See also Josten's v. C.I.R.*, 58 T.C.M. (CCH) 933 (T.C. 1989)(stating that the IRS Formula "requires acceptance of 'difficult and uncertain' assumptions and judgments that invite speculation rather

---

[4] CDAC purchased Chefs Diet Delivery LLC, Z.C.C.A. Corp., and Kosher Chefs Diet Corp. in 2009. *See* Second Amended and Restated Asset Purchase Agreement, March 18, 2009. Chefs Diet's sale price is especially probative given the company's lack of growth since its sale. Giuffré Report at 16-18.

than sound analysis"). Given the availability of better evidence of Chefs Diets' value—the price it actually sold for—it was inappropriate for Perez to apply the inferior IRS Formula.

### ii.   Even if Perez's reliance on the IRS Formula were proper, his application is incorrect

Perez's application of the IRS Formula is flawed because he fails to consider necessary factors in determining a capitalization rate. The IRS Formula requires consideration of various factors to determine an appropriate capitalization rate, including: "(1) the nature of the business, (2) the risk involved, and (3) the stability or irregularity of earnings." Rev. Rul. 68-609, 1968-2 C.B. 327.

Without addressing any of these factors, Perez applies a capitalization rate of 20%, insisting that it is "conservative." Perez Report 10. Despite his insistence, this rate is the highest rate that appears in the Revenue Ruling 68-609 and Perez's decision to apply this high rate is neither explained nor justified. Perez's mechanical application of such a high capitalization rate without any sort of analysis of the relevant factors is wholly unreliable and renders his opinions inadmissible.

### b.   Perez selects data on which to base favorable projections, grossly overstating the expected growth of the company

An award of lost profit damages is unwarranted when it is based purely on a projection of "past results," for there is "no reason to believe that such would have guaranteed [the plaintiff] the same success [it] enjoyed [in years before]" when other variables are at play. *Adams v. Lindblad Travel, Inc.*, 730 F.2d 89, 92 (2d Cir. 1984). In projecting profits, an analysis must consider a company's comprehensive sales history to be considered reliable. *See Celebrity Cruises Inc. v. Essef Corp.*, 434 F.Supp.2d 169, 179 (S.D.N.Y. 2006) citing Shannon P. Pratt, et

al., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (2000).[5] *See Lava Trading, Inc. v. Hartford Fire Ins. Co.*, No. 03 CIV. 7037 PKC, 2005 WL 4684238, at *9 (S.D.N.Y. April 11, 2005) (finding report fell "well short of the essential requirements for usable expert testimony" where, in calculating lost revenue, analysis excluded unfavorable sales history to inaccurately inflate its projected future profits).

Here, despite being provided Chefs Diet's detailed monthly sales from January 2010 through December 2014, Perez arbitrarily picks a 12-month period where CDAC's sales revenue experienced growth, from October 2011 through September 2012, and accepts this as CDAC's "growth trend." Perez Report 8-9. The 12-month period selected by Perez is not representative of CDAC's actual growth, which in fact declined over CDAC's total sales history.  Perez then projects this grossly overstated growth trend, without any other considerations, into future profits. This is wholly unreliable. His determination of a trend based solely on a select favorable sales period contradicts the established methodology for analyzing lost profits based on projected sales. Under a proper method, Perez should have looked at the entire sales history from, which actually shows a *declining* average in total sales revenue.[6]

   c. **Perez fails to account for the effects of market risks as well as CDAC's market share**

Finally, failing to control for adverse market conditions, such as "(1) the entry of

---

[5] In grounding an analysis on projected profits, Pratt encourages reviewing 5-10 years of operations in order to create a reasonable basis from which to project general growth rate. Shannon P. Pratt, et al., *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (1998) at 831. Pratt also encourages assessing the market to determine whether the company's projections are reasonable as compared to its competitors. *Id*. Perez failed to do either.

