UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
                                           :

CHEFS DIET ACQUISITION CORP. *d/b/a* CHEFS   :
DIET,

                             :

               Plaintiff,     :

                             :

         -v-              :

                             :

LEAN CHEFS, LLC, et al.,           :

                             :

              Defendants.   :

                             :
------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  09/28/2016

14-CV-8467 (JMF)

OPINION AND ORDER

JESSE M. FURMAN, United States District Judge:

      This case involves a dispute between two competitors in the diet food delivery industry. Plaintiff Chefs Diet Acquisition Corporation ("Chefs Diet") sues Defendants Lean Chefs, LLC ("Lean Chefs") and two Lean Chefs executives, alleging a variety of claims under federal and New York law arising out of the latter's entry into the same diet food delivery market and alleged improper use of Chefs Diet's customer list.  Defendants now move, pursuant to Rule 56 of the Federal Rules of Civil Procedure, for summary judgment on all claims and move, pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Rule 702 of the Federal Rules of Evidence, to exclude the testimony and report of Chefs Diet's proposed damages expert.  For the reasons stated below, Defendants' motion for summary judgment is GRANTED in part and DENIED in part, and their *Daubert* motion is DENIED.

## FACTS

      The following facts, taken from the Complaint and admissible materials submitted in connection with the pending motions, are either undisputed or described in the light most favorable to Chefs Diet.  *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

As noted, Chefs Diet is engaged in the diet food delivery business.  It entered that business in 2009, when — pursuant to an Asset Purchase Agreement (the "APA") — it purchased "certain intellectual property and confidential information" from Chefs Diet Delivery LLC, Zone Chefs Corp., and Kosher Chefs Diet Corp. (collectively, the "Sellers").  (Docket No. 107 ("Siegel Decl."), Ex. D ("Maniscalco 2014 Decl.") ¶ 3).  Among other things, the APA provided Chefs Diet exclusive rights to two "Chefs Diet" registered trademarks and certain customer lists developed by the Sellers.  (*Id.*; *see also* Docket No. 1 ("Compl."), Exs. A, B (registered trademarks)).  It also included a non-competition clause prohibiting the Sellers and their associates from competing with Chef Diets for a period of three years — that is, until at least March 2012.  (Docket No. 91 ("Stephenson Decl."), Ex. 17 (APA) § 6.8).

Defendant Arthur Gunning was the former Chief Executive Officer of Zone Chefs, an officer at Chefs Diet Delivery LLC and Kosher Chefs Diet, and a shareholder in all three entities. (*See* Maniscalco 2014 Decl. 3 n.5).  Defendant Nicholas Zazza was the Chief Technology Officer at Chefs Diet Delivery LLC; through two other companies, he also provided website, application, and telecommunication services to Chefs Diet Delivery LLC and Zone Chefs.  (*See* Maniscalco 2014 Decl. 3 n.4; *see also* Siegel Decl., Ex. H ("Zazza Dep."), at 22, 41-42, 52-53).  After the APA, Chefs Diet (the new entity) retained Zazza's company, Zazza Technologies, LLC, to manage its phone system and to aid in e-mail marketing.  (*See* Zazza Dep. 38-44, 105-107; *see also* Docket No. 108 ("Utilla Decl.") ¶¶ 12-13).[1]

In February 2010, Zazza requested and received Chefs Diet's complete customer database of over 40,000 names and dietary preferences for use in his marketing efforts.  (*See*

[1] The parties disagree over whether Zazza was compensated for his e-mail marketing services or if he performed these services gratuitously in the hopes of recouping a loan made to Chefs Diet prior to the asset sale.  (*Compare* Stephenson Decl., Ex. 1 ("Zazza Decl.") ¶¶ 3-4, *with* Utilla Decl. ¶¶ 12-14).  The disagreement is immaterial for present purposes.

Siegel Decl., Ex. A ("Utilla Dep."), at 140-43, 155; *id.*, Ex. K ("2010 E-mail Compilation")).
Before giving the database to Zazza, Chefs Diet had shared its full customer list with only one
vendor: U.S.A. Web Solutions, the vendor responsible for managing and maintaining the list,
which was bound by several non-disclosure agreements.  (Siegel Decl., Ex. E ("Maniscalco 2015
Decl.") ¶¶ 5-6).  Chefs Diet did not have confidentiality agreements with its employees until
2012.  (Utilla Dep. 31; Utilla Decl. ¶¶ 5, 9-10).  Its predecessors-in-interest, however, had valid
confidentiality agreements with their employees, who became Chefs Diet employees through the
sale.  (*Id.* ¶ 5).  In any event, Zazza concedes that when he received the database in 2010 he
knew that he was not authorized to use it in competition with Chefs Diet.  (Zazza Dep. 148-50).

In November 2013, after expiration of the non-competition period, Zazza and Gunning
opened Lean Chefs, a competing diet food delivery service.  (*See* Zazza Dep. 130-32).  Although
Lean Chefs officially opened in November 2013, Defendants purchased the Lean Chefs domain
name in September 2011 (*id.* at 108), and applied for a trademark on the name in July 2013 (*id.*
at 113).  At some point thereafter, the Chefs Diet customer data that had been shared with Zazza
in 2010 was incorporated into the Lean Chefs' customer database and used to solicit new
customers.  (*See id.* at 150-52; *see also* Siegel Decl., Ex. L ("Defendants acknowledge receiving
the 2010 Data and then using it to solicit potential customers.")).  On December 2, 2013, Chefs
Diet sent a cease-and-desist letter to Lean Chefs, requesting that the latter cease its use of Chefs
Diet's "proprietary customer list" and various intellectual property, including its trademarked
likeness.  (Stephenson Decl., Ex. 6 ("2013 Cease-and-Desist Exchange"), at 1-2).  Zazza, on
behalf of Lean Chefs, sent several reply e-mails to Chefs Diet requesting clarification of the
cease-and-desist letter, but he received no substantive response.  (*See id.* at 3-5; Maniscalco 2015
Decl. ¶ 9; Stephenson Decl., Ex. 1 ("Zazza Decl.") ¶¶ 9-10).