[6] *See* Giuffré Report at 16-18. Giuffré conducted a simple linear regression analysis of the sales from 2009 through 2013 and found that they "**do not** indicate a 'trend' of an increase of 18.75%." Instead, Giuffré found that CDAC's sales trend "is relatively 'flat' or slightly decreasing."

competitors; (2) technological developments; (3) regulatory changes; or (4) general market movements," and their potential impact on the success of a company renders a lost profit analysis unreliable. *Schonfeld*, 218 F.3d at 174.   This is because it creates the false inference that "plaintiff's venture was an assured success." *Id.* (citation omitted).

Perez makes no mention of market risks in his report and the impact of these risks on CDAC's sales and market share. Instead, his analysis assumes that CDAC and Lean Chefs operate exclusively in this market, despite over a dozen pre-cooked meal providers existing in the New York City area that could potentially affect CDAC's sales. Giuffré Report at 9. If Perez had properly afforded weight to potential market risks, he could anticipate that these risks could cause sales to decline, particularly considering CDAC's market share.[7] In his analysis, Perez afforded no consideration to the impact of competition whatsoever.

In sum, Perez's report is riddled with flawed methodology applied in a mechanical manner that fails to consider the necessary factors and facts of this case.   Accordingly, his opinions are unreliable and should be excluded.

### 3.      Perez fails to provide support for key assumptions

To recover damages for lost profits and destruction of business, a plaintiff has the burden to establish that its damages are capable of proof and measurement with reasonable certainty. *24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 566 F.Supp.2d 305, 317 (S.D.N.Y. 2008).

---

[7] *See* Giuffré Report at 18. Giuffré opines that a classic sales growth model is shown by an s-shaped curve. At the time of market entry, a company's growth is limited; over time, however, a business grows at an increasing rate. Eventually, the company reaches an "inflection point," after which growth continues, but at an ever decreasing rate. This inflection point represents a "mature" level, at which point an entity maintains a market share. At this point, sales fluctuate depending on a number of factors, namely market risks, as listed above. It is safe to assume that Chefs Diet has reached this inflection point, for its predecessor began in 2003. This is supported by CDAC's own assertion that it is a "market leader in the field of home delivery of pre-packaged meals designed to assist customers in losing weight." (Compl. ¶ 23).

While damages do not have to be calculated with "mathematical precision," they must be measurable "based upon known reliable factors without undue speculation." *Id.* at 316, quoting *Ashland Mgmt. v. Janien*, 82 N.Y.2d 395, 403 (1993). In this sense, an expert cannot base his calculations on assumptions that lack any support, for his "cheerful prognostications are not enough." *Celebrity Cruises*, 434 F.Supp.2d at 184 (S.D.N.Y. 2006), quoting *Schonfeld*, 218 F.3d at 173 (internal quotations and citations omitted). *See Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir. 2009) ("[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith."); *Billion Tower Int'l LLC v. MDCT Corp.*, No. 08-CV-4185, 2010 WL 5536513, at *9 (S.D.N.Y. Dec. 10, 2010) (rejecting lost profits damages award where plaintiff submitted two charts projecting sales, costs and profits without substantiating the numbers contained therein).

This Court has held that when a report contains "critical analytical gaps," the expert's proposed testimony is inadmissible. *Celebrity Cruises*, 434 F.Supp.2d at 180. In *Celebrity Cruises*, the defendant challenged the reliability of a number of plaintiff's damages reports. One report compared two market competitors in attempts to show lost profits. *Id.* The expert failed to justify the relationship between the performance of these competitors and the projected performance of plaintiff's company. *Id.* Instead, the expert assumed favorable results without any support. *Id.* His testimony was deemed unreliable and thus inadmissible. *Id.* Another report relied on speculative projections that failed to account for "certain company-specific and industry factors that affected the operations of [the company] during the period." *Id.* at 184, 188. This Court subsequently rendered his testimony inadmissible as well. *Id.* at 184.