3

According to Defendants' own expert, over 17% of Lean Chefs's current paying customers overlap with customers found in Chefs Diet's 2010 customer list. (Stephenson Decl., Ex. 15 ("Webster Expert Disc."), at 11). While many of those names can also be found on commercially available lists, over one hundred of them appear solely on the 2010 customer list and not on any commercial list identified by Lean Chef. (*Id.*). Other facts suggest that Defendants used Chefs Diet's list — and even had access to its customer data after the list was provided to Zazza in 2010. For instance, Chefs Diet included an intentional misspelling of one customer's name ("Joann" Glodek rather than "Joanne" Glodek) in the 2010 customer database sent to Zazza. (Siegel Decl., Ex. C, at 71-72). In 2014, Lean Chefs sent a mailing to Ms. Glodek with that exact spelling error. (*Id.* at 72). In 2012, Chefs Diet also added the name and contact information of an employee (Christian Ledan) as a fictitious customer to its list; and, in 2013, Chefs Diet added a fully fictitious name (Peter Daniel) that was linked to a Chefs Diet's employee's e-mail account. (Maniscalco 2015 Decl. ¶¶ 2-3). On September 3, 2014, Lean Chefs sent e-mail offers to those two fictitious customers identifying them by name. (*Id.*). Defendants claim that they obtained the two names from a commercial list purchased at a trade show in August 2013. (Zazza Decl. ¶ 15).

On October 21, 2014, Chefs Diet filed this suit against Lean Chefs, Zazza, and Gunning, alleging trademark infringement and unfair competition in violation of the Lanham Act, 15 U.S.C. §§ 1114, 1125; violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030(a)(2), (a)(4)-(5); and various state-law claims, including misappropriation of trade secrets, breach of contract (against Zazza and Gunning only), breach of fiduciary duty (against Zazza and Gunning only), unjust enrichment, conversion, and replevin. (*See* Compl.). In 2015, Chefs Diet suspended its business. (Docket No. 105 ("Perez Decl.") ¶ 4 n.2). Naturally, Chefs Diet

contends that the suspension of its business was due, at least in part, to Defendants' misconduct. (*See, e.g.*, Siegel Decl., Ex. E ("Maniscalco 2016 Decl.") ¶¶ 3-5).  By contrast, Defendants maintain that Chefs Diet's problems stem from other causes, namely poor management decisions.  (*See, e.g.*, Docket No. 92 ("Defs.' S.J. Mem.") at 5-7).

Defendants now move for summary judgment on all claims and further move to exclude the testimony, opinions, and report of Chefs Diet's economic damages expert.  Both sides have also moved for leave to file certain documents in redacted form.  Because the report of Chefs Diet's expert does not bear on Defendants' summary judgment claims, the Court will address the motion for summary judgment first and then turn to the motions to exclude and redact.

## THE MOTION FOR SUMMARY JUDGMENT

Summary judgment is appropriate when the record demonstrates that there are no genuine disputes as to any material facts and that one party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The moving party bears the initial burden of providing the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file that demonstrate the absence of a genuine dispute regarding any material fact.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 322.  All evidence must be viewed in the light most favorable to the non-moving party, *Overton v. N.Y. State Div. of Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and the court must "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 83 (2d Cir. 2004).

To defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 576 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted). Affidavits submitted in support of, or opposition to, summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show "that the affiant is competent to testify to the matters stated therein." *Patterson v. Cty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (quoting Fed. R. Civ. P. 56(e)).

Here, as noted, Defendants move for summary judgment on all of Chefs Diet's claims. Chefs Diet does not oppose the motion with respect to Count IV, its claim under Section 349 of New York's General Business Law. (Docket No. 106 ("Pl.'s S.J.Opp'n"), at 1 n.1). Accordingly, the motion is granted with respect to that claim. The Court will examine the other claims in turn.

## A. Trademark Infringement and Unfair Competition (Counts I, II, III, and VII)

The Court begins with Chefs Diet's federal and state trademark infringement and unfair competition claims, which are analyzed using the same two factors: first, "whether the plaintiff's mark is entitled to protection," and second, "whether [the] defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods." *Savin Corp. v. Savin Grp.*, 391 F.3d 439, 456 (2d Cir. 2004) (alteration in original) (quoting *Virgin Enters., Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003)); *see also Van Praagh v. Gratton*, 993 F. Supp. 2d 293, 301 (E.D.N.Y. 2014) ("Courts employ substantially similar standards when

analyzing claims for trademark infringement under the Lanham Act, 15 U.S.C. § 1114(1)(a); . . . trademark infringement under New York common law; and unfair competition under New York common law."); *Lorillard Tobacco Co. v. Jamelis Grocery, Inc.*, 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005) ("It is well-established that the elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law mirror the Lanham Act claims." (internal quotation marks omitted)).[2]  "While trademark infringement and unfair competition cases are often fact intensive, summary judgment may nevertheless be appropriate in such cases."  *Friesland Brands, B.V. v. Vietnam Nat. Milk Co.*, 228 F. Supp. 2d 399, 403 (S.D.N.Y. 2002).

### 1.  Entitlement to Protection

As an initial matter, Chefs Diet's marks are plainly entitled to protection.  When assessing whether protection is due, registration of a mark constitutes "*prima facie* evidence of the registrant's exclusive right to use the mark in commerce."  *Gruner + Jahr USA Pub. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993).  Moreover, a mark becomes "incontestable" where "it has been in continuous use for five consecutive years subsequent to its registration and is still in use."  *Id.*  That is the case here: The Chefs Diet trademarks have been registered and in use since 2008.  (Maniscalo 2014 Decl. ¶ 4).  Accordingly, they have become incontestable and, pursuant to Title 15, United States Code, Section 1065, that is conclusive evidence that the marks are entitled to protection.  In arguing otherwise, Defendants note that the marks at issue are comprised of two generic terms: "chefs" and "diet."  (Defs.' S.J. Mem. 25-26).  It is true that "generic marks" are generally "ineligible for trademark protection."  *Banff, Ltd. v.*

---

[2]      Unlike trademark infringement, New York unfair competition claims also require a showing of bad faith or intent.  *See Genesee Brewing Co. v. Stroh Brewing Co.*, 124 F.3d 137, 149 (2d Cir. 1997).  That difference is irrelevant for present purposes.

*Federated Dep't Stores, Inc.*, 841 F.2d 486, 489 (2d Cir. 1988).  But it is well established that courts must evaluate "marks as composites — not as isolated components."  *Id.*  Here, "[a]lthough each of the two words making up the mark[s at issue] is rather generic, together they make up a composite more distinctive than the sum of [their] parts."  *W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 572 (2d Cir. 1993).  Given that, Defendants' contentions are without merit.  *See Gruner + Jahr*, 991 F.2d at 1077 ("[W]here plaintiff has an incontestable mark because of five years' registration[, a defendant] may not succeed in a defense that declares the mark is entitled to no protection because it is descriptive.").