Like the reports in *Celebrity*, Perez's report is based on a number of unsupported assumptions and fails to consider a number of relevant factors that create critical analytical gaps in his analysis. First, in calculating the number of "converted customers," Perez provides no support for his assumption that the Lean Chefs' paying customers found on Chefs Diet's 2010 data set and the paying customers found on Chefs Diet's 2014 data set are mutually exclusive. Perez Report at 5. This assumption contradicts the opinions of Mr. Webster who Perez heavily relies upon. Indeed, in his report, Mr. Webster explicitly states that there are only 21 of Lean Chefs' paying customers found in the 2014 data set that are not also found in the 2010 data set and lists legally purchased by Defendants.  Declaration of Bruce F. Webster, ¶¶ 39, 49, 50 (Feb. 19, 2016)(**Ex. 4**).  Mr. Webster's analysis makes it clear that the data sets are not mutually exclusive, and there is in fact substantial overlap of Lean Chefs' paying customers between the 2010 and 2014 lists. *Id.* Even if Perez missed this point, his conclusion that there would be no overlap between paying customers on these lists is incredible given that 96.6% of the overlap between Plaintiff and Defendants' databases is attributable to the 2010 data set and the general cumulative nature (including former, potential, and current customers) of these lists. *Id.* at 39.

Second, while Perez acknowledges that more than half of the customers on the 2010 list and on the 2014 list can be found on public databases, he fails to subtract these customers from his calculations of damages without offering any explanation. Perez Report at 5. If Lean Chefs converted sales from any customers, it would be the customers that are uniquely found in CDAC's data set in 2014 rather than public databases.[8]

---

[8] It should further be noted that CDAC alleges that "the goods and services sold by Defendants are vastly inferior to those provided under the Chefs Diet mark…[f]or example, one consumer complained to Plaintiff that the food she received from Lean Chefs was the 'worst food [she] ever ate.'" *See* Dkt. # 1 at ¶¶ 42-43.  Perez thus assumes all overlapping customers have been misappropriated, despite CDAC allegation that Lean Chefs' food is terrible.

Third, even if this Court were to accept that Lean Chefs' paying customers appearing on the 2010 and 2014 lists are mutually exclusive, this would suggest poor product approval and disloyalty to the Chefs Diet brand. In other words, Chefs Diet would have a low, perhaps nonexistent, resale rate. In applying a resale rate to the purported "converted customers," however, Perez assumes a much higher resale rate of 65%. Perez Report at 7. This speculative high resale percentage directly contradicts Perez's assumption that Lean Chefs' paying customers appearing on the 2010 and 2014 lists are mutually exclusive. There is again no support for this rate, especially in light of Perez's failure to consider the alleged overlap of customers in 2011, 2012, and 2013.

Fourth, Perez assumes that these converted customers would purchase bags of food for 72 days, which he attributes to the "Chefs Diet average days sold of 72 days per customer." *Id.* at 7. Not only is there no specific reference for this "average," but Perez fails to show any sort of computation for this average as well.

Fifth, Perez applies a 61.05% variable cost deduction. However, this percentage is substantially different from the actual variable costs that are shown in the income statements provided in Chefs Diet's 2011 sales records, which amount to 79.61% of sales. Perez Report at 4; Giuffre Report at 19. Such a gross reduction in variable costs is neither explained nor sensible.

### a. Perez relies on assumptions from management without supporting them

An expert cannot rely on assumptions given by a company and use them without any adequate support, for a company's "projections and wishful thinking are not entitled to the added weight of the expert's supportive opinion unless there is a sound basis for that opinion." *See Lava Trading*, 2005 WL 4684238, at *2. In *Lava*, the expert took statements from the company of its market share projections and, without testing whether this was anything more than

optimism, assumed these statements to be true and incorporated these projections into his calculation. *Id.* at *3. This Court held that this was the "critical shortcoming[]" of the expert's analysis and precluded his testimony. *Id.* at *2.