### 2.  Likelihood of Confusion

Having found Chefs Diet's marks are entitled to protection, the Court turns to whether "numerous ordinary prudent purchasers are likely to be misled or confused as to the source of the product in question" because of Defendants' use of the Lean Chefs mark.  *Id.*  This prong requires "a probability of confusion, not a mere possibility."  *Id.*  That inquiry is guided by the so-called *Polaroid* factors: (1) the strength of the plaintiff's mark; (2) the similarity of plaintiff's and defendant's marks; (3) the competitive proximity of the products; (4) the likelihood that plaintiff will "bridge the gap" and offer a product like defendant's; (5) actual confusion between products; (6) good faith on the defendant's part; (7) the quality of defendant's product; and (8) the sophistication of buyers.  *See Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492 (2d Cir. 1961).  Significantly, "application of the *Polaroid* test is not mechanical"; instead, courts must focus "on the ultimate question of whether, looking at the products in their totality, consumers are likely to be confused."  *Kelly-Brown v. Winfrey*, 717 F.3d 295, 307 (2d Cir. 2013) (internal quotation marks omitted).  Summary judgment is appropriate if "the undisputed evidence would lead only to one conclusion" under the *Polaroid* test.  *Cadbury Beverages, Inc.*

*v. Cott Corp.*, 73 F.3d 474, 478 (2d Cir. 1996). But "[i]f a factual inference must be drawn to

arrive at a particular finding on a *Polaroid* factor, and if a reasonable trier of fact could reach a

different conclusion, the district court may not properly resolve that issue on summary

judgment." *Id.*

Applying the *Polaroid* test here, the Court cannot say that the undisputed evidence would

lead to only one conclusion, let alone a conclusion in Defendants' favor. Most of the *Polaroid*

factors are either neutral or a reasonable factfinder could find that they cut in either direction.

For example, although Defendants point out that the words "Chef" and "Diet" appear in many

registered trademarks (Defs.' S.J. Mem. 26), it does not necessarily follow that Chefs Diet's

marks are weak. Instead, given — among other things — the length of Chefs Diet's uncontested

use of the marks, the company's investment in advertising (*see* Maniscalco 2014 Decl. ¶ 5), and

unsolicited media coverage of the service, a reasonable factfinder could conclude that the first

factor cuts in Chefs Diet's favor. *See, e.g.*, *Mr. Water Heater Enters., Inc. v. 1-800-Hot Water

Heater, LLC*, 648 F Supp. 2d 576, 584-85 (S.D.N.Y. 2009) (discussing factors to be considered

in evaluating the strength of a mark); *see also Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d

955, 961 (2d Cir. 1996) (holding that the trier of fact could reasonably conclude that the plaintiff

has a strong mark despite evidence of third party use of the words making up the mark).

Moreover, although there are clear differences between the parties' marks (copies of which are

included in an Appendix to this Opinion), a trier of fact could find that they are similar given that

they both contain the word "Chef" in a distinctive green color, use a similar script-like font for

the only other word, and feature a chef-related image. *See, e.g.*, *Star Indus., Inc. v. Bacardi &

Co.*, 412 F.3d 373, 386 (2d Cir. 2005) ("In assessing similarity, courts look to the overall

impression created by the logos and the context in which they are found and consider the totality

of factors that could cause confusion among prospective purchasers." (internal quotation marks omitted)).  And Chefs Diet proffers evidence that could support (but certainly does not compel) findings in its favor with respect to the factors of actual consumer confusion (*see* Maniscalco 2014 Decl. ¶ 14-15); bad faith (*see, e.g.*, Defs.' S.J. Mem. 29 (conceding that "there was a great deal of overlap" in the people who "brainstorm[ed] to come up with the name CHEFS DIET" and who "brainstormed to come up with the name LEAN CHEFS")); and product quality (*see* Maniscalco 2014 Decl. ¶¶ 16-17).

In fact, only one factor — consumer sophistication — would seem to cut in Defendants' favor, as common sense suggests that consumers who commit for months (if not longer) to a relatively expensive diet food-delivery service are likely to do research into the product and service.  *See Star Indus., Inc.*, 412 F.3d at 390 (noting that an "analysis of consumer sophistication consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods" and that a court can "reach a conclusion about consumer sophistication based solely on the nature of the product or its price" (alteration in original) (internal quotation marks omitted)).  At the same time, Defendants offer little in the way of concrete evidence even as to that factor.  By contrast, at least one factor —  competitive proximity — cuts strongly in Chef Diet's favor, as Lean Chefs and Chefs Diet offer the same services to similar customers in the same region.  *See, e.g.*, *Lang v. Ret. Living Pub. Co.*, 949 F.2d 576, 582 (2d Cir. 1991) ("To the extent goods (or trade names) serve the same purpose, fall within the same general class, or are used together, the use of similar designations is more likely to cause confusion.").  In these circumstances — where all but one of the factors appear to favor the plaintiff (or, at a minimum, could be found by a reasonable fact finder to favor the plaintiff)

10

— summary judgment is plainly inappropriate.  *See, e.g.*, *Sports Auth.*, 89 F.3d at 965 (holding

that the district court had committed error in granting summary judgment to the defendant on the

plaintiff's trademark infringement claim where five of the eight *Polaroid* factors "would have

weighed in favor" of the plaintiff).

**B.  Misappropriation of Trade Secrets (Count VI)**

The Court turns next to Chef Diet's misappropriation-of-trade-secrets claim.  To succeed

on such a claim, a plaintiff must show: "(1) that it possessed a trade secret, and (2) that the

defendants used that trade secret in breach of an agreement, a confidential relationship, or duty,

or as a result of discovery by improper means."  *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38,

43-44 (2d Cir. 1999).  To determine whether information qualifies as a trade secret, New York

courts consider the following factors: "(1) the extent to which the information is known outside

of the business; (2) the extent to which it is known by employees and others involved in the

business; (3) the extent of measures taken by the business to guard the secrecy of the

information; (4) the value of the information to the business and its competitors; (5) the amount

of effort or money expended by the business in developing the information; (6) the ease or

difficulty with which the information could be properly acquired or duplicated by others."  *Iron*

*Mountain Info. Mgmt., Inc. v. Taddeo*, 455 F. Supp. 2d 124, 138 (E.D.N.Y. 2006) (quoting

*Ashland Mgmt. Inc v. Janien*, 82 N.Y.2d 395, 407 (1993)).  Whether the information at issue is

actually secret is critical to the analysis; "upon disclosure, even if inadvertent or accidental, the

information ceases to be a trade secret and will no longer be protected."  *Defiance Button Mach.*

*v. C&C Metal Prods. Corp.*, 759 F.2d 1053, 1063 (2d Cir. 1985).