Perez consistently cites to statements from management to support the bases of his assumptions, but then fails to explain these statements. For instance, Perez provides sales percentages on which he bases his minimum profit analysis and attributes them to indications from management, despite having actual data with which to calculate these percentages with precision. Perez Report at 8.

Most remarkably, in calculating maximum profits, he claims that 10% of the sales from "converted customers" would be reinvested in marketing and assumes that there would be a 5:1 return on this investment. *Id.* at 7. In calculating maximum loss at disposition of business, Perez relies on a return of marketing dollars of 1,020%, which was calculated from sales that management had projected. *Id.* at 10-11. Perez, like the expert in *Lava*, provides no support for these statements from management and this projection is far too unreasonable to accept without investigation.[9] Like this Court found in *Lava*, Perez's failure to provide support for statements from management should render his proposed testimony inadmissible.

Moreover, statements made by CDAC's 30(b)(6) representative, Joe Maniscalco, concerning CDAC's return on marketing investment directly contradict the management projections relied on by Perez. In his deposition, Maniscalco claimed that while it was difficult to measure the return on investment, he could "spend a million and a half on advertising and get no revenue from it." Deposition of Joseph Maniscalco, 104:20-105:12 (Nov. 25, 2014)(**Ex. 5**).

---

[9] If this were a historically accurate experience of Chefs Diet, then it is economically rational for Chefs Diet to invest far more than 10% of its current revenues to take advantage of this alleged phenomenon.

When asked to opine on whether there was a correlation between marketing and revenues, Maniscalco suggested that "free, referral, word of mouth" accounted for a "very big portion of [Chefs Diet's] sales." *Id.* at 106:8-20. Accordingly, Maniscalco did not offer any basis to conclude that the company could see such gross returns on marketing and Perez did not explain why he relied on management projections yet dismissed CDAC's actual experience as explained by Maniscalco.[10]

### b.   Perez's reliance on statements from management constitutes unreliable hearsay

While an expert may rely on facts or data in forming his opinion, he cannot be a "mere conduit for others' hearsay." Fed. R. Evid. 703; *Island Intellectual Prop. LLC v. Deutsche Bank AG*, No. 09-CV-2675 KBF, 2012 WL 526722, at *2 (S.D.N.Y. Feb. 14, 2012). In this sense, an expert cannot rely on another's statements, for this is "simply repeat[ing] hearsay evidence without applying any expertise whatsoever." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008) (internal citation and quotation omitted).

Assuming that the various statements from management were actually correct, Perez cannot simply rely on these and base his inflated numbers on these statements without providing any support for them. Because Perez failed to analyze these alleged statements on which he bases his marketing return numbers, he is repeating hearsay evidence without applying any expertise. Therefore, this analysis should be deemed inadmissible.

The many assumptions made by Perez without any sort of support suggest "critical analytical gaps" in his reasoning akin to those of *Celebrity*. Perez failed to consider a number of

---

[10] *See* Giuffré Report at 12-14. Giuffré calculates a simple linear regression analysis on the return on a marketing investment and finds "that there may not be a well-defined relationship between advertising expenditures and sales in the experience of Chefs Diet," which supports the testimony of Maniscalco.

relevant factors and instead provided his speculation grounded only in unjustifiably optimistic predictions from CDAC itself. Because nearly every aspect of his analysis is grounded in unsupported assumptions, his report should be deemed unreliable.

## IV.    CONCLUSION

Perez's report fails to meet the standards established in *Daubert* and Rule 702. For the reasons stated, Defendants respectfully request that Perez's report and his opinions contained therein be excluded as inadmissible evidence.

RESPECTFULLY SUBMITTED this 22 day of February, 2015.

MEREDITH & KEYHANI, PLLC

By: */s/ Dariush Keyhani___*
DARIUSH KEYHANI
125 Park Ave, 25th Floor
New York, New York 10017
Direct Dial: (212) 380-1325
Facsimile: (212) 202-3819
dkeyhani@meredithkeyhani.com