Applying those standards here, Defendants' motion must be denied.  First, there is a

factual dispute with respect to whether the information at issue — Chefs Diet's customer list —

qualifies as a trade secret.  *See, e.g.*, *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 89 (2d Cir.

1991) ("The question of whether or not a customer list is a trade secret is generally a question of

fact."); *see also* 1 *Milgrim on Trade Secrets* § 2.03, at 2-32 to 2-33 (1984) ("Existence of a trade

secret is a question of fact for the determination of the trier of fact, secrecy being a basic

element.").  It is true, as Defendants argue, that most names on that list can be found on

commercially available "lead lists."  (Defs.' S.J. Mem 11-12).  But Chefs Diet proffers evidence

that its list — approximately 40,000 names and corresponding dietary preferences for people

who have shown an interest in subscribing to a diet delivery service — took several years to

develop.  (*See* Utilla Decl. ¶ 19; Maniscalco 2014 Decl. ¶ 18; Siegel Decl., Ex. O ("Podlog

Decl.") ¶ 18).  *See, e.g.*, *Leo Silfen, Inc v. Cream*, 278 N.E.2d 636, 640 (N.Y. 1972) (stating that

a list of customers who have been "screened . . . at considerable effort and expense, without

which their receptivity and willingness to do business with this kind of a service organization

could not be known," qualifies as a trade secret); *see also, e.g.*, *Velo-Bind, Inc. v. Scheck*, 485 F.

Supp. 102, 107 (S.D.N.Y. 1979) (holding that a customer list was a trade secret because it

"consisted exclusively of owners of Velo-Blind machines").  And while a trier of fact could

conceivably find that Chefs Diet did not adequately safeguard the list (given, for example,

evidence that the company did not enter confidentiality agreements with employees hired

between the asset purchase in 2009 and 2012 (Utilla Dep. 31, 34)), the company points to

measures it did take to ensure its confidentiality, including: maintaining twenty-four-hour video

surveillance of its offices (Maniscalco 2014 Decl. ¶ 19; Podlog Decl. ¶ 19); maintaining

comprehensive computer security systems, including firewalls and web hosting services

requiring bio-metric access (Maniscalco 2014 Decl. ¶ 19; Podlog Decl. ¶ 19); making it

impossible for general employees to print, download, or e-mail the list (Maniscalco 2015 Decl.

¶ 6; Utilla Decl. ¶ 18); limiting the number of employees with access to the list (Maniscalco 2015 Decl. ¶ 6); distributing a policy manual containing a section on "Confidential and Proprietary" information (Utilla Decl. ¶¶ 6-8); emphasizing at staff meetings the confidential nature of the customer list (*id.* ¶ 11); and limiting distribution of the list to vendors who understood that the list was confidential (*id.* ¶¶ 16-17).[3]  That evidence would permit a reasonable fact finder to conclude that Chefs Diet's customer list qualifies as a trade secret.  *See, e.g.*, *Integrated Cash Mgmt. Servs., Inc. v. Dig. Transactions, Inc.*, 920 F.2d 171, 173-74 (2d Cir. 1990) (discussing the kinds of security measures that would support a finding that information qualifies as a trade secret).

Additionally, there is little or no dispute that a trier of fact could find that Defendants misappropriated Chefs Diet's customer list.  To constitute misappropriation, a defendant must have used the trade secret "in breach of an agreement, a confidential relationship or duty, or as a result of discovery by improper means."  *N. Atl. Instruments*, 188 F.3d at 44.  In this case, there is evidence that Zazza received Chefs Diet's customer list when he was working as a vendor and

---

[3]      Chefs Diet submitted a request for leave to file a sur-reply, which argues that the Court should disregard affidavits from two former Chefs Diet employees and one former vendor that Defendants submitted in conjunction with their reply.  (Docket No. 115; *see also* Docket 113, Exs. 1-3).  Defendants counter that the affidavits were filed in response to evidence that Chefs Diet itself produced for the first time in connection with this motion — namely, the existence of a policy manual and the claim that confidentiality was discussed in staff meetings.  (*See* Docket No. 116).  Under the circumstances, the Court exercises its broad discretion to accept both Chefs Diet's sur-reply and Defendants' affidavits.  *See, e.g.*, *Compania Del Bajo Caroni (Caromin), C.A. v. Bolivarian Rep. of Venezuela*, 341 F. App'x 722, 724 (2d Cir. 2009) (summary order) ("A district court enjoys broad discretion (1) to consider arguments made for the first time in a reply brief, [and] (2) to rely on evidence submitted with the reply papers . . . ."); *see also, e.g.*, *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.*, 945 F. Supp. 693, 708 (S.D.N.Y. 1996) ("Where new evidence is presented in a party's reply brief or affidavit in further support of its . . . motion, the district court should permit the nonmoving party to respond to the new matters prior to the disposition of the motion." (internal quotation marks omitted)).  The parties, however, should promptly confer with respect to whether Chefs Diet should be given the opportunity to depose the three new affiants before trial and shall submit a joint letter on that issue **within a week** of this Opinion.

helping with marketing and advertising campaigns.  (*See* Utilla Dep. 140-43, 155; *see also* 2010 E-mail Compilation).  Further, Zazza himself conceded he was aware that he was not entitled to use the customer list to compete with Chefs Diet at a later date.  (Zazza Dep. 148-150).  Given those facts, a factfinder could reasonably conclude that Zazza used a trade secret in breach of a confidential relationship or duty, even though there was no employment contract or express written agreement between him and Chefs Diet.  *See, e.g.*, *ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 994 (2d Cir. 1983) (noting that, even outside the scope of formal employment, a principal-agent relationship can impose "a duty not to use confidential knowledge acquired [during] employment in competition with [the] principal" (internal quotation marks omitted)); *Cardiocall, Inc. v. Serling*, 492 F. Supp. 2d 139, 149 (E.D.N.Y. 2007) (noting that, under New York law, "[a] duty can arise from the existence of an express written agreement or from the employment relationship itself" and that even an at-will employment "imposes upon employees a duty of good faith and fair dealing").  Accordingly, drawing all ambiguities in favor of Chefs Diet, Defendants' motion for summary judgment with respect to the claim of misappropriation of trade secrets must be and is denied.

## C.  The Computer Fraud and Abuse Act (Count VIII)

Next, Chefs Diet brings a claim under the Computer Fraud and Abuse Act (the "CFAA"), 18 U.S.C. § 1030 *et seq.*  The CFAA provides a cause of action against a person or entity who "intentionally accesses a computer *without authorization* or *exceeds authorized access*, and thereby obtains . . . information from any protected computer."  18 U.S.C. § 1030(a)(2) (emphasis added).  This Court has held that the statute does not apply to a "so-called faithless or disloyal employee" — that is, an employee who has been granted access to an employer's computer and misuses that access, either by violating the terms of use or by breaching a duty of

14

loyalty to the employer. *Advance Watch Co. v. Pennington*, No. 13-CV-8169 (JMF), 2014 WL

5364107, at *1, *3-4 (S.D.N.Y. Oct. 22, 2014); *accord JBCHoldings NY, LLC v. Pakter*, 931 F.

Supp. 2d 514, 523-25 (S.D.N.Y. 2013).  The Second Circuit has not yet considered this issue in

the civil context, but in *United States v. Valle*, 807 F.3d 508 (2d Cir. 2015), a criminal case, it

applied the rule of lenity to reach the same conclusion.  *See id.* at 526-28; *accord United States v.*

*Nosal*, 676 F.3d 854, 863 (9th Cir. 2012); *WEC Carolina Energy Solutions LLC v. Miller*, 687

F.3d 199, 206 (4th Cir. 2012).  That decision arguably compels the conclusion that this Court

reached in *Advance Watch*, *see, e.g.*, *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004) ("[The statute]

has both criminal and noncriminal applications.  Because we must interpret the statute

consistently, whether we encounter its application in a criminal or noncriminal context, the rule

of lenity applies."), and it certainly provides no basis to revisit the issue.  Thus, to prevail on its

claim under the CFAA, Chefs Diet must show that Defendants accessed its computer system

without approval; it is not enough to prove access to information beyond the scope of approval.

     In light of that requirement, Chefs Diet's CFAA claim fails as a matter of law.  The

evidence is undisputed that Chefs Diet provided Zazza with access to its customer list in 2010

when he was providing services to the company.  (*See* 2010 E-mail Compilation).  Conceding

that point, as it must, Chefs Diet argues that Defendants must have had ongoing access to its

computer systems because they solicited customers using names and data that were added to its

customer list only after 2010 (including some fictitious names and data that were added as tests).

(Pl.'s S.J. Opp'n 17-18).  But while those facts raise some suspicions, it is pure speculation to

infer from them that Defendants hacked into Chefs Diet's computer system.  Notably, Chefs Diet

concedes that "it does not have direct forensic evidence of hacking."  (Pl.'s S.J.Opp'n 17).  And

what evidence there is in the record strongly supports the inference that Defendants obtained the

data through other means.  First, Chefs Diet itself (in defending its misappropriation-of-trade-secrets claim) maintains that it is impossible even for general employees to print, download, or e-mail its customer list.  (Maniscalco 2015 Decl. ¶ 6; Utilla Decl. ¶ 18).  Second, all of the fictitious names identified by Chefs Diet that were added after Zazza received their customer list in 2010 appear on lists that Defendants purchased from third parties.  (*See* Zazza Decl. ¶¶ 14-15; Zazza Dep. 79-84; Stephenson Decl., Ex. 3 ("Gunning Dep.")129-134).  Third, Defendants did not solicit the customers at issue until long after the data had been added to Chefs Diet's customer list (in one case, two years later), suggesting that they did not have ongoing access to the list.  (*See* Maniscalco 2015 Decl. ¶¶ 2-3).  And finally, Defendants' technical expert found that 5,471 names from Chefs Diet's 2014 database — names "distributed across the full alphabet range (A to Z), without any obvious clumping" — could not be found anywhere in Defendants' data, a fact for which there is no "clear technical explanation" if Defendants actually had access to Chefs Diet's computer systems.  (Webster Expert Disc. 10).  In the face of this evidence, Chefs Diet's rank speculation is insufficient to avoid summary judgment.  *See, e.g.*, *Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 200 (2d Cir. 2004) (noting that to defeat a motion for summary judgment, "'[t]he non-moving party may not rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence showing that its version of the events is not wholly fanciful'" (quoting *Damico v. City of N.Y.*, 132 F.3d 145, 149 (2d Cir. 1998)).

**D.  Conversion (Count X)**

Chef Diet's conversion claim also fails as a matter of law.  Under New York law, conversion is the "unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights."  *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006) (internal quotation marks omitted).  "'Two key

16

elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights.'" *Cruz v. TD Bank, N.A.*, 855 F. Supp. 2d 157, 174 (S.D.N.Y. 2012) (quoting *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49-50 (2006)); *see also Thyroff*, 460 F.3d at 404. Here, Chefs Diet cannot establish the second element because Defendants' possession of the 2010 customer data did not prevent Plaintiff from simultaneously accessing or using that data. *See, e.g.*, *Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 536 (S.D.N.Y. 2011) ("While [the defendant] did assume or exercise control over Pure Power's client list to the extent that he accessed the client list from a Pure Power computer and downloaded it onto a thumb drive, [the defendant] possessed only a copy of the client list and did not, in any way, limit or otherwise deprive Pure Power of possession or use of that list."); *Jamison Bus. Sys., Inc. v. Unique Software Support Corp.*, No. CV 02-4887 (ETB), 2005 WL 1262095, at *1, *15 (E.D.N.Y. May 26, 2005) (dismissing a conversion claim on the ground that the defendant's use of the plaintiffs' "source code did not prohibit plaintiffs from using the code, because [the] defendant [] took a copy of the code, and plaintiffs still had the original code").  In arguing otherwise, Chefs Diet relies on *In re Cross Media Mktg. Corp.*, 06-CV-4228 (MBM), 2006 WL 2337177 (S.D.N.Y. Aug. 11, 2006).  But that case is both legally distinguishable (it involved clear-error review of findings made by the Bankruptcy Court) and factually distinguishable (the defendant had attempted to auction off the customer list, refused to return the information despite an order from the Bankruptcy Court, and hindered the plaintiff's own ability to sell the list).  *See id.* at *6.  Summary judgment is thus appropriate with respect to Chef Diet's conversion claim.

**E. Replevin (Count XI)**

By contrast, Chef Diet's replevin claim survives summary judgment.  Under New York law, "replevin is a remedy employed to recover a specific, identifiable item of personal property." *TAP Manutencao e Engenharia Brasil S.A. v. Int'l Aerospace Grp.*, 127 F. Supp. 3d 202, 211 (S.D.N.Y. 2015) (quoting *Heckl v. Walsh*, 996 N.Y.S.2d 413 (N.Y. App. Div. 2014) (alterations omitted)).  Thus, a plaintiff "must establish that the defendant is in possession of certain property of which the plaintiff claims to have a superior right." *Doré v. Wormley*, 690 F. Supp. 2d 176, 183 (S.D.N.Y. 2010) (internal quotation marks omitted).  Where a defendant "came into possession of the property lawfully, plaintiff must also establish that it made a demand for possession and was refused." *Christie's, Inc. v. Davis*, 247 F. Supp. 2d 414, 419 (S.D.N.Y. 2002).  Unlike conversion, replevin is still available even if the property taken is a copy — so long as the plaintiff's right is superior.  *See, e.g.*, *Jamison Bus. Sys.*, 2005 WL 1262095, at *14 (holding that the plaintiffs were "entitled to the return of the portions of the defendants' program copied" from the plaintiffs' source code after making out a successful replevin claim).

Here, there appears to be no dispute that a trier of fact could find that Defendants were (and, indeed, continue to be) in possession of property as to which Chefs Diet claims to have a superior right — namely, the 2010 customer list.  (*See* Defs.' S.J. Mem. 23).  Instead, Defendants' sole argument for summary judgment is that Chefs Diet's demand for return was legally insufficient.  (*Id.*).  To the extent that a jury could find that Defendants misappropriated the customer list, however, the demand requirement would not even apply.  *See, e.g.*, *Thyroff v. Nationwide Mut. Ins. Co.*, 360 F. App'x 179, 180 (2d Cir. 2010) ("The purpose of the demand requirement 'is simply that one in lawful possession shall not have such possession changed into

an unlawful one until he be informed of the defect of his title and have an opportunity to deliver the property to the true owner.'" (quoting *Leveraged Leasing Admin. Corp. v. PacifiCorp Capital, Inc.*, 87 F.3d 44, 49 (2d Cir. 1996))).  And in any event, whether Chefs Diet's demand for the customer list was "sufficiently definite and complete to apprise the defendant of the specific property claimed" is a disputed question of fact.  90 C.J.S. Trover & Conversion § 45.  On the one hand, Chefs Diet sent Defendants a letter on December 2, 2013, requesting, among other things, that they cease their "unauthorized misuse of [Chefs Diet's] proprietary customer list."  (*See* 2013 Cease-and-Desist Exchange 1-2).  On the other hand, Defendants contacted Chefs Diet several times thereafter to get more information concerning the list, without meaningful response.  (*See id.* at 3-5).  *Cf. TAP Manutencao*, 127 F. Supp. 3d at 210 ("If [the plaintiff] had responded, and [the defendant] had not sent the parts, [the plaintiff] might have a case . . . but because [the plaintiff] failed to respond to multiple requests regarding the logistics of the return, its case fails.").  In short, any way one slices it, summary judgment is inappropriate with respect to Chefs Diet's replevin claim.

## F.  Breach of Contract (Count XII)

The Court turns, then, to Chef Diet's breach-of-contract claim, which is brought against Zazza and Gunning alone.  To make out a claim for breach of contract under New York law, a plaintiff must show "(1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of the contract by the defendant, and (4) damages."  *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996).  Moreover, the plaintiff "must identify what provisions of the contract were breached as a result of the acts at issue."  *Wolff v. Rare Medium, Inc.*, 171 F. Supp. 2d 354, 358 (S.D.N.Y. 2001).  Notably, in its Complaint, Chefs Diet's breach-of-contract claim is limited to the allegation that Zazza and Gunning violated Section 6.7 of the APA, which

prohibits "Sellers" and their "Affiliates" from using "'Chefs Diet' . . . , any derivative or variation thereof or any name similar thereto."  (APA § 6.7; *see* Compl. ¶¶ 155-161).  In its opposition to Defendants' motion for summary judgment, however, Chefs Diet makes no mention of Section 6.7 or the allegation that Zazza and Gunning breached the APA "by forming Lean Chefs and using a trade name . . . that is similar to" Chefs Diet (*id.* ¶ 159), so the Court deems that claim abandoned.  *See, e.g., Jackson v. Fed. Exp.*, 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims.").  Instead, Chefs Diet argues only that Zazza and Gunning somehow breached the APA by soliciting customers using the customer list that Zazza obtained in 2010.  (Pl.'s S.J.Opp'n 18-19).  But that claim appears nowhere in the Complaint, and it is well established that a party may not amend its pleadings through its motion papers.  *See, e.g., Enzo Biochem, Inc. v. Amersham PLC*, 981 F. Supp. 2d 217, 223 (S.D.N.Y. 2013) ("It is well settled that a party may not amend its pleadings in its briefing papers." (citing *Avillan v. Donahoe*, 483 F. App'x 637, 639 (2d Cir. 2012)).  Additionally, putting aside the question of whether a breach-of-contract claim can be brought against Zazza and Gunning at all (as they themselves were not parties to the APA), Chefs Diet fails to identify any specific provision of the APA that would have been breached by their alleged misuse of the customer list.[4]  Put simply, "[s]tating in a conclusory manner that an

---

[4]      The Court presumes that Chefs Diet might invoke Section 6.8 of the APA, which — broadly speaking — prohibited Sellers from competing with Chefs Diet for a period of three years after the closing and "us[ing] or disclos[ing] any Confidential Information of the Business."  (APA § 6.8(b)).  But Chefs Diet makes no allegation that Zazza or Gunning started competing before the end of the three-year non-compete period and "Confidential Information" is explicitly defined in the APA as information to which Sellers were privy *before* the 2009 sale and, thus, would not seem to extend to the customer list, which was shared in 2010.  (*See id.* ("Sellers *have had* access to and *have gained* knowledge with respect to the Business, including trade secrets . . . and information concerning customers . . .  (the '*Confidential Information*')." (initial emphases added)).

agreement was breached does not sustain a claim of breach of contract." *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 202 (S.D.N.Y. 2008).  Accordingly, Chefs Diet's breach-of-contract claim must be and is dismissed.

### G.  Breach of Fiduciary Duty (Count V)

Chefs Diet's penultimate claim, also against Zazza and Gunning alone, is for breach of fiduciary duty.  "A breach of fiduciary duty . . . occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets [or] misuse of confidential information . . . ." *Poller v. BioScrip, Inc.*, 974 F. Supp. 2d 204, 227 (S.D.N.Y. 2013) (internal quotation marks omitted).  "Broadly stated, a fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another." *In re Refco Inc. Secs. Litigation*, 826 F. Supp. 2d 478, 502-03 (S.D.N.Y. 2011) (internal quotation marks omitted); *see Greenberg v. Chrust*, 198 F. Supp. 2d 578, 585-86 (S.D.N.Y. 2002) (finding no fiduciary relationship when parties transact at arm's length).  Thus, a fiduciary duty is "not dependent upon an express contractual relationship," but may exist "even where the employment relationship is at-will," *Pure Power Boot Camp*, 813 F. Supp. 2d at 521, or where the relationship does not involve compensation, *see People v. Lower Esopus River Watch, Inc.*, 975 N.Y.S2d 369, 2013 WL 3014915 (N.Y. Sup. Ct. 2013) (unpublished table decision) ("Fiduciary duties arise regardless of whether the party in whom trust is reposed is a volunteer or is compensated.").  Moreover, fiduciary duties "may continue after termination of the employment relationship." *Poller*, 974 F. Supp. 2d at 227 (internal quotation marks omitted); *see also Am. Bldg. Main. Co. of N.Y. v. Acme Prop. Servs., Inc.*, 515 F. Supp. 2d 298, 310 (N.D.N.Y. 2007) ("New York courts have found that former employees can be restricted from using their former employer's trade secrets to advance their own interest, even when they have

not signed an employment agreement limiting their activities."). For example, New York courts have found a violation of fiduciary duties where former employees — one of whom had been a corporate officer — used their former employer's proprietary secrets to build a competing business, *see Laro Maint. Corp. v. Culkin*, 700 N.Y.S.2d 490, 492 (N.Y. App. Div. 1999), and where employees planned and formed a competing corporation while still employed, *see CBS Corp. v. Dumsday*, 702 N.Y.S.2d 248, 251 (N.Y. App. Div. 2000).

Applying those standards here, there are plainly disputes of fact precluding summary judgment with respect to Chef Diet's breach-of-fiduciary-duty claim. For one thing, there is a factual dispute over whether Zazza owed fiduciary duties to Chefs Diet — and if so, the scope of those duties — as a result of either his employment by Chefs Diet's predecessors-in-interest or his work on the e-mail marketing campaign (in which capacity he requested and received the 2010 customer list). *See, e.g.*, *Veleron Holding, B.V. v. Stanley*, 117 F. Supp. 3d 404, 451 (S.D.N.Y. 2015) ("The existence of an agency relationship is a mixed question of law and fact that should generally be decided by a jury." (internal quotation marks omitted)); *see also id.* ("[T]he question whether a fiduciary relationship exists is necessarily fact-specific." (alterations and internal quotation marks omitted)). Defendants argue that, even if the work Zazza did in 2010 created a fiduciary relationship, its scope was limited to telephone services, but a reasonable trier of fact could certainly find otherwise and conclude that safeguarding the customer list that Chefs Diet shared with him fell within the scope of his duties. (*See* 2010 E-mail Compilation; Zazza Dep. 148 -150). If the factfinder were to find that Zazza owed Chefs Diet fiduciary duties (particularly if those duties extended to not using the customer list for his own purposes), there is plainly enough evidence to find that Zazza breached those duties (and that Gunning aided and abetted that breach); indeed, Defendants do not really argue otherwise.

Accordingly, Chefs Diet's claim for breach of fiduciary duty survives for trial.

## H.  Unjust Enrichment (Count IX)

Finally, Chefs Diet's unjust enrichment claim easily survives summary judgment.  To prevail on a claim of unjust enrichment, a plaintiff must show "1) that the defendant benefitted; 2) at the plaintiff's expense, and 3) that equity and good conscience require restitution."  *Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (internal quotation marks omitted).[5]  "The plaintiff has the burden to demonstrate not only that a benefit was conferred upon the defendants, but also that the defendants should have to compensate the plaintiff for the benefit conferred."  *Schatzki v. Weiser Capital Mgmt., LLC*, 995 F. Supp. 2d 251, 252 (S.D.N.Y. 2014), *aff'd sub nom. BPP Wealth, Inc. v. Weiser Capital Mgmt., LLC*, 623 F. App'x 7 (2d Cir. 2015).  The misappropriation of a trade secret — including customer lists — can cause the enrichment of the defendant at plaintiff's expense.  *See Pure Power Boot Camp*, 813 F. Supp. 2d at 535 ("Defendants did confer a benefit upon themselves . . . in stealing [Plaintiffs'] confidential business documents.  Moreover, this benefit was clearly acquired at Plaintiffs' expense.  After all, it was Plaintiffs, and not Defendants, who expended substantial time, resources, money, and effort to develop these materials."); *see also In re Cross Media*, 2006 WL 2337177, at *7 ("[Plaintiff's] unjust enrichment claim overlaps its misappropriation of trade secrets claim."); *JTH Tax, Inc. v. Gouneh*, 721 F. Supp. 2d 132, 139 (N.D.N.Y. 2010) (finding allegations that defendants acquired the plaintiff's "confidential customer lists through improper means and at its

---

[5]     It is a "well-settled principle[s] of New York law" that "the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter."  *Superintendent of Ins. v. Ochs (In re First Cent. Fin. Corp.)*, 377 F. 3d 209, 213 (2d Cir. 2004) (quotation marks omitted).  Defendants do not, however, seek dismissal of the unjust enrichment claim on that basis.  Further, recovery for unjust enrichment is not duplicative given the Court's dismissal of Chef Diet's breach-of-contract claim.

expense" and "used and benefitted from the use of these lists" sufficient to survive a motion to dismiss). Given that authority and the Court's discussion and conclusion with respect to the misappropriation-of-trade-secrets claim, there are plainly disputes of material fact precluding summary judgment on the unjust enrichment claim.

## THE *DAUBERT* MOTION

As noted, Defendants also move to preclude the report, opinion, and testimony of Chefs Diet's economic damages expert, Mario Perez. (*See* Docket 98 ("Defs.' *Daubert* Mem.)). Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony; specifically, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify" if:

> (a) the expert's scientific, technical, or other specified knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. It is the district court's task to "ensu[re] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993). This analysis is a "flexible" one that "depends upon the particular circumstances of the particular case at issue." *Floyd v. City of N.Y.*, 861 F. Supp. 2d 274, 286 (S.D.N.Y. 2012) (internal quotation makrs omitted). "Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith, or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Cohalan v. Genie Indust., Inc.*, 10-CV-2415 (JMF), 2013

WL 829150, at *5 (S.D.N.Y. Mar. 1, 2013) (internal quotation marks omitted).  In general, "the rejection of expert testimony is the exception rather than the rule."  *Floyd*, 861 F. Supp. 2d at 287 (internal quotation marks omitted).  Instead, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."  *Daubert*, 509 U.S. at 596.

Applying those standards here, there is no basis to preclude Chefs Diet's expert from testifying.  Defendants do not take issue with Perez's credentials, and for good reason: He is a forensic accountant and investigative auditor with over twenty-five years of experience, and he has testified at least six times as an expert witness at trial and at more than twenty depositions. (*See* Perez Decl.¶ 1).  Instead, Defendants contend that Perez used a flawed methodology to value Chefs Diet (specifically, by failing to give "any weight" to the sales price paid for the company in 2009 and by incorrectly applying the valuation formula that he did use); did not consider all relevant data; and made several unsupported assumptions.  (*See* Defs.' *Daubert* Mem. 3-4, 9-11).  Ultimately, however, all of those objections go to the weight of Perez's testimony rather than to its admissibility.  *See, e.g.*, *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (stating that "minor flaw[s] in an expert's reasoning or slight modification of an otherwise reliable method will not render an expert's opinion *per se* inadmissible"); *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995) ("Disputes as to the strength of [an expert's] credentials, faults in his use of different etiology as a methodology, or lack of textual authority for his opinion, go to the weight, not the admissibility, of his testimony."); *see also, e.g.*, *Discover Fin. Servs. v. Visa U.S.A., Inc.*, 582 F. Supp. 2d 501, 507 (S.D.N.Y. 2008) ("To the extent Defendants have any questions about the weight or sufficiency of the evidence upon which [the expert] relied, or the conclusions generated

therefrom, those questions can be asked on cross-examination."). Particularly where the opposing party has retained a rebuttal expert, as Defendants have here (*see* Docket No. 96, Ex. 3), "it should be left to the jury to decide which expert engaged in the proper analysis." *E.E.O.C. v. Bloomberg L.P.*, No. 07-CV-8383 (LAP), 2010 WL 3466370, at *7 (S.D.N.Y. Aug. 31, 2010).[6]

In short, the "adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony," *Amorgianos*, 303 F.3d at 267, and so Defendants' motion to exclude Perez from testifying is denied accordingly.

## THE MOTIONS TO SEAL AND REDACT

One housekeeping matter remains: By letter, the parties requested leave to file certain documents in redacted form. (*See* Docket Nos. 89, 110). Filings that are "relevant to the performance of the judicial function and useful in the judicial process," however, are considered "judicial documents" to which a presumption in favor of public access attaches. *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (internal quotation marks omitted). Moreover, the mere fact that information is subject to a confidentiality agreement between litigants is not a valid basis to overcome that presumption. *See, e.g.*, *United States v. Wells Fargo Bank N.A.*, No. 12-CV-7527 (JMF), 2015 WL 3999074, at *4 (S.D.N.Y. June 30, 2015)

---

[6]       In their reply memorandum of law, Defendants also contend that Perez should be precluded from testifying because he failed to attach to his report the documents and exhibits upon which he relied. (*See* Docket No. 114, at 3-4). But Perez provided an Attachment listing the materials, all of which were apparently produced to Defendants as part of discovery. (Perez Decl. ¶¶ 6-7). Accordingly, there is no basis to preclude Perez from testifying on that ground. *See, e.g.*, *Lab Crafters, Inc. v. Flow Safe, Inc.*, No. 03-CV-4025 (SJF) (ETB), 2007 WL 7034303, at *5 (E.D.N.Y. Oct. 26, 2007) (qualifying an expert as having relied on sufficient facts and data where his "report include[d] a list of data and documents that [he] reviewed in connection with the creation of his report"); *Genon Mid-Atl., LLC v. Stone & Webster, Inc.*, No. 11-CV-1299 (HB), 2012 WL 1372150, at *3 (S.D.N.Y. Apr. 18, 2012) (similar). (In light of that conclusion, the Court need not and does not consider Chefs Diet's proposed sur-reply with respect to the *Daubert* motion. (*See* Docket No. 115).)

(citing cases).  Thus, the parties are ORDERED to show cause, in writing, why the listed documents should remain filed under seal or in redacted form within **two weeks** of the date of this Opinion and Order.  If, within two weeks, neither party makes a filing arguing why a particular document should remain under seal or in redacted form, the parties shall promptly file the relevant documents on ECF.

## CONCLUSION

For the reasons stated above: (1) Defendants' motion for summary judgment is GRANTED in part and DENIED in part; and (2) Defendants' motion to exclude Chefs Diet's expert is DENIED.  More specifically, the following claims survive for trial: trademark infringement and unfair competition under the Lanham Act and New York law (Counts I, II, III, and VII); misappropriation of trade secrets (Count VI); replevin (Count XI); breach of fiduciary duty (Count V); and unjust enrichment (Count IX).  By contrast, the following claims must be and are dismissed: violation of New York General Business Law Section 349 (Count IV); violation of the CFAA (Count VIII); conversion (Count X); and breach of contract (Count XII). Finally, the parties are ordered to: (1) promptly confer with respect to whether Chefs Diet should be given the opportunity to depose Defendants' three new affiants before trial and to submit a joint letter on that issue **within a week** of this Opinion and Order; and (2) show cause, in writing, within **two weeks** of the date of this Opinion and Order why the documents they filed under seal or in redacted form should remain filed in that state.

Per the Case Management Plan and Scheduling Order (Docket Nos. 27, 56), **within thirty days** of this Opinion and Order, the parties shall submit to the Court for its approval a Joint Pretrial Order prepared in accordance with the Court's Individual Rules and Practices and Rule 26(a)(3) of the Federal Rules of Civil Procedure.  The parties shall also follow Paragraph 5

of the Court's Individual Rules and Practices, which identifies submissions that must be made at or before the time of the Joint Pretrial Order, including any motions *in limine*.

If this action is to be tried before a jury, joint requests to charge, joint proposed verdict forms, and joint proposed *voir dire* questions shall be filed on or before the Joint Pretrial Order due date in accordance with the Court's Individual Rules and Practices.  Jury instructions may not be submitted after the Joint Pretrial Order due date, unless they meet the standard of Rule 51(a)(2)(A) of the Federal Rules of Civil Procedure.  If this action is to be tried to the Court, proposed findings of fact and conclusions of law shall be filed on or before the Joint Pretrial Order due date in accordance with the Court's Individual Rules and Practices.  Unless the Court orders otherwise for good cause shown, the parties shall be ready for trial approximately two weeks after the Joint Pretrial Order is filed.

Finally, if the parties are interested in a settlement conference before the assigned Magistrate Judge, they shall so advise the Court by joint letter as soon as possible.

The Clerk of Court is directed to terminate Docket Numbers 90 and 94.


SO ORDERED.

Dated: September 28, 2016
       New York, New York

JESSE M. FURMAN
United States District Judge

# APPENDIX



